1   KELLY M. KLAUS (State Bar No. 161091)
    kelly.klaus@mto.com
2   ERIN J. COX (State Bar No. 267954)
    erin.cox@mto.com
3   JORDAN D. SEGALL (State Bar No. 281102)
    jordan.segall@mto.com
4   MUNGER, TOLLES & OLSON LLP
5   560 Mission Street, Twenty-Seventh Floor
    San Francisco, California 94105
6   Telephone:    (415) 512-4000
    Facsimile:    (415) 512-4077
7

8   Attorneys for Defendants

9
                    UNITED STATES DISTRICT COURT
10
        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
11

12

13  KELLY WILSON,                          Case No. 3:14-cv-01441-VC

            Plaintiff,                     **DEFENDANTS' NOTICE OF MOTION
14                                         AND MOTION FOR SUMMARY
                                           JUDGMENT; MEMORANDUM OF
15        vs.                              POINTS AND AUTHORITIES IN
                                           SUPPORT THEREOF; OPPOSITION TO
16  THE WALT DISNEY COMPANY, DISNEY        PLAINTIFF'S MOTION FOR PARTIAL
    ENTERPRISES, INC., WALT DISNEY         SUMMARY JUDGMENT**
17  PICTURES, and WALT DISNEY MOTION
    PICTURES GROUP, INC.,                  **[Declarations of Erin J. Cox, Peter Del
18                                         Vecho, Matt Roberts, and Edwin Fabian
            Defendants.                    filed concurrently herewith]**
19
                                           **REDACTED VERSION OF DOCUMENT
20                                         SOUGHT TO BE SEALED**
21
                                           Judge:   Hon. Vince G. Chhabria
22                                         Date:    April 9, 2015
23                                         Time:    10:00 a.m.
                                           Ctrm:    4
24

25

26

27

28

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on April 9, 2015, at 10:00 a.m., in the Courtroom of the Honorable Vince G. Chhabria, located at 450 Golden Gate Avenue, San Francisco, California, Defendants The Walt Disney Company, Disney Enterprises, Inc., Walt Disney Pictures, and Walt Disney Motion Pictures Group, Inc. (collectively, "Disney" or "Defendants") will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Defendants as to Plaintiff's claims for copyright infringement and declaratory judgment in the above-captioned case. This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities attached hereto; the Declarations of Erin J. Cox, Peter Del Vecho, Matt Roberts, and Edwin Fabian and supporting exhibits filed concurrently herewith; any reply papers that may be submitted by Defendants; oral argument of counsel; the complete files and records in this action; and such additional matters as the Court may consider.

## STATEMENT OF THE ISSUE

Whether Defendants are entitled to summary judgment in view of the absence of a material factual dispute concerning: (1) lack of access (no one involved in the conception or development of the allegedly infringing work, Defendants' *Frozen* teaser trailer, had access to *The Snowman* before creating the teaser trailer); (2) lack of substantial similarity between the works (under the extrinsic test, any incidental commonalities between the works flow from the unprotectable concept of a snowman competing with an animal over a carrot nose and must be filtered out); and (3) Defendants' independent creation of the *Frozen* teaser trailer (the undisputed evidence shows that Disney developed the teaser trailer independently of *The Snowman*).

DATED: March 12, 2015                    MUNGER, TOLLES & OLSON LLP


By:      */s/ Kelly M. Klaus*
                              _____
                              KELLY M. KLAUS
                              Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS ......................................................................................... 2

    A.  There Is No Evidence That Anyone Involved In the Creation of the *Frozen* Teaser Trailer Had Access to *The Snowman.* .......................................... 2

        1.  There Is No Evidence That Plaintiff's or Wrischnik's Job Applications Gave Any Direct or Intermediary Access to The Snowman. ......................................................................................... 2

        2.  There Is No Evidence of Access Through Any Film Festivals. .................... 7

        3.  There Is No Evidence of Access Through Plaintiff's and Wrischnik's Internet Postings. ...................................................... 9

    B.  The Evidence Conclusively Proves Disney's Independent Creation of the *Frozen* Teaser Trailer. ....................................................................... 11

    C.  Plaintiff Conducted Abundant Discovery to Try to Prove Her Theory. ................. 14

III. ARGUMENT .............................................................................................................. 14

    A.  Plaintiff's Speculation and Reliance on Incorrect Legal Standards Do Not Create Triable Issues of Access or Substantial Similarity. ..................................... 15

        1.  Plaintiff Has No Evidence of Access. ...................................................... 15

        2.  The Teaser Trailer and Plaintiff's Work Are Not Substantially Similar As a Matter of Law. ....................................................................... 20

    B.  Disney Is Entitled to Summary Judgment on the Basis of Its Undisputed Evidence of Independent Creation. .............................................................. 23

IV. CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Armour v. Knowles*,
   512 F.3d 147 (5th Cir. 2007) ................................................................. 17

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
   581 F.3d 1138 (9th Cir. 2009) ...................................................... 16, 17, 19

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) ............................................ 17, 18

*Building Graphics, Inc. v. Lennar Corp.*,
   866 F. Supp. 2d 530 (W.D.N.C. 2011) .................................................. 20

*Briggs v. Blomkamp*,
   -- F. Supp. 3d --, 2014 WL 4961396 (N.D. Cal. Oct. 3, 2014) ........................... 15, 19

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ......................................................... 15, 21

*Chafir v. Carey*,
   2007 WL 2702211 (S.D.N.Y. Sept. 17, 2007) ........................................ 20

*Chivalry Film Productions v. NBC Universal, Inc.*,
   2006 WL 3780900 (S.D.N.Y. Dec. 22, 2006) ..................................... 15, 23

*Cox v. Abrams*,
   1997 WL 251532 (S.D.N.Y. May 14, 1997) ............................................ 18

*Dimmie v. Carey*,
   88 F. Supp. 2d 142 (S.D.N.Y. 2000) ............................................. 19, 23

*Funky Films, Inc. v. Time Warner Entertainment Co.*,
   462 F.3d 1072 (9th Cir. 2006) ......................................................... 14

*Gable v. NBC*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010) ................................................. 17

*Hayes v. Minaj*,
   No. 2:12-cv-07972-SVW-SH, Dkt. 319, *slip op.* (C.D. Cal. Aug. 13, 2013) .................. 19, 20

*In re Novatel Wireless Securities Litigation*,
   846 F. Supp. 2d 1104 (S.D. Cal. 2012) ................................................. 22

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003) ............................................................. 19

-ii-

**TABLE OF AUTHORITIES**
(continued)

Page

*Kenney v. Warner Bros. Entertainment Inc.*,
    984 F. Supp. 2d 9 (D. Mass. 2013) ........................................................................ 20

*Mattel, Inc. v. MGA Entertainment, Inc.*,
    616 F.3d 904 (9th Cir. 2010) ................................................................................. 21

*Meta-Film Associates, Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984) ...................................................................... 18

*Moore v. Lightstorm Entertainment*,
    992 F. Supp. 2d 543 (D. Md. 2014) ....................................................................... 18

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F. Supp. 2d 500 (S.D.N.Y. 2008) ................................................................... 19

*Olson v. Tenney*,
    466 F. Supp. 2d 1230 (D. Or. 2006) ...................................................................... 18

*Roth Greeting Cards v. United Card Co.*,
    429 F.2d 1106 (9th Cir. 1970) ............................................................................... 15

*Scholastic Inc. v. Speirs*,
    28 F. Supp. 2d 862 (S.D.N.Y. 1998) ..................................................................... 23

*Selle v. Gibb*,
    741 F.2d 896 (7th Cir. 1984) ................................................................................... 2

*Selletti v. Carey*,
    177 F.R.D. 189 (S.D.N.Y. 1998) ........................................................................... 25

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) ............................................................................... 21

*Silberstein v. Fox Entertainment Group, Inc.*,
    424 F. Supp. 2d 616 (S.D.N.Y. 2004) ................................................................... 24

*Stewart v. Wachowski*,
    574 F. Supp. 2d 1074 (C.D. Cal. 2005) ................................................................. 15

*Tomasini v. Walt Disney Co.*,
    84 F. Supp. 2d 516 (S.D.N.Y. 2000) ..................................................................... 19

**RULES**

Federal Rule of Civil Procedure 30(b)(6) ................................................................... 14

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page

OTHER AUTHORITIES

4 NIMMER ON COPYRIGHT § 13.02[B] (2005 ed.)..........................................................................15

3 NIMMER ON COPYRIGHT § 12.10[B][2][b] (2014 ed.) ...............................................................23

DEFENDANTS' OPENING SUMM. J. BRIEF
3:14-CV-01441-VC

1

## I.     INTRODUCTION

2       Disney did not copy *The Snowman*.  After deposing nine witnesses and receiving nearly

3   80,000 pages of documents through discovery, Plaintiff has not a shred of evidence that anyone

4   involved with the *Frozen* teaser trailer knew of *The Snowman*—much less that anyone had an

5   opportunity to see it—before completing the teaser trailer.  Under the extrinsic test, the two works

6   are not substantially similar as a matter of law.  Either of these deficiencies dooms Plaintiff's

7   claim.  But there is a third ground for summary judgment: the undisputed evidence conclusively

8   shows that Disney developed the teaser trailer independently of *The Snowman*.[1]

9       Plaintiff's access theory is a jumble of conjecture.  Plaintiff asserts that she and her co-

10  creator Neil Wrischnik included or referenced *The Snowman* in multiple job applications to

11  Disney, Pixar, and affiliates.  Many of these applications *pre-dated* Plaintiff's film and so could

12  not have provided access.  There is no evidence that any of the applications made their way past

13  the recruiting departments, which act as gatekeepers between submitters such as Plaintiff and the

14  people who create Disney's animated films.  Plaintiff also asserts that "Defendants" saw *The*

15  *Snowman* at film festivals.  But Plaintiff's evidence shows only that her work was screened at two

16  film festivals attended by *Pixar*, not Disney Animation, employees; those Pixar employees had

17  nothing to do with the teaser trailer.  There is no evidence that any of those people discussed even

18  the film festivals—much less Plaintiff's film—with anyone involved with the teaser trailer.

19  Finally, Plaintiff speculates that people involved with the teaser trailer viewed her film on

20  YouTube or Vimeo in early January 2013, when Plaintiff surmises Disney was meticulously

21  copying *The Snowman*.  This is pure speculation, and the evidence positively refutes the charge.

22      Recognizing she has no evidence of access, Plaintiff argues that she does not need any

23  because Disney supposedly admitted that the two works are "strikingly similar."  The email that

24  Plaintiff cites for this was written by an effects artist upon his first viewing of Plaintiff's posting,

25

26  _____

[1] Citing Disney's 12(b)(6) motion, Plaintiff asserts that Disney does not deny copying.  (Pl.'s Mot.
at 1.)  That is wrong.  Disney had to argue objective similarity at the dismissal stage because
27  procedural constraints precluded Disney from submitting evidence refuting Plaintiff's allegations.
This is summary judgment; the undisputed evidence shows there was no copying.

28

which was *after* the teaser trailer's release.  This and other emails Plaintiff cites in fact undermine her theory of copying; they all speak of surprise, not guilt, upon learning of *The Snowman*.  The email is not and does not purport to be an admission of the legal standard, namely, that the works share a "similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded."  *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984).  Even if Plaintiff could show a high degree of similarity—which she cannot—that still would not satisfy her burden to prove access: "The plaintiff must always present sufficient evidence to support a reasonable possibility of access because *the jury cannot draw an inference of access based upon speculation and conjecture alone*."  *Id.* (emphasis added).

Apart from lacking proof of access, Plaintiff's claim fails because the two works are not substantially similar under the extrinsic test.  Plaintiff now admits—as she must—that "a snowman losing and competing for his carrot nose on an ice pond with an animal antagonist" is a "basic idea," (Pl.'s Mot. at 17), which copyright does not protect.  Elements inherent in any expression of this basic idea cannot be protected by themselves or in a sequence that flows from it.  Plaintiff's current submission fails to establish substantial similarity as a matter of law.

Finally, the undisputed evidence proves Disney independently created the teaser trailer.  Brainstorming meeting minutes and storyboard drawings document step-by-step, and in minute detail, the independent exchange of ideas that resulted in the teaser trailer.

## II.    STATEMENT OF FACTS

### A.    There Is No Evidence That Anyone Involved In the Creation of the *Frozen* Teaser Trailer Had Access to *The Snowman.*

#### 1.    *There Is No Evidence That Plaintiff's or Wrischnik's Job Applications Gave Any Direct or Intermediary Access to* The Snowman.

Plaintiff's copyright covers a version of *The Snowman* completed in 2010; Plaintiff's declaration pegs August 2010 as the completion date for her film.  (Cox Decl., Ex. 2 (copyright registration); Ex. 1 (Wilson Dep. 229:17–20); Wilson Decl. ¶¶ 4, 8.)  Plaintiff offers no evidence that the full version of *The Snowman*—or even clips from a working version—was ever submitted to Defendants, Pixar, or any Disney affiliate.  Several applications that Plaintiff cites *pre-dated* her completion of *The Snowman*, and thus could not have contained the film.  This fact alone

-2-

undermines Plaintiff's access contentions.  As to all applications—pre- and post-dating *The Snowman*'s completion—there is no evidence that any made it past a company recruiter.  As is common in the industry, Disney and Pixar recruiters are separate from the people who animate motion pictures.  The recruiters' receipt and/or review of an application does not constitute access.

(a)   Applications Submitted Before the August 2010 Completion of *The Snowman*

Plaintiff admits that her March 2008 application for a summer internship at Pixar merely "lists *The Snowman* as in production."  (Pl.'s Mot. at 8 n.4.)  In September 2008, Plaintiff applied for a secretarial position for an ABC drama series.  (Cox Decl., Ex. 5 at TWDC_18; Ex. 6 at TWDC_14.)  While Plaintiff's *brief* asserts that the latter application included "a portfolio containing still shots from *The Snowman*," (Pl.'s Mot. at 8 n.5, citing Barteau Decl., Ex. 35), Plaintiff's *declaration* does not attest to that fact, and her attorney's declaration (which is not competent on the fact) instead states the materials were sent to Pixar.  (*See* Barteau Decl. ¶ 36.)

Wrischnik then applied for an internship with Walt Disney Animation Studios in December 2008.  Plaintiff asserts that the application included a DVD reel of Wrischnik's animation, but then admits that "*[i]t is unknown* whether this reel contained parts of *The Snowman*."[2]  (Pl.'s Mot. at 9 n.13 (emphasis added).)

Six months later, in June 2009, Wrischnik applied online for an animator position with Walt Disney Animation Studios.  (Roberts Decl. ¶¶ 10–11, Ex. 1.)  He uploaded a digital reel with this application, which did not contain any clips from *The Snowman*.  (*Id.* ¶¶ 11, 13–14, Ex. 2 (DVD of Wrischnik's June 2009 reel produced from the Walt Disney Animation Studios recruiting database).)  Plaintiff in fact concedes that Wrischnik's June and July 2009 applications to Walt Disney Animation Studios only *referenced The Snowman* on his resume, and that the reel allegedly submitted to Pixar in July 2009 also did not include clips from the film.  (Pl.'s Mot. at 9 nn.14–16.)  According to her attorney's declaration (but not her own), Plaintiff sent Pixar a

---

[2] It *is* known that the reel did not contain *The Snowman*.  In January 2014, Wrischnik forwarded Plaintiff his December 2008 submission form (which Plaintiff cites) and admitted that "The snowman did not exist at this time."  (Cox Decl., Ex. 7.)

-3-

1   portfolio with still images twice in October 2009.  (Barteau Decl. ¶¶ 37–38.)  Only two pages,

2   consisting of character sketches and a few stills, related to *The Snowman*.  (*Id*., Exs. 36–37.)

3          Plaintiff next asserts that she and Wrischnik sent a slew of applications to Walt Disney

4   Animation Studios and Pixar entities in 2010.  All of these pre-dated *The Snowman*'s completion,

5   and again there is no competent evidence the applications included all or part of the film.

6   Plaintiff's *brief* says that in January and February 2010, Wrischnik submitted reels to Pixar that

7   purportedly included "part" of *The Snowman.*  (Pl.'s Mot. at 9 nn.17–18.)  Tellingly, however,

8   Plaintiff provides no evidence to support her assertion—no reels and no declaration from a witness

9   with personal knowledge.[3]  Plaintiff likewise offers no evidence that Wrischnik submitted reels

10  "featuring *The Snowman*" to Walt Disney Animation Studios in April 2010 or to Pixar Canada in

11  March 2010.  (Pl.'s Mot. at 9 nn.19–20; Barteau Decl., Exs. 49-50.)  Even the inadmissible

12  averments in her attorney's declaration do not establish that all or part of *The Snowman* was

13  included with Wrischnik's applications.  (Barteau Decl. ¶¶ 50–51.)

14         Though Plaintiff's brief asserts that Wrischnik's application to Walt Disney Animation

15  Studios was submitted in April 2010, the materials that Plaintiff's lawyer submits to evidence this

16  submission are undated, (*id.*, Ex. 49), and the record shows only an application from *March* 2010.[4]

17  In the absence of any evidence to the contrary, the only reasonable inference is that Wrischnik sent

18  the same animation clips to Walt Disney Animation Studios in March 2010 that he sent to Pixar

19  Canada around the same time—i.e., clips that did not include anything from *The Snowman*.

20  (Roberts Decl. ¶¶ 12–14, Ex. 4 (DVD of Wrischnik's March 2010 reel produced from the Walt

21  Disney Animation Studios recruiting database).)

22

23

24  ───────────────────

25  [3] The assertions by Plaintiff's attorney concerning the fact and content of the submissions, (*see* Barteau Decl. ¶¶ 48–49), are not admissible on summary judgment.  *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

26

27  [4] Records from the Walt Disney Animation Studios recruiting department reflect that Wrischnik applied on March 23, 2010.  (Roberts Decl. ¶¶ 10, 12, Ex. 3.)  The reel submitted with this application does not contain anything from *The Snowman*.  (Roberts Decl. ¶¶ 12–14, Ex. 4.)

28

(b)     Applications Submitted After the August 2010 Completion of *The Snowman*

Oddly, Plaintiff does not contend that either she or Wrischnik submitted a reel to Walt Disney Animation Studios or Pixar after *The Snowman* was completed.  Plaintiff instead cites four more purported "applications" from September and November 2011 and February 2012 in which she only listed her personal website.  (Pl.'s Mot. at 8–9 & nn. 8–12.)  Plaintiff does *not* declare that the completed version of *The Snowman* was available on her website at the time of these submissions, because the evidence does not support that fact.[5]

Plaintiff testified that, from the homepage of her website, "you can click on the snowman art and you can get to the film."  (Cox Decl., Ex. 1 (Wilson Dep. 174:7–13).)  In clicking on the "snowman art" from the archived May 2010 homepage of Plaintiff's website,[6] the archive repository loads an archived page from ***October 2013***—four months after the *Frozen* teaser trailer had been published.  (Cox Decl. ¶ 8, Ex. 8.)[7]  Plaintiff's evidence thus fails to show that the "snowman art" on her website linked to *The Snowman* in May 2010; the evidence at most shows that *The Snowman* was available on her website *after* the *Frozen* teaser trailer was publicly available.  The evidence does not create an issue of fact on access.

Plaintiff's "application" to Playdom in September 2011 was not submitted through Playdom's online application portal, but rather was mailed indiscriminately to Playdom's offices.  (Barteau Decl., Ex. 38 at 4.)  Bruce Ferguson, a Playdom employee, emailed Plaintiff and encouraged her instead to visit Playdom's job page online and submit her resume there.  (*Id.*)  In

---

[5] Plaintiff states in her brief, "*The Snowman* has been available on www.kellywilsonfilms.com since at least May 12, 2010," citing to a document that Plaintiff did not produce in discovery or refer to in her deposition.  (Pl.'s Mot. at 7; Barteau Decl. ¶ 31; Cox Decl., Ex. 1 (Wilson Dep. 174:25–175:4 (stating *The Snowman* was posted to Plaintiff's website at some point "between May 2010 to January of 2012.  Sorry, can't give you more detail")).)  The archived page from May 2010 to which Plaintiff directs the Court merely shows a handful of still images from *The Snowman*—not even a clip from the film.  (Barteau Decl. ¶ 31, Ex. 30.)

[6] *See* Barteau Decl. ¶ 31 (directing Court to access archived webpage at https://web.archive.org/web/20100512184725/http://kellywilsonfilms.com/).

[7] The archived page from October 2013 is at https://web.archive.org/web/20131006233157/http://kellywilsonfilms.com/films_pages/snowman_Page.html.

-5-

1    November 2011, Plaintiff followed Ferguson's advice and applied online for two open positions at

2    Playdom.  (Cox Decl., Exs. 10–13; Ex. 9 (Dundas Dep. 83:19–102:22).)  The online application

3    prompts the applicant to answer a series of questions, including "Do you wish to upload artistic

4    portfolio materials?"  (*Id.*, Ex. 10 at TWDC_5; Ex. 11 at TWDC_11.)  For both positions, Plaintiff

5    answered, "No."  (*Id.*)  Recruiting database records produced by Defendants indicate that

6    Plaintiff's applications to Playdom were never reviewed.  (*Id.*, Ex. 12; Ex. 9 (Dundas Dep. 65:12–

7    66:4, 86:9–88:23, 91:6–92:1, 99:14–22).)

8         Plaintiff's September 2011 submission to Pixar was not in response to any job posting.

9    (*See* Barteau Decl., Ex. 39.)  On October 4, 2011, a human resources intern at Pixar manually

10   entered Plaintiff's name and email address into Pixar's recruiting database and sent Plaintiff an

11   email stating, "there doesn't appear to be an appropriate opportunity that matches your skill set."

12   (Cox Decl., Ex. 15 at PIXAR_1–4; Ex. 14 (Fabian Dep. 73:8–80:22); Ex. 16 at PIXAR_15; Ex. 3;

13   Ex. 1 (Wilson Dep. 211:21–212:12).)

14        Plaintiff's last cited "application," from February 2012, was an email to Kirk Scott at

15   Cinderbiter, a former Disney production subsidiary that created stop motion films.  (Cox Decl.,

16   Ex. 1 (Wilson Dep. 212:22–216:5).)  Plaintiff never heard back from anyone at Cinderbiter about

17   her application and, after an initial response, had no further contact with Mr. Scott.  (*Id.*)

18            (c)     Plaintiff's and Wrischnik's Actual Job Applications Never
                      Advanced Beyond an Initial Screen Conducted by a Recruiter.
19

20        The various recruiting departments to which Plaintiff and Wrischnik submitted

21   applications follow the same general procedures.  Resumes are first screened by a recruiter who is

22   assigned to recruit for an open position.  (Cox Decl., Ex. 9 (Dundas Dep. 85:15–86:14, 30:20–

23   31:15); Roberts Decl. ¶¶ 5–6; Fabian Decl. ¶¶ 4–5.)  The recruiter would not necessarily look at all

24   resumes; for instance, if an offer is extended to a candidate who accepts, a recruiter with The Walt

25   Disney Company can disqualify all other applicants for the position through the recruiting

26   database without reviewing the resumes.  (Cox Decl., Ex. 9 (Dundas Dep. 66:2–67:8); *see also*

27   Fabian Decl. ¶¶ 4, 8–10 (describing Pixar process).)  The recruiter determines whether an

28   applicant's submission should be forwarded to the "hiring manager," the department head seeking

-6-

to hire a new assistant, animator, or whatever role is needed. The recruiter is a gatekeeper; the hiring manager does not review an application unless the recruiter flags it for consideration. (Cox Decl., Ex. 9 (Dundas Dep. 30:20–31:5, 54:3–55:5); Roberts Decl. ¶¶ 6–8; Fabian Decl. ¶¶ 5–7.) There is no evidence that Plaintiff's or Wrischnik's applications ever made it past the recruiter screen. (*See., e.g.*, Roberts Decl. ¶ 13.) As to several of the applications, there is no evidence that even the recruiter reviewed the submissions. (Cox Decl., Ex. 9 (Dundas Dep. 65:12–66:1, 86:9–87:25, 90:19–92:1, 99:14–22); Fabian Decl. ¶¶ 9–10; *id.* at ¶¶ 4, 8 & Cox Decl., Exs. 15, 14 (Fabian Dep. 73:8–80:22).) In all cases, hard-copy reels submitted by unsuccessful applicants are shredded, and any resumes or artistic reels digitally uploaded to a recruiting database are accessible only by recruiters. (Roberts Decl. ¶ 9; Fabian Decl. ¶ 6; *see also* Cox Decl., Ex. 9 (Dundas Dep.15:17–16:24, 49:6–11, 74:12–76:24).)

2. *There Is No Evidence of Access Through Any Film Festivals.*

(a) 2011 San Francisco International Film Festival ("SFIFF")

Plaintiff's work was screened at the SFIFF along with a series of other short films, including one titled *Play by Play*, which several Pixar employees produced as an independent project. (Cox Decl., Ex. 17 (Baena Dep. 66:15–67:24).) Several Pixar employees attended the screening of *Play by Play* on May 1, 2011. (*See* Barteau Decl., Ex. 55; Cox Decl., Ex. 18; Barteau Decl., Ex. 56.) It is undisputed that *none* of these Pixar employees had anything to do with the *Frozen* teaser trailer.[8]

Plaintiff deposed *Play by Play*'s director, Carlos Baena, and executive producer, Elyse Klaidman, who both attended the May 1 screening. Baena did not remember seeing *The Snowman* and did not speak about the festival with anyone at Pixar other than the members of the *Play by Play* crew. (Cox Decl., Ex. 17 (Baena Dep. 153:10–155:24, 162:7–165:5).) In fact, Baena took a

---

[8] John Lasseter, the Chief Creative Officer of both Walt Disney Animation Studios and Pixar, was the *only* Pixar employee involved in the creation of the *Frozen* teaser trailer. There is no evidence of any other Pixar personnel taking part in the development of the teaser trailer in the nearly 80,000 pages of documents produced by Disney and Pixar. Walt Disney Animation Studios and Pixar employees each work on their own respective projects. (Cox Decl., Ex. 20 (Lasseter Dep. 17:4–18:8, 58:11–17).)

-7-

leave of absence from Pixar around the time of the film festival, and he never returned to Pixar. (*Id.* at 126:17–128:9, 150:17–151:8.)  Klaidman likewise did not remember seeing *The Snowman* at the festival or hearing anyone involved with *Play by Play* talk about *The Snowman* with anyone at Pixar or anywhere else.  (*Id.*, Ex. 19 (Klaidman Dep. 62:13–63:13).)  Neither Baena nor Klaidman received a DVD containing any of the shorts screened at the film festival.  (*Id.*, Ex. 17 (Baena Dep. 165:7–166:9); Ex. 19 (Klaidman Dep. 37:23–38:1).)

John Lasseter, the Chief Creative Officer of Walt Disney Animation Studios and Pixar, was not involved with *Play by Play* and did not attend the 2011 SFIFF.  (*Id.*, Ex. 19 (Klaidman Dep. 14:22–15:4, 33:17–21).)  Klaidman never discussed the festival with Lasseter.  (*Id.* at 37:5–7).  Baena did not speak to Lasseter at any point during the production of *Play by Play.*  (*Id.*, Ex. 17 (Baena Dep. 76:12–15).)  Lasseter himself did not see *The Snowman* before this lawsuit was filed and did not communicate with anyone from Pixar about the *Frozen* teaser trailer during the brainstorming or development process.  (*Id.*, Ex. 20 (Lasseter Dep. 11:10–23, 58:11–59:16).)

(b)     2012 Santa Barbara International Film Festival ("SBIFF") and Other Festivals

The SBIFF began on Thursday, January 26, 2012.  A Pixar animated short film, *La Luna,* was selected to screen that night.  (Cox Decl., Ex. 21 at PIXAR_2188; Ex. 22.)  The director of *La Luna,* Enrico Casarosa, attended the opening night screening, as did Chris Wiggum, a publicist at Pixar.  (Barteau Decl., Ex. 64 at PIXAR_2531.)  Laurel Ladevich, a Pixar employee in post-production, was there to help troubleshoot any technical issues with the screening.  (*Id.*)  There is no evidence that any of these three had anything to do with the *Frozen* teaser trailer or that they discussed anything about the SBIFF with anyone.  There is no evidence that any of them even saw *The Snowman*, because it did not screen at the Santa Barbara festival until January 28, two days *after* the screening of *La Luna.*  (Pl.'s Mot. at 11 (citing Barteau Decl., Ex. 61).)

Lacking any evidence that any of these individuals even saw *The Snowman*—much less that they discussed it with anyone involved with the teaser trailer—Plaintiff is reduced to rank speculation, which is not only inadmissible but refuted by the documents Plaintiff cites.  For example, Plaintiff presumes, with no evidence, that "it is reasonably likely that Enrico Casarosa

-8-

attended a screening of *The Snowman* at the festival." (*Id*. at 12.)  But Plaintiff cites Casarosa's itinerary, (*id*. at 11), which shows that he was scheduled to travel back to Berkeley on January 27, and therefore could not have seen *The Snowman* on January 28.  (Barteau Decl., Ex. 64 at PIXAR_2532.).

Denise Ream, a producer on Pixar's *Cars 2*, was slated to speak on a women's panel at the film festival on January 28, at 2 p.m.  Plaintiff again speculates that it is "reasonably likely" that Ream and Wiggum "would attend the screening of short animated films that morning."  (Pl.'s Mot. at 11-12.)  Ream's itinerary, which Plaintiff submits, shows that Ream's flight to Burbank was scheduled to land at 9:35 a.m. on Saturday morning; after collecting her bags and traveling another 85 miles by car, Reams was scheduled to arrive in Santa Barbara at 12:30 p.m.  (Barteau Decl., Ex. 67 at PIXAR_2599–600.)  Plaintiff's film screened at 10:00 a.m.  (*Id*., Ex. 61.)

Plaintiff also points to the fact that her work was submitted to several other film festivals, but there is no evidence that anyone involved with the *Frozen* teaser trailer (or anyone connected to any of those people) attended any of those film festivals, much less that they saw *The Snowman*.

> ### 3.   *There Is No Evidence of Access Through Plaintiff's and Wrischnik's Internet Postings.*
>
> #### (a)   Evidence Produced by Plaintiff Shows That the Only Individuals from California Who Watched *The Snowman* on YouTube Between Its Upload Date and January 19, 2013 Were Plaintiff and Wrischnik.

Plaintiff asserts that, by accessing the video on YouTube, "eleven people in California viewed *The Snowman*" during what she calls a "critical time period" of alleged copying (January 9–15, 2013).  (Pl.'s Mot. at 22.)  But each of those 11 viewings in California is attributable to either Plaintiff or Wrischnik.  Plaintiff further states that "[i]t is reasonably likely that someone involved with the creation of the *Frozen* teaser trailer was researching ideas on the Internet and viewed *The Snowman* as a result of a search for 'snowman cartoons for children' on YouTube." (*Id.* at 22–23.)  However, this search *did not* originate from California, and the person who conducted it watched only one minute and 10 seconds of the four-and-a-half minute video.

A day-by-day analysis of the traffic to *The Snowman* during the supposed "critical time period" forecloses any possibility of access by anyone involved with the *Frozen* teaser trailer:

- Wrischnik uploaded *The Snowman* on January 10, 2013.  Wrischnik watched it four times that day.  No one else watched the video on January 10.  Wrischnik emailed Plaintiff the posting around 9:30 p.m.  (Cox Decl. ¶¶ 23–26, 53, Exs. 23–26.)

- On January 11, one person from California visited *The Snowman*'s page on YouTube—the evidence strongly shows it was Plaintiff herself.  She accessed it five times.  (*Id.* ¶¶ 25, 27–29, 54, Exs. 25, 27–29.)

- On January 12, one person from California accessed the video—and viewed it for *0 seconds*.  This was one of the same users from the two previous days—either Wrischnik or Plaintiff.  One other person from an "unknown region" navigated to the page by searching for "snowman and rabbit," and then watched the video for a total of **56 seconds**—stopping before the Snowman tried to step foot on the ice and before the rabbits reached the far end of the pond.  (*Id.* ¶¶ 25, 30–31, 55, Exs. 25, 30–31.)

- On January 13, 2013, one person from California—either Wrischnik or Plaintiff—watched *The Snowman* for **9 seconds**.  (*Id.* ¶¶ 25, 28, 32, 56, Exs. 25, 28, 32.)

- No one in the United States accessed *The Snowman* on YouTube on January 14, 2013.  (*Id.* ¶¶ 25, 33, 57, Exs. 25, 33.)

- On January 15, 2013, one person in the U.S. accessed *The Snowman* by conducting a YouTube search for "snowman cartoons for children."  Although Plaintiff omits the daily view log for that day (she included logs for January 11–13), the various other analytics produced reveal that the viewer was *not* from California and the viewing lasted **one minute and 10 seconds**—just after the Snowman had taken his first step onto the ice and then jumped back onto the embankment.  (*Id.* ¶¶ 29, 34, 58, Exs. 29, 34.)

- No one in the world watched *The Snowman* on YouTube on January 16, 17, or 19.  One person from the U.S.—but not from California—watched **30 seconds** of it on January 18.  (*Id.* ¶¶ 25, 33–35, 59, Exs. 25, 33–35.)

On the basis of a total viewing time of *0 seconds* by people in California other than herself or Wrischnik, Plaintiff asserts that "the storyboards for the teaser trailer went from looking nothing like *The Snowman*" to "looking strikingly similar to *The Snowman*."  (Pl.'s Mot. at 7.)  Putting aside that the works are not strikingly (or even substantially) similar, the point here is that, for Plaintiff's theory to hold water, some storyboard artist in California would have needed to watch *The Snowman*—all four minutes and 31 seconds of it, not fragments at the start—and would have needed to do that repeatedly.  No evidence supports Plaintiff's conjecture; the actual evidence disproves it.

-10-

(b)     Plaintiff's Own Facebook Friends Comprised the Audience for *The Snowman* on Vimeo.

Plaintiff asserts that "*The Snowman* was loaded 267 times and played 124 times on Vimeo" in January 2013.  (Pl.'s Mot. at 7.)  Plaintiff presents no evidence that anyone involved with the *Frozen* teaser trailer accounted for these viewings and omits the fact that 115 of the plays occurred over the three-day period after Plaintiff and her friends circulated the link on Facebook.

Wrischnik uploaded *The Snowman* to Vimeo in the first week of November 2012; by the end of the year, the video had been played eight times in the U.S.  (Cox Decl. ¶ 36, Ex. 36.)  The video was not played even once in the first week of 2013.  (*Id.* ¶ 37, Ex. 37.)  On the morning of January 8, Dan Phillips, an animator who worked on *The Snowman*, sent a Facebook message to Plaintiff asking for a link to the Vimeo page so he could share it on his Facebook wall.  (*Id.* ¶ 39, Ex. 39 at 4.)  By 10:00 a.m., Phillips had posted the link to Facebook, encouraging friends to watch.  (*Id.* ¶ 40, Ex. 40.)  Phillips's post was "shared" by two of his Facebook friends, meaning that the post was replicated on their own Facebook pages.  (*Id.*)  By 5:30 p.m., *The Snowman* received another 26 viewings.  (*Id.* ¶ 4, Ex. 4; Ex. 1 (Wilson Dep. 185:12–186:20).)  In a "chat" with Wrischnik, Plaintiff asked, "should i share this link too? or upload it to my page myself?" (*Id.*)  By 5:50 p.m., Plaintiff had uploaded the link to her own page, and another three of her Facebook friends shared the link on their Facebook walls.  (*Id.*, Ex. 41; *see also* Exs. 42–43.)  Between 5:30 p.m. and midnight, the video was watched another 38 times, bringing the total plays for this one day to 64.  (*Id.* ¶ 37, Ex. 37.)  On January 9, the video was played 36 times, and another 15 times on January 10.  (*Id.*)

Viewership on Vimeo dropped off precipitously during the purportedly "critical time period" in which Plaintiff speculates copying occurred.  (Pl.'s Mot. at 22.)  There was one play per day on January 11, 12, 14, 15, and 16, and none at all on January 13 or 17.  (Cox Decl. ¶ 37, Ex. 37.)  Once again, the actual facts of viewing undermine Plaintiff's conjecture.

**B.      The Evidence Conclusively Proves Disney's Independent Creation of the *Frozen* Teaser Trailer.**

The *Frozen* creative team developed the idea for the teaser trailer in a series of collaborative brainstorming sessions beginning in January 2013.  Plaintiff claims that none of

-11-

1    these brainstorming sessions yielded any ideas reflected in the final teaser trailer until a January 15

2    pitch meeting.  (Pl.'s Mot. at 3.)  That is false.  Plaintiff submits only two sets of Disney's

3    brainstorming minutes for the teaser trailer and suggests that the process was short and rushed.

4    (Barteau Decl., Exs. 7, 9.)  In fact, Disney provided Plaintiff with numerous minutes spanning a

5    three-month period.  (Del Vecho Decl. ¶ 6, Ex. 1.)  The minutes record the creative process in rich

6    detail and show indisputably that the plot of the teaser trailer developed organically over multiple

7    meetings, with no reliance on any outside work.  We summarize some details here but encourage

8    the Court to read the entirety of the minutes to see the creative process in action.

9          Development work began on January 7, 2013, when members of the *Frozen* creative team,

10   including directors Chris Buck and Jennifer Lee, head of story Paul Briggs, producer Peter Del

11   Vecho, and several employees from Disney's story and animation departments gathered for that

12   purpose.  (*Id.* ¶ 9.)  Brainstorming meetings with a creative team all together in a large conference

13   room, throwing out ideas and forming new ones, are a longstanding part of Disney's development

14   process.  (*Id.* ¶ 5.)  For the teaser trailer, this group considered ideas around several characters

15   from *Frozen*, but was particularly interested in ideas involving Olaf and Sven—characters likely

16   to have broad appeal and therefore naturals for a teaser trailer focused on nonverbal physical

17   comedy.  (*Id.* ¶ 10.)  The detailed minutes of the January 7 meeting show that the team considered

18   ideas that made their way into the final teaser trailer.  Lee proposed the idea of ███████████

19   ████████████  (*Id.*, Ex. 1 at WDP_1.)  ███████████████████████████████████

20   █████████████████████████  (*Id.* at WDP_1–3.)

21         Brainstorming continued with a second meeting on January 11.  (*Id.* ¶ 12.)  There, the team

22   discussed story ideas that could be storyboarded and pitched to Lasseter.  (*Id.*)  Again, some of the

23   ideas discussed in this meeting found their way into the teaser trailer.  ███████████████████

24   ████████████████████████████████████████████████████████████

25   ███████████████████████████  (*Id.*, Ex. 2 at WDP_41–42).  ███████████████

26   ███████████████████████████████████████████████████████████████

27   ████████████████████████████████████  (*Id.* at WDP_48–51.)

28

-12-

1    On January 15, the trailer team pitched these and other ideas to Lasseter.  (Del Vecho Decl.

2    ¶ 14.) ████████████████████████████████████████████████

3    ██████████ (Cox Decl., Ex. 20 (Lasseter Dep. 48:20–23); Del Vecho Decl., Ex. 2.)  The

4    minutes show the participants then had an active brainstorming session that reflected and built off

5    of the ideas in the storyboard pitches.  (Del Vecho Decl. ¶ 14.)  A number of the elements of the

6    teaser trailer emerged from this brainstorming. ████████████████████████

7    ███████████████████████████████████████ (*Id.*) ████

8    ████████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ██████████████████████████████████████████

12   ██████████ (*Id.* ¶ 15.) ████████████████████████████

13   ███████████████████████████████████████████

14   ████████████████

15
16   ███████████████████████████████████████
17   ███████████████████████████████████████

18   *Id.* at WDP_10.

19   The creative team continued to meet and refine the concepts for the teaser trailer over the

20   next several weeks. ████████████████████████████████████

21   ███████████████████████████████████████ (*Id.*,

22   Ex. 1 at WDP_11.) █████████████████████████████

23   ███████████████████████████████████████████████

24   █████████████████████████████

25   There is no evidence that anyone on the creative team consulted YouTube or other online

26   video sources for inspiration for the teaser trailer.  Briggs testified that he sometimes consults *non-*

27   *animated* images of animals or objects as a reference for their "anatomy, proportion, [or] scale,"

28   but that he never uses the internet for "character or story."  (Cox Decl., Ex. 44 (Briggs Dep.

-13-

39:23–40:21).)  Similarly, Buck testified that the only reason Disney employees would use YouTube is for technical details such as the physical appearance of snow or ice, never for ideas. (*Id.*, Ex. 46 (Buck Dep. 15:17–16:18).).  Even Plaintiff's purported "expert," Maureen Furniss, testified that in her more than 20 years of studying the history of animation by the Walt Disney Animation Studios, she was not aware of Disney *ever* using animated works by others as reference footage.  (*Id.*, Ex. 48 (Furniss Dep. 55:8–10, 55:17–56:16).)

   **C.    Plaintiff Conducted Abundant Discovery to Try to Prove Her Theory.**

   Early in discovery, Plaintiff deposed Peter Del Vecho—*Frozen*'s producer and the person responsible for the overall production of the teaser trailer—on numerous Rule 30(b)(6) topics relating to the conception and production of the teaser trailer.  (Cox Decl. ¶ 60.)  Plaintiff was able to examine Del Vecho about the detailed brainstorming minutes and storyboards demonstrating Defendants' independent creation.  (*Id.*)  Defendants also produced more than 72,000 pages from more than 40 Disney employees involved in the creation of the teaser trailer, and gigabytes of video and animation files that reflect the teaser's development.  (*Id.* ¶ 61.)  Pixar produced more than 6,000 pages of documents from the Pixar employees who may have attended film festivals where Plaintiff's work was screened.  (*Id.* ¶ 62.)  Defendants and Pixar both produced their documents relating to Plaintiff's and Wrischnik's job applications.  (*Id.* ¶ 63.)  Plaintiff deposed Matt Roberts, the recruiter at Walt Disney Animation Studios who personally reviewed the reels that Wrischnik submitted, and Andrea Dundas, the director of talent acquisition for The Walt Disney Company.  (*Id.*)  Plaintiff also deposed Edwin Fabian, a human resources analyst at Pixar, about the job-application and recruitment systems there and about Plaintiff's and Wrischnik's applications. (*Id.*) Plaintiff also deposed Baena, Briggs, Buck, Del Vecho, Klaidman, and Lasseter. (*Id.* ¶ 64.)

**III.    ARGUMENT**

   An infringement plaintiff must demonstrate "copying of constituent elements of the work that are original."  *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (citation omitted).  Where, as here, there is no direct evidence of copying, the plaintiff must show that defendants "had access to plaintiff's copyrighted work and that the works at issue are

-14-

substantially similar in their protected elements."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  No evidence supports Plaintiff's burden on either prong.

A copyright protects "against copying," not against the "coincidental[] duplicat[ion]" of the plaintiff's work through "an independently created work."  *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109–10 (9th Cir. 1970), *superseded on other grounds as stated in Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 616 n.5 (9th Cir. 2010).  "Summary judgment is appropriate where a plaintiff fails to offer evidence sufficient to raise a factual question about a defendant's proof of independent creation . . . ." *Chivalry Film Prods. v. NBC Universal, Inc.*, 2006 WL 3780900, at *2 (S.D.N.Y. Dec. 22, 2006).  The undisputed evidence conclusively proves that Disney did not copy Plaintiff's work.

### A.     Plaintiff's Speculation and Reliance on Incorrect Legal Standards Do Not Create Triable Issues of Access or Substantial Similarity.

#### 1.     *Plaintiff Has No Evidence of Access.*

##### (a)     Plaintiff Must Prove Access.

Recognizing that no evidence supports access, Plaintiff argues that the Court should relieve her of the obligation to prove it, purportedly because Defendants admitted that the two works are "striking[ly] similar[]."  (Pl.'s Mot. at 17.)  The argument fails legally and factually.

There is a "high bar" for the "strikingly similar" standard that Plaintiff cites: it means that "in human experience, it is *virtually impossible* that the two works could have been independently created."  *Briggs v. Blomkamp*, -- F. Supp. 3d --, 2014 WL 4961396, at *9 (N.D. Cal. Oct. 3, 2014) (emphasis added) (quoting 4 NIMMER ON COPYRIGHT § 13.02[B] (2005)).  Even if Plaintiff could meet that standard—and she cannot—Plaintiff would not be relieved of her burden to prove access.  The very case that Plaintiff relies on makes clear that "striking similarity" is "a means of proving access, not that it obviates the need to prove access."  *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1098 (C.D. Cal. 2005).  If the record does not reflect a reasonable possibility of access, not even striking similarity between the works will sustain an infringement claim.  *Id.* at 1100 & 1098 n.118.

The Court does not have to reach metaphysical questions about access; as a matter of law, there is no "striking similarity." *First*, Plaintiff argues that Disney "admitted" that there are striking similarities between the works because, following the release of the teaser trailer on June 18, 2013, a Disney effects artist, Sam Klock, emailed others a link to *The Snowman* and wrote, "Someone posted an interesting animated short from 2009 with striking similarities to our teaser." (Pl.'s Mot. at 17; Barteau Decl., Ex. 14.)  But Klock obviously was making a lay observation, not offering a legal opinion.[9]  Indeed, the reaction of Disney employees to learning of the existence of *The Snowman* affirms that any similarity between the works was coincidental.  Their reactions prove that none previously knew of *The Snowman*.  (*See* Barteau Decl., Ex. 18; Cox Decl., Ex. 47 at WDP_143, WDP_154 ("that was cute," and "Someone posted this as a response to our teaser— apparently an older short!!"); *id.*, Ex. 46 (Buck Dep. 69:9–72:13).)

*Second*, Disney's undisputed evidence of independent creation undermines any claim that it is "virtually impossible" the two works were created independently.

*Third*, Furniss, Plaintiff's proffered expert, offers a wholly conclusory (and inadmissible) opinion of striking similarity.  Furniss did not support that assertion with analysis or even purport to apply the controlling standards.  She excluded the possibility of independent creation without ever reviewing and evidence relating to the development of the teaser.  She did not review the brainstorming minutes, storyboards, production notes, or anything other than the two works.  (Cox Decl., Ex. 48 (Furniss Dep. 25:21–29:10).)  Furniss would not survive a *Daubert* motion excluding her testimony at trial, and her "report" does nothing to create a fact issue here.

In sum, Plaintiff must prove access.  As discussed below, she has no evidence of access.

           (b)      There Is No Evidence that Anyone Involved with the Teaser Trailer Had Access to Plaintiff's Work.

Plaintiff must prove a "reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work" before the alleged infringement.  *Art Attacks*

---

[9] Other alleged statements about the works' similarities made by anonymous commentators on the Internet or in emails from reporters are inadmissible hearsay that cannot be considered on summary judgment. *See Stewart*, 574 F. Supp. 2d at 1105.

*Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009).  Access "may not be inferred

through mere speculation or conjecture"; it must be based on "significant, affirmative and

probative evidence."  *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1053–

54 (C.D. Cal. 2010) (quotations omitted).  Plaintiff has no direct evidence of access, and so must

either "(1) establish[] a chain of events linking the plaintiff's work and the defendant's access, or

(2) show[] that the plaintiff's work has been widely disseminated."  *Art Attacks*, 581 F.3d at 1143.

"[P]laintiff can survive summary judgment only if [her] evidence is *significantly probative* of a

*reasonable opportunity* for access."  *Armour v. Knowles*, 512 F.3d 147, 153 (5th Cir. 2007).

(i)      Plaintiff's Theories Based on Applications and Film<br>Festivals Fail As a Matter of Law.

There is not a shred of evidence—in nine depositions and tens of thousands of pages of

documents—that anyone involved in the creation of the *Frozen* teaser trailer viewed Plaintiff's

work or even spoke with anyone about Plaintiff's work.  Plaintiff's access theory is premised on

the concept of "corporate receipt" by Pixar through its employees, which Plaintiff tries to impute

to all corporate affiliates of Pixar and all of their employees—including the creators of the teaser

trailer.  (*See* Pl.'s Mot. at 22 ("it is indisputable that Pixar viewed *The Snowman*"); *id*. at 12–13

(insisting that "Pixar's" purported access must be "imputed to Defendants").)  Plaintiff is wrong

on the law: "Plaintiff cannot create a triable issue of access merely by showing 'bare corporate

receipt' of his work by an individual who shares a common employer with the alleged copier."

*Gable v. NBC*, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010), *aff'd*, 438 F. App'x 587 (9th Cir. 2011)

(citations omitted).  Plaintiff's argument has been discarded for "mak[ing] little sense."  *Id.* at 827

n.8 (granting summary judgment on lack of access where plaintiff "argue[d] (without citation to

any relevant authority) that because TGA, the entity, received Plaintiff's screenplay, access can be

shown by the fact that [defendant] had an agency relationship with TGA").  "The case law

discussing access addresses whether actual persons are in a position vis-à-vis the creator to allow

for reasonable access.  Access is not a metaphysical concept, it requires a reasonable possibility

that the actual creator(s) has seen (or heard or read) the work which is allegedly infringed."  *Id.*  It

does not suffice to assemble a "tortuous chain of hypothetical transmittals" that show nothing

-17-

1    more than a "bare possibility of access."  *Olson v. Tenney*, 466 F. Supp. 2d 1230, 1235 (D. Or.

2    2006).

3          In *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346 (C.D. Cal. 1984), for

4    instance, the court found insufficient evidence of access where the plaintiff showed his work to a

5    director who was under contract with the defendant studio and worked on the studio lot, but could

6    not demonstrate any connection between the director and the studio's allegedly infringing project.

7    *Id*. at 1356–59.  Likewise, in *Bernal*, the court granted summary judgment against a plaintiff who

8    submitted her screenplay to a talent agent who worked with the agent representing the creator of

9    the allegedly infringing work, *Desperate Housewives*.  788 F. Supp. 2d at 1058.  "[T]he only

10   reasonable inference from the record" was that the two agents were "the type of distant colleagues

11   who occasionally engaged in idle chit-chat while riding the elevator together or attending an office

12   holiday party.  In short, they simply worked for the same company."  *Id.*

13         Plaintiff's access theory based on what she calls "Pixar's" viewing of *The Snowman* at the

14   2011 SFIFF requires the following insupportable leaps:  (1) that the director and executive

15   producer of *Play by Play* discussed *The Snowman* with people at Pixar (contrary to their

16   testimony); (2) that they or someone else reached out to Lasseter to describe in detail the plot,

17   mood, camera angles, sequence of events, and so on of *The Snowman* based on this single viewing

18   (when they testified they did not, and Lasseter testified that no one else did), and (3) that this

19   collusion took place, unprompted, either nearly two years before the teaser trailer was developed

20   (during Baena's leave of absence from Pixar), or nearly two years after the SFIFF (and after Baena

21   left Pixar).  This is conjecture piled on conjecture, and no evidence supports it.  On summary

22   judgment, courts routinely find insufficient evidence of access where the alleged intermediary's

23   personnel testify that "they did not provide any part of the [plaintiff's work], or communicate its

24   substance, to any of the defendants."  *Cox v. Abrams*, 1997 WL 251532, at *4 (S.D.N.Y. May 14,

25   1997); *see also Moore v. Lightstorm Entm't*, 992 F. Supp. 2d 543, 554 (D. Md. 2014) (rejecting

26   theory of access premised on two intermediaries who worked with, and could have transmitted

27   screenplay to, James Cameron where intermediaries denied they passed script on to Cameron;

28

-18-

1   "[i]n this case, the mere fact that a script was sent to a production company is insufficient to infer

2   access by everyone at that company").

3       Plaintiff's access theory based on job applications also is a nonstarter.  There is no

4   evidence that the full version of her film, or even clips from a working version, were ever

5   submitted with a job application.  *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 52 (2d Cir.

6   2003) (affirming summary judgment on no access where plaintiff produced no "reasonable

7   documentation that he actually mailed [tapes of the allegedly infringed work]"); *Dimmie v. Carey*,

8   88 F. Supp. 2d 142, 146 (S.D.N.Y. 2000) (rejecting plaintiff's claim that the mailing of tapes to a

9   corporation could "be equated with access" where there was no evidence that the tapes were ever

10  received or forwarded to the alleged infringers).  What the evidence *does* show is that nobody but

11  a company recruiter ever saw the applications, whatever their content.  *See Tomasini v. Walt*

12  *Disney Co.*, 84 F. Supp. 2d 516, 520 (S.D.N.Y. 2000) (insufficient proof of access where

13  employees followed policy of not reviewing unsolicited submissions and did not view plaintiff's

14  submission, and there was no evidence that the employees' testimony was untrue).

15          (c)     YouTube and Vimeo Postings Do Not Constitute "Wide
                    Dissemination," and There Is No Evidence the Creators of the
16                  *Frozen* Teaser Watched *The Snowman* on the Sites.

17      Trying to prove widespread dissemination, Plaintiff points to the YouTube and Vimeo

18  postings and speculates that the creators of the teaser trailer could have accessed those sites.  But

19  "the mere fact that the video was placed on YouTube does not imply it was disseminated widely."

20  *Hayes v. Minaj*, No. 2:12-cv-07972-SVW-SH, Dkt. 319, *slip op.* at 4 (C.D. Cal. Aug. 13, 2013)

21  (Cox Decl., Ex. 52); *see also Briggs*, 2014 WL 4961396, at *9 ("Internet postings do not

22  constitute evidence of wide dissemination of the screenplay."); *O'Keefe v. Ogilvy & Mather*

23  *Worldwide, Inc.*, 590 F. Supp. 2d 500, 515 (S.D.N.Y. 2008) ("mere fact that [plaintiff's] work was

24  posted on the internet prior to the creation of defendants' work is insufficient by itself to

25  demonstrate wide dissemination"); *Art Attacks*, 581 F.3d at 1145 ("Although we recognize the

26  power of the internet to reach a wide and diverse audience, the evidence here is not sufficient to

27  demonstrate wide dissemination.").  Given the scope of the internet, courts will not infer "a

28  reasonable probability of access to the specific, copyrighted work embedded" on a post absent

-19-

"evidence that Defendants *actually visited the website* on which Plaintiff's [works] were posted." *Bldg. Graphics, Inc. v. Lennar Corp.*, 866 F. Supp. 2d 530, 541, 543 (W.D.N.C. 2011) (emphasis added) (finding no fact issue of access despite internet publication); *see also Chafir v. Carey*, 2007 WL 2702211, at *3 (S.D.N.Y. Sept. 17, 2007) ("[T]he fact that Plaintiff's Song was available on a publicly accessibly website does not prove access, because there is no evidence that Defendants actually visited the website on which Plaintiff's Song was posted.").

In a case in which the plaintiff had allegedly posted her work to YouTube, a California district court found that the plaintiff had "fail[ed] to set forth any chain of events connecting the video to Defendant Viacom," the producer of an alleging infringing television series, and thus "fail[ed] to allege how Viacom could have known the video was available on YouTube." *Minaj*, No. 2:12-cv-07972-SVW-SH, Dkt. 319, *slip op.* at 4 (Cox Decl., Ex. 52). In the absence of such allegations, the court concluded that it had "no basis to infer that Defendant had an opportunity to access" the plaintiff's work and accordingly dismissed the complaint at the pleading stage. *Id.* Here, Plaintiff's speculation that the creators of the teaser may have watched *The Snowman* online falls short of these standards. A review of the evidence demonstrates that Plaintiff, Wrischnik, and their Facebook friends constituted the online viewership that Plaintiff tries to pin on Defendants. Moreover, evidence that someone, somewhere, viewed a short portion of just the beginning of a nearly five-minute film would not enable the substantial copying that Plaintiff alleges. *See Kenney v. Warner Bros. Entm't Inc.*, 984 F. Supp. 2d 9, 13 (D. Mass. 2013) ("Insofar as [plaintiff] relies on his website to support his claim of access, he does not allege that the site included the screenplay, full-length film, or any significant amount of material that Warner Brothers could have substantially (and successfully) plagiarized.").

In sum, Plaintiff's speculation fails to meet her burden on access. Disney is entitled to summary judgment on this ground alone.

### 2. *The Teaser Trailer and Plaintiff's Work Are Not Substantially Similar As a Matter of Law.*

Plaintiff also fails to raise a triable issue on substantial similarity. Plaintiff contends her burden is "tripl[y] lower[ed]," purportedly because (1) the works are for children; (2) *The*

-20-

*Snowman* is fictional; and (3) Disney had a "high degree of access" to her work. (Pl.'s Mot. at 16.) Plaintiff is wrong on all three points. *First*, in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), which plaintiff cites, the court held that the fact that the works were aimed at children was relevant to the *intrinsic* test. *Id.* at 1166. This motion, however, concerns the *extrinsic* test, and there is no lowering of the burden at this stage. *See Cavalier*, 297 F.3d at 822–29 (applying extrinsic test to children's books with no lowering of burden). *Second*, no case suggests that a plaintiff's burden on substantial similarity is *lowered* for fictional works; Plaintiff has confused the fact that, for some types of works (including compilations of unprotectable elements), the burden is *raised* to "virtual identity." *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010). But that does not help lower Plaintiff's burden. *Third*, there is *no* evidence of access in this case, so Plaintiff's reliance on the so-called "inverse-ratio" rule is misplaced.

On Disney's motion to dismiss, the Court correctly found that Olaf and Plaintiff's snowman were dissimilar and identified other significant differences in the works' pace, mood, plot, and dialogue. (Dkt. 39 at 3–4.) Plaintiff survived dismissal because the Court concluded that the sequence of events might allow a finding of substantial similarity. Plaintiff now admits that the basis for this sequence of events—"the concept of a snowman competing with an animal antagonist over a carrot nose"—is a "basic idea," which is not protected by copyright. (Pl.'s Mot. at 17–19.) When necessary or generic elements of the sequence of events are filtered out, as they must be in applying the extrinsic test, it is clear that no triable issue of substantial similarity exists. *Mattel*, 616 F.3d at 913.

The Court's order denying Disney's motion listed eight elements of the sequence of events. (Dkt. 39 at 1.) Many of those elements flow necessarily from the concept of a snowman competing with an animal over a carrot nose. *Mattel*, 616 F.3d at 913. These *scenes-a-faire* elements include the snowman losing the carrot; the carrot sliding to the middle of the pond; the snowman and competitor being situated on opposite sides of the pond; and a contest to reach the carrot. These events are necessary to express an idea of competition between a snowman and an animal for a carrot nose on a frozen pond. (Cox Decl., Ex. 50 (Expert Report of James McDonald)

-21-

at 11–14.)  Hence, these elements should be filtered out.  The Court also should filter out the use of cross-cutting and music as the two antagonists race to reach the carrot; cross-cutting is not an "event" but rather a generic filmmaking technique used to build tension.  (*Id.* at 14.)  The concrete expression of the remaining items in the Court's sequence of events, involving the resolution of the plots after the characters reach the carrot nose, are highly *dissimilar* in the two works:  Plaintiff's Snowman retrieves the nose first; in the teaser trailer, *Sven* the reindeer is the first to retrieve the carrot.  (*Id.*)

Plaintiff tries to show substantial similarity through (1) her own frame-by-frame comparison of individual frames from the two films and (2) the Furniss report.  Neither creates a fact issue, much less establishes substantial similarity.  Plaintiff's chart does not even purport to illustrate that the sequences of events in the two films are substantially similar.  (Wilson Decl., Ex. B.)  It is instead a misleading collection of single *frames* that Plaintiff cherry-picked to show similarities in still images.  (Cox Decl., Ex. 51 (Rebuttal Expert Report of James McDonald) at 3–4, 12.)  Even this exercise fails to show substantial similarity, as many pairs are completely different.  "Frame 3," for example, shows Plaintiff's Snowman shivering in a clearing and Olaf staring at a flower and smiling.  (Wilson Decl., Ex. B.)

Furniss's opinions on substantial similarity are inadmissible and should be excluded in their entirety because she failed to apply the controlling standards in conducting her analysis.  *See In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (if "erroneous legal conclusions form the basis of" an expert opinion, it must be excluded).  There is no dispute that, in assessing similarity at the extrinsic stage, an expert must identify unprotectable elements, filter them out, and determine whether the *protectable* elements are substantially similar.  (*See* Pl.'s Mot. at 15–16.)  Furniss, however, testified that she was "*not asked* to identify unprotectable elements" in the two works; she said her only job was to "identify similarities" between the works without regard to whether they involved protectable expression.  (Cox Decl., Ex. 48 (Furniss Dep. 223:9–14, 94:18–24 ("It's *someone else's job* to identify whether or not those [similarities] are protectable and flow out of the story.") (emphases added)).)  Furniss further testified that she does not even know what filtration analysis is and could not say whether she applied it in rendering her

-22-

1    expert opinion on substantial similarity.  (*Id.* at 222:16–223:3.)  Consistent with her testimony,

2    Furniss's report made no effort to filter out unprotectable elements.  She simply listed every

3    similarity between the two works, even clearly generic ones.  (*E.g.*, *id.*, Ex. 49 (Expert Report of

4    Maureen Furniss) at 21 (noting that both snowmen at some point have a "worried expression")).)

5    Because Furniss failed to conduct a substantial similarity analysis in conformance with the

6    controlling legal standards, her opinion is unreliable, has no probative value, and must be

7    excluded.

8           Plaintiff fails to establish or even raise a triable issue of substantial similarity.

9        **B.    Disney Is Entitled to Summary Judgment on the Basis of Its Undisputed
                 Evidence of Independent Creation.**

10

11          Disney's detailed records of the development of the teaser trailer constitute overwhelming

12   evidence that it independently created the teaser trailer.  This evidence of independent creation is

13   sufficient by itself to warrant summary judgment, irrespective of the degree of similarity between

14   the works at issue.  *Chivalry Film Prods.*, 2006 WL 3780900, at *2  ("Summary judgment is

15   appropriate where a plaintiff fails to offer evidence sufficient to raise a factual question about a

16   defendant's proof of independent creation . . . .").  Where, as here, the evidence of independent

17   creation is clear and undisputed, defendants are entitled to summary judgment.  *See, e.g.*,

18   *Scholastic Inc. v. Speirs*, 28 F. Supp. 2d 862, 869 (S.D.N.Y. 1998) (independent creation

19   "demonstrate[d] unambiguously" by "paper trail of contemporaneous memos and sketches . . .

20   relating to the development of the allegedly infringing [work]"); *Dimmie*, 88 F. Supp. 2d at 150–

21   51 (working tapes documenting the songwriting process and a journal showing the evolution of

22   song lyrics were "convincing proof of independent creation" warranting summary judgment). *But

23   see* 3 NIMMER ON COPYRIGHT § 12.10[B][2][b] (2014 ed.).[10]

24   _____

     [10] The Nimmer treatise argues that courts should not grant summary judgment to defendants who
25   present undisputed evidence of independent creation, no matter how strong or undisputed, if the
     plaintiff has demonstrated access and substantial similarity.  *See* 3 NIMMER ON COPYRIGHT
26   § 12.10[B][2][b] (2014 ed.).  Many courts, however, recognizing the sound principle that
     independent creation "fully negat[es]" a claim of infringement, *see Benson v. Coca–Cola Co.*, 795
27   F.2d 973, 975 (11th Cir. 1986) (en banc), disagree, and accordingly have entered summary
     judgment when a defendant offers undisputed evidence of independent creation.  *See, e.g., Cox*,

28

                                                    -23-

1    Here, Disney has "produced copious undisputed testimonial and documentary evidence

2    that the [*Frozen* teaser trailer] evolved organically out of the research and creative and narrative

3    developmental work performed by the film's creators."  *Silberstein v. Fox Entm't Group, Inc.*, 424

4    F. Supp. 2d 616, 628 (S.D.N.Y. 2004).  The minutes and storyboards show that the core of the

5    teaser trailer—Olaf sneezing off his nose; a conflict between Olaf and Sven over the carrot nose

6    on the frozen pond; Sven placing the nose on Olaf's head—developed organically through the

7    combined independent contributions of multiple members of the Disney creative team.  (Del

8    Vecho Decl. ¶¶ 6–13.)  Well after the basic premise of the teaser trailer was conceived, the

9    creative team continued to develop and adjust the specific details of the plot and visuals.  (*Id.*

10   ¶¶ 13–15.)  ████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████  (*Id.* ¶¶ 15–16.)

13   In *Silberstein*, the defendants presented similar evidence that the animated character Scrat

14   from *Ice Age* "evolved organically" over time out of the cooperative endeavors of many

15   employees.  424 F. Supp. 2d at 628.  The court explained that, while it was "theoretically not

16   impossible that an individual involved with *Ice Age* was exposed" to the plaintiff's work, the

17   evidence demonstrated that "the conception of this character and its role in the film evolved and

18   developed in an incremental fashion that does not bear any indicia of having been shaped by

19   plaintiff's Sqrat or indeed by any other preexisting creative work."  *Id.* at 628–29.

20   To credit Plaintiff's theory of copying, the Court would have to conclude that the entire

21   production process was an elaborate charade undertaken to conceal the true source of inspiration

22   for the teaser trailer.  (Del Vecho Decl. ¶¶ 19–20.)  There is no evidence that the creative team

23   _____

24   1997 WL 251532, at *7–8 (agreeing that "independent creation offers yet another ground on

25   which summary judgment can [be] granted"); *see also Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1235 (11th Cir. 2002) (affirming summary judgment on the ground that "there is no genuine issue

26   of material fact about McGee independently creating 'Emmanuel'").  In this case, Plaintiff has not

27   shown a triable issue on either access or substantial similarity.  But even if she did, the reasoning of the courts that do not follow the Nimmer treatise on this point is more persuasive and should

28   control here.

1   engaged in this broad conspiracy.[11]  *See Selletti v. Carey*, 177 F.R.D. 189, 194 (S.D.N.Y. 1998)

2   (crediting evidence of independent creation of a song in the form of tapes and writing books,

3   because to credit plaintiff's theory of infringement those documents "would have to be

4   fabrications").  The record instead indisputably demonstrates independent creation.

5   **IV.    CONCLUSION**

6        Disney's motion should be granted, and Plaintiff's motion should be denied.

7   DATED:  March 12, 2015                    MUNGER, TOLLES & OLSON LLP

8

9

10                                   By:    ___/s/ Kelly M. Klaus_____
                                            KELLY M. KLAUS
11                                          Attorneys for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25   [11] On the final page of her report, Furniss conclusorily asserts that the teaser trailer "could not
     have been created independently."  (Cox Decl., Ex. 49 at 30.)  This "opinion" is not supported
26   elsewhere in the report, and it is completely unreliable given Furniss's admission that she
     refrained from reviewing the evidence of independent creation (the minutes and storyboards),
27   notwithstanding that Plaintiff's lawyer provided those materials to her.  (*Id.*, Ex. 48 (Furniss Dep.
     17:1–18:22).)
28

                                        -25-