J. Paul Gignac, State Bar No. 125676
Mischa N. Barteau, State Bar No. 274474
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone:  (805) 683-7400
Facsimile:   (805) 683-7401
j.paul@aogllp.com
mbarteau@aogllp.com

J.A. Ted Baer, State Bar No. 135092
**LAW OFFICE OF J.A. TED BAER**
21 E. Canon Perdido Street, Suite 223
Santa Barbara, California 93101
Telephone:  (805) 963-7177
Facsimile:   (801) 730-2874
ted@tedbaerlaw.com

Attorneys for Plaintiff
Kelly Wilson

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KELLY WILSON, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation; DISNEY ENTERPRISES, INC., a Delaware corporation; WALT DISNEY PICTURES, a California corporation; WALT DISNEY MOTION PICTURES GROUP, INC., a California corporation; and DOES 1 through 25, inclusive,<br><br>        Defendants. | Case No.  3:14-cv-01441-VC<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:   Hon. Vince G. Chhabria<br>Date:    April 9, 2015<br>Time:   10:00 a.m.<br>Ctrm:   4 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*ARIAS OZZELLO & GIGNAC LLP*

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 9, 2015 at 10:00 a.m., or as soon thereafter as counsel may be heard in Courtroom 4 of the above-captioned Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, Plaintiff Kelly Wilson will and hereby does move this Court for partial summary judgment establishing the liability of Defendants on Plaintiff's claim for copyright infringement.

This motion is made on the grounds that, pursuant to Federal Rule of Civil Procedure 56, there is no genuine dispute as to any material fact and Plaintiff Kelly Wilson is entitled to a determination of liability as a matter of law on the grounds that:

1.      It is undisputed that Plaintiff is the owner of the copyright in her animated short film entitled *The Snowman*; and

2.      It is undisputed that Defendants copied *The Snowman*.

This Motion is based on the attached Memorandum of Points and Authorities, the Declarations of Mischa N. Barteau and Kelly Wilson filed herewith, the files and records of this case, and such additional evidence and oral argument as may be presented at the hearing.

ARIAS OZZELLO & GIGNAC LLP

1

2

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     RELEVANT FACTS ............................................................................................... 1

    A.   Plaintiff's Creation Of *The Snowman* ................................................. 1

    B.   Defendants' Creation Of The *Frozen* Teaser Trailer ............................ 2

    C.   The *Frozen* Teaser Trailer Was First Published On Or About June 18, 2013 And The Striking Similarities Between The *Frozen* Teaser Trailer And *The Snowman* Were Immediately Recognized .................................................. 4

    D.   Defendants Had Access To *The Snowman* ........................................... 6

        1.   *The Snowman* Has Been Widely Available on the Internet via YouTube, Vimeo, and Plaintiff's Website ................................................................. 6

        2.   Defendants Used the Internet to Conduct Research for *Frozen* ................... 7

        3.   The Snowman Was Submitted to Defendants with Job Applications Fourteen Times from 2008-2011 ................................................................. 8

        4.   *The Snowman* Was Screened with Defendants' Film at the 2011 San Francisco Film Festival .................................................................. 9

        5.   Defendants Attended the 2012 Santa Barbara International Film Festival on the Same Day that *The Snowman* Was Screened ...................................... 11

        6.   The Snowman Was Widely Disseminated at Eight Film Festivals Across the Country ...................................................................................... 12

        7.   Defendants Own and Control Pixar and Had Access to *The Snowman* Through Pixar Employees who Actually Saw *The Snowman* .................... 12

III.    LEGAL STANDARD .......................................................................................... 14

IV.     ARGUMENT ......................................................................................................... 15

    A.   Plaintiff Owns The Copyright In *The Snowman* ................................ 16

    B.   Defendants Copied Original Elements Of *The Snowman* ................... 17

        1.   The *Frozen* Teaser Trailer Is Strikingly Similar to *The Snowman* ............ 17

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIAS OZZELLO & GIGNAC LLP**

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

1

2.      Access Need Not Be Shown ....................................................... 21

3.      Defendants Had Access to *The Snowman* .................................... 21

4.      The *Frozen* Teaser Trailer Is Substantially Similar to *The Snowman* Under

Both the Extrinsic and Intrinsic Tests ........................................ 23

V.     CONCLUSION ......................................................................................... 25

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................14

*Apple Computer, Inc. v. Formula Int'l, Inc.*,
    725 F.2d 521 (9th Cir. 1984) ....................................................................17

*Baxter v. MCA, Inc.*,
    812 F.2d 421 (9th Cir. 1987) ............................................... 15, 17, 21, 24

*Benay v. Warner Bros. Entm't, Inc.*,
    607 F.3d 620 (9th Cir. 2010) ....................................................................24

*Brown Bag Software v. Symantec Corp.*,
    960 F.2d 1465 (9th Cir. 1992) ..................................................................18

*Castle Rock Entm't v. Carol Publ'g Group*,
    150 F.3d 132 (2d Cir. 1998)......................................................................20

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ....................................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................14

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...................................................................................15

*Hayes v. Keys*,
    2015 U.S. Dist. LEXIS 2860 (C.D. Cal. Jan. 7, 2015) ...........................22

*Landsberg v. Scrabble Crossword Game Players, Inc.*,
    736 F.2d 485 (9th Cir. 1984) ....................................................................16

*Mattel, Inc. v. MGA Enter., Inc.*,
    616 F.3d 904 (9th Cir. 2010) ....................................................................15

*Meta-Film Associates, Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984).........................................................23

ARIAS OZZELLO & GIGNAC LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARIAS OZZELLO & GIGNAC LLP

1  *Morris v. Guetta*,

2          2013 U.S. Dist. LEXIS 15556 (C.D. Cal. Feb. 4, 2013) ................................... 14, 25

3  *Olem Shoe Corp. v. Wash. Shoe Corp.*,

4          2015 U.S. App. LEXIS 434 (11th Cir. Jan. 12, 2015) ........................................ 18

5  *R.F.M.A.S., Inc. v. Mimi So*,

6          748 F. Supp. 2d 244 (S.D.N.Y. 2010) ................................................................ 20

7  *Rogers v. Koons*,

8          960 F.2d 301 (2d Cir. 1992)................................................................................ 25

9  *Selle v. Gibb*,

10         741 F.2d 896 (7th Cir. 1984) .............................................................................. 17

11 *Sheldon v. Metro-Goldwyn Pictures Corp.*,

12         81 F.2d 49 (2d Cir. 1936) ................................................................................... 18

13 *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,

14         562 F.2d 1157 (9th Cir. 1977) ............................................................................ 16

15 *Smith v. Jackson*,

16         84 F.3d 1213 (9th Cir. 1996) .............................................................................. 15

17 *Stewart v. Wachowski*,

18         574 F. Supp. 2d 1074 (C.D. Cal. 2005) .............................................................. 17

19 *Swirsky v. Carey*,

20         376 F.3d 841 (9th Cir. Cal. 2004) ....................................................................... 20

21 *Three Boys Music Corp. v. Bolton*,

22         212 F.3d 477 (9th Cir. 2000) ......................................................................... 18, 21

23 *Twentieth-Century Fox Film Corp. v. MCA, Inc.*,

24         715 F.2d 1327 (9th Cir. 1983) ............................................................................ 21

25 *Universal Pictures Co. v. Harold Lloyd Corp.*,

26         162 F.2d 354 (9th Cir. 1947) .............................................................................. 24

27 *White v. Twentieth Century Fox Corp.*,

28         572 F. App'x 475 (9th Cir. 2014) ....................................................................... 15

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Williams v. Bridgeport Music, Inc.*,

      2014 U.S. Dist. LEXIS 182240 (C.D. Cal. Oct. 30, 2014)……………………..18, 20

**STATUTES**

17 U.S.C. § 410 ................................................................................................................ 16

17 USC § 302(a) .............................................................................................................. 15

**RULES**

Fed. R. Evid. 801 ............................................................................................................. 17

**TREATISES**

3-12 NIMMER ON COPYRIGHT § 12.10 ............................................................................... 25

4-13 NIMMER ON COPYRIGHT § 13.01 ............................................................................... 17

4-13 NIMMER ON COPYRIGHT § 13.02 ................................................................... 21, 22, 23

4-13 NIMMER ON COPYRIGHT § 13.03 ............................................................................... 24

ARIAS OZZELLO & GIGNAC LLP

**ARIAS OZZELLO & GIGNAC LLP**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.  INTRODUCTION**

   *The Snowman* is an original work created by Plaintiff Kelly Wilson and protected by the Copyright Act.  *The Snowman* was created between 2008 and 2010 and has been widely disseminated since 2010.

   Defendants created the teaser trailer for their feature film *Frozen* between January 2013 and May 2013.  Defendants copied substantial portions of the original elements expressed in *The Snowman* and used the same expression of those elements in the *Frozen* teaser trailer.  Most striking is Defendants' copying of the storyline and sequence of events expressed in *The Snowman*.  Defendants' copying of original elements from *The Snowman* indisputably infringes Plaintiff's copyright.

   Defendants have admitted that the similarities between the two works are "striking." Remarkably, Defendants do not deny that they copied *The Snowman*; instead, Defendants claim that what they copied is not protectable expression under copyright law.[1]  An examination of the evidence, however, indisputably demonstrates that there are striking similarities between the unique expression of ideas in *The Snowman* and the expression of the same ideas in the *Frozen* teaser trailer.  Accordingly, Plaintiff seeks summary adjudication on the issue of Defendants' liability for copyright infringement.

**II.  RELEVANT FACTS**

   **A. Plaintiff's Creation Of *The Snowman***

   Plaintiff created and developed the animated short film *The Snowman* between February 2008 and August 2010.  Declaration of Kelly Wilson In Support Of Plaintiff's Motion for Partial Summary Judgment ("Wilson Decl.") at ¶4.  *The Snowman* was Plaintiff's original idea, and Plaintiff worked primarily with Neil Wrischnik ("Wrischnik") to create and develop *The Snowman*.  Wilson Decl. at ¶5.  *The Snowman* is Plaintiff's

---

[1] "The factual question whether Disney copied the work is not at issue. The works' objective similarity is."  Reply Brief in Support of Defendants' Motion to Dismiss Complaint, Doc. 34, 1:25-26.

original and unique expression and is substantially distinguishable from prior films involving snowmen. *See* Wilson Decl., ¶5; Expert Report of Maureen Furniss, Ph.D. ("Furniss Report") at 6-15.

During the creation of *The Snowman*, Plaintiff uploaded still images and video clips of her work in progress to her website www.kellywilsonfilms.com. Wilson Decl., ¶6. Plaintiff listed her website on her resume and cover letters when applying to jobs and used her website as an online portfolio of her work, which was available to the public. *Id*. After completing *The Snowman* around August 2010, Plaintiff also distributed copies to friends and family and submitted *The Snowman* to film festivals across the country. *Id*. at ¶8. On July 6, 2013, Plaintiff and Wrischnik registered their copyright in *The Snowman* with the U.S. Copyright Office. On September 20, 2013, Wrischnik assigned all of his rights in the copyright to *The Snowman* to Plaintiff. Barteau Decl., Ex. 1.

### B. Defendants' Creation Of The *Frozen* Teaser Trailer

"[*Frozen*] was actually supposed to come out this November, 2014. And six months into the project, they asked us to come out a year earlier. […] So when you talk about putting a teaser together, we didn't have a lot of the things you would normally have, and so we had to move quickly and expeditiously and so forth, so I don't know if that is relevant or not, but it's the truth." - Peter Del Vecho, Producer of *Frozen*. Barteau Decl., Ex. 2 (Deposition of Peter Del Vecho ("Del Vecho Depo.") at 60:23-61:6).

The *Frozen* teaser trailer was created at Walt Disney Animation Studios in Burbank, California between ███████████████████ *See* Barteau Decl., Ex. 2 (Del Vecho Depo. at 100:3-18); Barteau Decl., Ex. 3 (Deposition of Paul Briggs ("Briggs Depo.") at 83:16-23); Barteau Decl., Ex. 4 (Deposition of James Christopher Buck ("Buck Depo.") at 25:13-15). Defendants knew before they started brainstorming ideas on January 7, 2013 that they wanted to create a teaser trailer that featured the snowman and reindeer characters from *Frozen* in order to appeal to a male audience. Barteau Decl., Ex. 5 (Deposition of John Lasseter ("Lasseter Depo.") at 41:16-22). Defendants also knew that they wanted to create a teaser trailer based on physical comedy and little dialogue to appeal

ARIAS OZZELLO & GIGNAC LLP

1   to an international audience.  *See* Barteau Decl., Ex. 2 (Del Vecho Depo. at 85); Barteau

2   Decl., Ex. 5 (Lasseter Depo, at 23:21-25:2).  Children were the intended audience for the

3   teaser trailer.  Barteau Decl., Ex. 6.

4       The *Frozen* teaser trailer was created by many of the same individuals who created

5   the feature film *Frozen*.  Peter Del Vecho, Producer of *Frozen*, produced the *Frozen* teaser

6   trailer.  Chris Buck, Co-Director of *Frozen*, co-directed the *Frozen* teaser trailer. Barteau

7   Decl., Ex. 4 (Buck Depo. 30:25-31:2).  Paul Briggs, Head of Story on *Frozen*, was also

8   Head of Story on the *Frozen* teaser trailer. Barteau Decl., Ex. 3 (Briggs Depo. 23:8-11).

9   John Lasseter, Executive Producer of *Frozen*, was Executive Producer of the *Frozen* teaser

10  trailer and had the final decision-making authority on the creative aspects of the *Frozen*

11  teaser trailer. Barteau Decl., Ex. 5 (Lasseter Depo. at 18:25-19:24); Ex. 4 (Buck Depo.

12  30:11-15); Ex. 3 (Briggs Depo. at 62:24-63:4).

13  

14  ▌▌▌▌▌.  *See* Barteau Decl., Ex. 7; Ex. 3 (Briggs Depo. at 64:1-6).  ▌▌▌

15  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

16  ▌▌▌▌▌▌▌▌   *See* Barteau Decl., Ex. 7.   ▌▌▌▌▌▌▌▌▌▌▌

17  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

18  ▌▌▌▌▌▌▌▌▌▌   *See* Barteau Decl., Ex. 8.

19      The first brainstorming meeting for the *Frozen* teaser trailer that John Lasseter

20  attended was held on January 15, 2013.  Barteau Decl., Ex. 2 (Del Vecho Depo. at 134:18-

21  135:13).  Paul Briggs testified that the following plot/sequence of events came out of "the

22  last meeting of what John pitched" (Barteau Decl., Ex. 3 (Briggs Depo. at 93:13-94:2); Ex.

23  9) on January 15, 2013: "▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

24  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

25  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

26  ▌▌▌▌▌   Barteau Decl., Ex. 10.   ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

27  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌   *Id.*   ▌▌▌▌▌▌▌▌▌▌▌▌▌

28  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**ARIAS OZZELLO & GIGNAC LLP**

██████████████████████████████████████

████████████████ Barteau Decl., Ex. 11; Ex. 3 (Briggs Depo. at 94:15-95:16). ██

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ Barteau Decl., Ex. 12.

**C. The *Frozen* Teaser Trailer Was First Published On Or About June 18, 2013 And The Striking Similarities Between The *Frozen* Teaser Trailer And *The Snowman* Were Immediately Recognized**

On or about June 18, 2013, Disney released the *Frozen* teaser trailer on YouTube. That morning, Matt Meyer, one of the animators on *Frozen*, emailed the other *Frozen* animators a link to *The Snowman* on Vimeo (https://vimeo.com/52869137#at=0) and said: "A friend sent me this link…".  Barteau Decl., Ex. 13.  Later that same morning, Sam Klock, one of the effects artists on *Frozen*, emailed a link to *The Snowman* on Vimeo (https://vimeo.com/52869137) to other effects artists and animators at Disney Animation Studios and said: "*Someone posted an interesting animated short from 2009 with striking similarities to our teaser.*"  Barteau Decl., Ex. 14 (emphasis added).  Thom Wickes, an animator on *Frozen*, responded by saying: "Oh dear…".  Barteau Decl., Ex. 15.  Daniel Naulin, a visual effects artist on *Frozen*, responded by saying: "At least it's not in the film." Barteau Decl., Ex. 16.

Later that afternoon, Paul Roeder, Senior Vice President of Global Communications for The Walt Disney Studios, received the following email from a reporter named Jen Yamato at *Deadline Hollywood*: "Hi Paul, There's a resemblance between the Frozen trailer and an animated short from 2009 called The Snowman.  Can you tell me if there's any connection/collaboration between Disney and the filmmaker?"  Barteau Decl., Ex. 17.

That evening, Mohit Kallianpur, lighting supervisor on the *Frozen* teaser trailer, sent an email to Chris Buck (co-director of the *Frozen* teaser trailer), Steve Goldberg (visual effects supervisor on the *Frozen* teaser trailer) and Mike Giaimo (art director on the *Frozen*

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

teaser trailer) with a link to *The Snowman* and stating: "Someone posted this as a response to our teaser – apparently an older short!!  http://vimeo.com/52869137".  Barteau Decl., Ex. 18.

Other members of the press and the general public noticed the striking similarities between the *Frozen* teaser trailer and *The Snowman*.

On June 18, 2013, the animation blog *Awesome Robo!* posted an entry entitled "THE UNCANNY RESEMBLANCE BETWEEN DISNEY'S 'FROZEN' TEASER AND A 2009 STUDENT ANIMATION" (at http://www.awesome-robo.com/2013/06/the-uncanny-resemblance-between-disneys.html) and wrote that "there were some striking similarities between the [*FROZEN*] teaser and a short [film] written, produced and directed by Kelly Wilson in 2009 called *The Snowman*, which featured an identical scenario, down to the resolution."  Barteau Decl., Ex. 19.  The blog continues: "We initially assumed that *Frozen's* scenario might simply be based off of an event that happened in the fairy tale it was based off of, but following some research about the Danish fairy tale we realized that there was no comic relief snowman in the original story (The Snow Queen), just a reindeer that accompanies the ice princess.  We did a comparison between the two plots, and if you watch the shorts *you can judge for yourself whether Disney might have lifted some ideas from the student animator.  Considering Disney's history of borrowing ideas, like the infamous Lion King/Kimba The Lion controversy, we wouldn't be terribly surprised*."  *Id*. (emphasis added)  The blog further notes that: "[b]oth shorts feature a clumsy snowman that loses his nose, which lands on a frozen lake that gets the attention of a carrot eating creature.  Rabbits in *The Snowman*, a reindeer in *Frozen*.  In both shorts the carrot lands on a frozen lake, and a struggle ensues in which the snowman and creature struggle to get the carrot back. Both shorts feature the creature getting the carrot instead of the snowman, nearly eating it, and changing their mind last minute before handing it back to the snowman."  *Id*.

On the morning of June 19, 2013, Plaintiff received an email from Randee Dawn, a reporter for *TODAY.com/NBCNews.com*, asking about the similarities between *The*

ARIAS OZZELLO & GIGNAC LLP

*Snowman* and the *Frozen* teaser trailer. Barteau Decl., Ex. 20. Ms. Dawn asked Plaintiff a series of questions, including: "Were you approached by anyone associated with Disney Animation prior to their posting of the 'Frozen' short? In what manner, if at all? Have you ever had any dealings with Disney Animation in the past?" and "*Disney has a history, some litigated and some not, of appropriating outside sources and ideas for its work. Does this surprise you very much?*" *Id.* (emphasis added).

On June 27, 2013, a video review of the *FROZEN* teaser trailer was posted on YouTube (at http://www.youtube.com/watch?v=qanoZhFNfD8) which calls the *Frozen* teaser trailer "less of a teaser, and more of a short film" and says "if you think this looks familiar, you may have seen Kelly Wilson's short film *The Snowman* back in 2009, which shares a lot of similarities to the *FROZEN* teaser. Okay, *it's practically identical* to the *FROZEN* teaser." (emphasis added). Barteau Decl., Ex. 21.

On November 28, 2013, Wrischnik received an email from Larry Wright from www.refocusedmedia.com asking: "Did you give permission to Disney to copy your short film for their FROZEN teaser?" Barteau Decl., Ex. 22.

### D. Defendants Had Access To *The Snowman*

#### 1. *The Snowman* Has Been Widely Available on the Internet via YouTube, Vimeo, and Plaintiff's Website

*The Snowman* has been publicly available on YouTube since January 10, 2013. *See* https://www.youtube.com/watch?v=PJ6c7RLV8ew. Between January 10, 2013 and January 14, 2013, *The Snowman* was viewed 18 times on YouTube. Barteau Decl., Ex. 23. Of those views, 13 views were from the United States (Barteau Decl., Ex. 24) and, of those, 11 views came from California. Barteau Decl., Ex. 25. On January 12, 2013, someone in the United States viewed *The Snowman* as a result of a search on YouTube for "snowman and rabbit." Barteau Decl., Ex. 26. On January 15, 2013, someone in the United States viewed *The Snowman* as a result of a search on YouTube for "snowman cartoons for children."[2] *Id.*

[2] Plaintiff subpoenaed records from YouTube (owned by Google) requesting identifying

███████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████ *See* Barteau Decl., Ex. 9. █████████████████████

██████████████████████████████████████

██████████████████████████████████████

███ *See* Barteau Decl., Ex. 8; Ex. 11.

*The Snowman* has been publicly available on Vimeo since November 5, 2012. Barteau Decl., Ex. 27.  Between November 5, 2012 and January 31, 2013, *The Snowman* was loaded 614 times and played 173 times in the United States on Vimeo.  Barteau Decl., Ex. 28.  Between January 1, 2013 and January 31, 2013, *The Snowman* was loaded 267 times and played 124 times on Vimeo.[3]  Barteau Decl., Ex. 29.

*The Snowman* has been available on www.kellywilsonfilms.com since at least May 12, 2010.  Barteau Decl., Ex. 30.  Plaintiff submitted a link to her website to Defendants eight times with resumes and cover letters between 2008 and 2012.

**2.  Defendants Used the Internet to Conduct Research for *Frozen***

███████████████████████████████████

██████████████████  *See e.g.,* Barteau Decl. Ex. 31, Ex. 32, Ex. 4 (Buck Depo. at 15:17-25; 20:13-21:7); Ex. 3 (Briggs Depo. at 40:13-41:3).  Chris Buck, Co-Director of the *Frozen* teaser trailer, testified that it is standard practice to look on YouTube for research. ., Barteau Decl., Ex. 4 (Buck Depo. at 23:7-18).  Paul Briggs, Head of Story on the *Frozen*

information for those individuals who viewed *The Snowman* on YouTube during this time period.  Plaintiff's counsel was informed by Google's counsel that such records from this time period are unavailable because they have been "anonymized" -- meaning all identifying information has been removed.

[3] Plaintiff also subpoenaed records from Vimeo requesting identifying information for those individuals who viewed *The Snowman* on Vimeo during this time period.  Plaintiff received objections from Vimeo's counsel on the grounds that "a compelling need for this discovery" cannot be shown because "Plaintiff need not produce direct evidence of copying." (citing *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846-47 (9th Cir. 2012) (direct evidence of copying not necessary)).  Barteau Decl., Ex. 33.

ARIAS OZZELLO & GIGNAC LLP

1   teaser trailer, also testified that he used YouTube for research.  Barteau Decl., Ex. 3 (Briggs

2   Depo. at 40:13-41:3).  In at least once instance, ████████████████████████████████

3   ██████████████████████████████████████████████████████████  Barteau Decl.,

4   Ex. 31.

5       **3.  The Snowman Was Submitted to Defendants with Job Applications Fourteen Times from 2008-2011**

6       Plaintiff  and  *The  Snowman*'s  co-creator  Wrischnik  submitted  sixteen  job

7   applications  to  Defendants  between  2008  and  2012.   Of  those,  fourteen  contained

8   references to *The Snowman*, images of *The Snowman*, a link to *The Snowman* online at

9   kellywilsonfilms.com, or a copy of the final version of *The Snowman*.

10      Plaintiff submitted eight job applications to Defendants:  (1) on March 20, 2008 to

11  Pixar[4]; (2) on September 24, 2008 to The Walt Disney Company[5]; (3) on October 12, 2009

12  to Pixar[6]; (4) on October 29, 2009 to Pixar[7]; (5) on September 27, 2011 to Playdom[8] [9]; (6)

13  on September 27, 2011 to Pixar[10]; (7) on November 21, 2011 to Playdom[11]; and (8) on

14

15  [4]  The  resume  submitted  by  Plaintiff  on  this  date  lists  *The  Snowman*  as  in  production.
16  Barteau Decl., Ex. 34.

17  [5] This job submission included a link to Plaintiff's website, Plaintiff's resume that lists *The Snowman* as in production, and a portfolio containing still shots from *The Snowman*.
18  Barteau Decl., Ex. 35.

19  [6] This job submission included a portfolio that contained still images from *The Snowman*.
    Barteau Decl., Ex. 36.

20  [7] This job submission included a link to Plaintiff's website and a portfolio containing still
21  shots from *The Snowman*.  Barteau Decl., Ex. 37.

22  [8]  Playdom, Inc. is a wholly owned subsidiary of The Walt Disney Company that.was
    acquired by The Walt Disney Company on August 27, 2010.

23  [9] This job submission included a link to Plaintiff's website and Plaintiff's resume which
24  lists *The Snowman* and four film festivals in which *The Snowman* was featured.  Barteau
    Decl., Ex. 38.

25  [10] This job submission included a link to Plaintiff's website and Plaintiff's resume which
26  lists *The Snowman* and four film festivals in which *The Snowman* was featured.  Barteau
    Decl., Ex. 39.

27  [11] This job submission included a link to Plaintiff's website and Plaintiff's resume which
28  lists *The Snowman* and four film festivals in which *The Snowman* was featured.  Barteau
    Decl., Ex. 40.

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

ARIAS OZZELLO & GIGNAC LLP

1  February 2, 2012 to Cinderbiter.[12]

2      Wrischnik submitted eight job applications to Defendants: (1) in December 2008 to

3  Walt Disney Animation Studios[13]; (2) on June 25, 2009 to Walt Disney Animation

4  Studios[14]; (3) in July 2009 to Walt Disney Animation Studios[15]; (4); in July 2009 to

5  Pixar[16]; (5) in January 2010 to Pixar[17]; (6) in February 2010 to Pixar[18]; (7) in April 2010 to

6  Walt Disney Animation Studios[19]; and (8) in March 2010 to Pixar Canada[20].

7      On March 3, 2010, Wrischnik received an email from Pixar stating: "[w]e had your

8  animation reel & resume reviewed…".  Barteau Decl., Ex. 48.  This reel contained a

9  version of *The Snowman* that was complete except for the music.  Barteau Decl., ¶ 49.

10      **4.  *The Snowman* Was Screened with Defendants' Film at the 2011 San**
11          **Francisco Film Festival**

12      *The Snowman* was screened at the 2011 San Francisco International Film Festival in

13  a category of short films called "Do You See What I See?"  The film *Play by Play*, a short

14  ---

[12] Cinderbiter is a stop motion animation division of The Walt Disney Company.  Barteau
15  Decl., Ex. 42 (Deposition of Matt Roberts ("Roberts Depo.") at 119:12-21).  This job
    submission included a link to Plaintiff's website and lists *The Snowman* and six film
    festivals in which *The Snowman* was featured. Barteau Decl., Ex. 41.

16
[13] This job submission included a DVD of Wrischnik's animation reel.  It is unknown
17  whether this reel contained parts of *The Snowman*.  Barteau Decl. Ex. 43.

18  [14] This job submission listed *The Snowman* on Wrischnik's resume. Barteau Decl., Ex. 44.

19  [15] This job submission listed *The Snowman* on Wrischnik's resume. Barteau Decl., Ex. 45.

20  [16] This job submission included an animation reel that did not feature *The Snowman*.
    Barteau Decl., Ex. 46.

21
[17] This job submission listed *The Snowman* on Wrischnik's resume and included an
22  animation reel featuring part of *The Snowman*. Barteau Decl., Ex. 47.

23  [18] This job submission listed *The Snowman* on Wrischnik's resume and included an
    animation reel featuring part of *The Snowman*.  In response to this submission, Wrischnik
24  received an email from recruiting@pixar.com on March 3, 2010, stating: "We had your
    animation reel & resume reviewed and while everyone was impressed with your work, we
25  are unable to utilize your skill set at this time."  Barteau Decl., Ex. 48.

26  [19] This job submission listed *The Snowman* on Wrischnik's resume and included an
    animation reel featuring *The Snowman*.  Barteau Decl., Ex. 49.

27
[20] This job submission listed *The Snowman* on Wrischnik's resume and included an
28  animation reel featuring *The Snowman*.  Barteau Decl., Ex. 50.

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

ARIAS OZZELLO & GIGNAC LLP

film created by Pixar employees (who are also employees of Defendants), was screened at the 2011 San Francisco International Film Festival in the same category as *The Snowman*. The films were shown together in a series of short films.  Barteau Decl., Ex. 51.  *Play by Play* was screened immediately after *The Snowman* was screened.  *Id.*

*The Snowman* and *Play by Play* screened together four times: April 29, 2011; May 1, 2011; May 2, 2011; and May 3, 2011.  Barteau Decl., Ex. 51, Ex. 52.  Plaintiff and Wrischnik spoke on stage with Pixar employees ***twice*** during the film festival.  On May 1, 2011, Plaintiff, Wrischnik and some of the Pixar employees spoke about their respective films on stage together after a public screening of their series of short films.  Wilson Decl. ¶ 14-15, Ex. A; Barteau Decl., Ex. 53 (Deposition of Carlos Baena ("Baena Depo.") at 146:5-151:18).   Plaintiff has a photo of her and Wrischnik on stage with then-Pixar employee Carlos Baena, as well as two other Pixar employees, David Munier and Sureena Mann.  *Id.*  On May 3, 2011, Plaintiff, Wrischnik and some of the Pixar employees spoke together a second time about their respective films at a special screening for children. Wilson Decl., ¶ 16; *see also* Barteau Decl., Ex. 54.

At least 16 people affiliated with Pixar attended at least one of the screenings of the short film series "Do You See What I See?" which featured *The Snowman* immediately preceding *Play by Play*. Barteau Decl., Ex. 55, Ex. 56, Ex. 57.   In addition, Plaintiff recalls speaking to Pixar employee Carlos Baena and one of the producers of *Play by Play* at a "Bay Area Filmmaker Reception" held on April 8, 2011 for filmmakers who were included in the festival. Wilson Decl., ¶10.

Both *The Snowman* and *Play by Play* were in competition for the film festival's Golden Gate Award in the "Best Work for Kids and Families" category.   *See* http://fest11.sffs.org/awards/gga.php.   *The Snowman* won the Golden Gate Award for "Youth Work Honorable Mention," beating *Play by Play* in the "Best Work for Kids and Families" category.  Barteau Decl., Ex. 58.

Chris Wiggum, publicist at Pixar, received an email on May 5, 2011 from the San Francisco International Film Festival containing a press release with a recap of the festival.

ARIAS OZZELLO & GIGNAC LLP

1    Barteau Decl., Ex. 58. The press release states: "The Best Work for Kids and Families was

2    Specky Four Eyes by Jean-Claude Rozec (France), with Honorable Mention going to The

3    Snowman by Kelly Wilson and Neil Wrischnik (USA)." Barteau Decl., Ex. 59.

4        On June 29, 2011, an independent filmmaker named Cynthia Pepper sent an email to

5    both David Munier at Pixar and Plaintiff, stating that she was given their names by the San

6    Francisco Film Society as "local filmmakers with interesting short films that may work for

7    my current project." Barteau Decl., Ex. 60.

8        **5.  Defendants Attended the 2012 Santa Barbara International Film Festival
9            on the Same Day that *The Snowman* Was Screened**

10   *The Snowman* was screened at the 2012 Santa Barbara International Film Festival on

11   the mornings of January 28, 2012 and January 30, 2012 with a series of other short

12   animated films. Barteau Decl., Ex. 61. Defendants' animated short film *La Luna* was also

13   screened at the 2012 Santa Barbara International Film Festival. Barteau Decl., Ex. 62.

14   John Lasseter was the executive producer of *La Luna*. Barteau Decl., Ex. 63.

15       At least four Pixar employees attended the 2012 Santa Barbara International Film

16   Festival: Enrico Casarosa, Laurel Ladevich, Denise Ream, and Chris Wiggum. Barteau

17   Decl., Ex. 64, 65. Enrico Casarosa attended at least the screening of his film *La Luna*.

18   Barteau Decl., Ex. 62. Laurel Ladevich attended at least the screening of *La Luna*. *Id*.

19   Denise Ream, producer of *Cars 2*, attended the festival, and spoke on a panel of women

20   filmmakers on the afternoon of January 28th, after *The Snowman* had screened that

21   morning. Barteau Decl., Ex. 65, Ex. 67. Chris Wiggum attended the screening of *La Luna*

22   and the women's panel with Denise Ream. Barteau Decl., Ex. 66.

23       These attendance of these individuals at the film festival shows access because

24   Denise Ream (who produced *Cars 2*, which was written and directed by John Lasseter)

25   attended the film festival on the same day that *The Snowman* was screened. *The Snowman*

26   screened in the morning at 10 a.m., and the panel on which Ms. Ream spoke did not begin

27   until 2 p.m. It is reasonably likely that Ms. Ream, who produced animated films, along

28   with Mr. Wiggum, Pixar's head publicist, would attend the screening of short animated

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

films that morning.

In addition, it is reasonably likely that Enrico Casarosa attended a screening of *The Snowman* at the festival.  Mr. Casarosa's attendance at the 2012 Santa Barbara International Film Festival is especially relevant because Paul Briggs, Head of Story for *Frozen* and the person who created the storyboards for the *Frozen* teaser trailer which look strikingly similar to *The Snowman*, has been friends with Mr. Casarosa for approximately six to seven years.  Barteau Decl., Ex. 3 (Briggs Depo. at 17:7-15).

### 6. The Snowman Was Widely Disseminated at Eight Film Festivals Across the Country

*The Snowman* was screened at eight film festivals around the United States from 2011-2012.  Wilson Decl., ¶ 9.  It is an indisputable fact that Defendants regularly attend film festivals.  Despite his fallacious testimony that he does not attend film festivals and that the last film festival he attended was "probably about 35 years ago," (Barteau Decl., Ex. 4 (Buck Depo. at 23:19-25)) a simple Google search reveals that Chris Buck attended the Santa Barbara International Film Festival in 2014 and the Dubai International Film Festival in December 2013, both with *Frozen* co-director Jennifer Lee.  John Lasseter has attended the San Francisco and Santa Barbara film festivals, and another simple Google search reveals many recent film festivals attended by Mr. Lasseter.  It is reasonably possible, indeed very likely, that any one of the many people involved in the creation and production of the *Frozen* teaser trailer could have seen *The Snowman* at any of the eight film festivals at which it was screened over a two-year period and/or spoken with a fellow Disney or Pixar employee who saw *The Snowman* at one of these festivals.

### 7. Defendants Own and Control Pixar and Had Access to *The Snowman* Through Pixar Employees who Actually Saw *The Snowman*

The evidence that Pixar had access to and viewed *The Snowman* is indisputable.  In addition to the many other ways that Defendants had access to *The Snowman*, the creators of the *Frozen* teaser trailer had access to *The Snowman* by virtue of their many connections to Pixar.  In an effort to insulate themselves, Defendants have taken the indefensible

1  position that Pixar is a completely separate and distinct entity whose access to *The*
2  *Snowman* may not be imputed to Defendants in this case. However, this baseless position
3  is directly refuted by the evidence, including Defendants' own statements and actions—
4  including those of Pixar Animation Studios's and Disney Animation Studio's Chief
5  Creative Officer, John Lasseter.

6      Pixar is a wholly-owned subsidiary of defendants The Walt Disney Company and
7  Disney Enterprises Inc. and, according to The Walt Disney Company, Pixar has been
8  "effectively integrated" with Disney. The Walt Disney Company Fiscal Year 2013 Annual
9  Financial Report and Shareholder Letter at 1, available online at
10  http://cdn.media.ir.thewaltdisneycompany.com/2013/annual/10kwrap-2013.pdf. Pixar
11  merged with Defendants in 2006 and, according to the merger agreement, Defendants assert
12  control over Pixar. Article VI ("Covenants") of the Agreement and Plan of Merger by and
13  among The Walt Disney Company, Lux Acquisition Corp. and Pixar, dated January 24,
14  2006. In describing the company overview, the Walt Disney Company states that: "Feature
15  films are released under the following banners: Disney, including Walt Disney Animation
16  Studios and Pixar Animation Studios…". *See* http://thewaltdisneycompany.com/about-
17  disney/company-overview.

18      In addition, and especially important in this case, the leadership at Pixar Animation
19  Studios is the same leadership as at Disney Animation Studios. Dr. Ed Catmull is President
20  at both Disney and Pixar Animation Studios. John Lasseter has been Chief Creative
21  Officer at Disney and Pixar Animation Studios since at least 2011, and he oversees all films
22  and associated projects from Disney Animation Studios and Pixar Animation Studios.
23  Barteau Decl., Ex. 5 (Lasseter Depo. at 14:8-9). According to Mr. Lasseter: "Pixar is a part
24  of The Walt Disney Company, so it's all covered under The Walt Disney Company, a
25  wholly owned subsidiary." Barteau Decl., Ex. 5 (Lasseter Depo. at 13:16-22). Mr.
26  Lasseter is also the person who had the final decision-making power as to creative
27  decisions on the *Frozen* teaser trailer. *Id*. (Lasseter Depo. at 18:25-19:24). Mr. Lasseter
28  worked with numerous people who actually saw *The Snowman*, and Mr. Lasseter is the

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

person who contributed the ideas expressed in the *Frozen* teaser trailer that are strikingly similar to *The Snowman*. Moreover, Mr. Lasseter is a fan of short films (Barteau Decl., Ex. 5 (Lasseter Depo. at 61:17-18) and ███████████████████████ Barteau Decl., Ex. 31.

In addition, the creators of the *Frozen* teaser trailer know and interact with many people at Pixar. Besides John Lasseter, who founded Pixar and interacts with Pixar on a weekly basis, Peter Del Vecho and Chris Buck testified that attend meetings at Pixar. Paul Briggs, Head of Story and the person who created the storyboards for the *Frozen* teaser trailer, knows 10 people who work at Pixar. Barteau Decl., Ex. 3 (Briggs Depo. at 15:25).

## III. LEGAL STANDARD

A motion for summary judgment must be granted where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are material if they affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact." *Morris v. Guetta*, 2013 U.S. Dist. LEXIS 15556, 4 (C.D. Cal. Feb. 4, 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where the moving party bears the burden of proof on an issue at trial, that party must demonstrate that no reasonable trier of fact could find other than for the moving party. *Id*. at 4-5. "If the moving party meets its initial burden, the nonmoving party must set forth 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 5 (quoting *Anderson*, 477 U.S. at 250).

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

**ARIAS OZZELLO & GIGNAC LLP**

## IV. ARGUMENT

Plaintiff's copyright in *The Snowman* arose from the moment she created it. *See* 17 USC § 302(a).  Plaintiff has the right to exclude any other person from reproducing, preparing derivative works, distributing, performing, displaying, or using *The Snowman* for the term of her life plus seventy years.  *See* 17 USC § 302(a).

For Plaintiff to prevail in this case, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Originality requires that a work was "independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id*. at 345. Unlawful copying may be shown through circumstantial evidence of Defendants' access to *The Snowman* and substantial similarity between the *Frozen* teaser trailer and the original elements of *The Snowman*.  *See White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 476 (9th Cir. 2014).  Alternatively, Plaintiff may prove that Defendants unlawfully copied *The Snowman* by showing that there are striking similarities between the *Frozen* teaser trailer and *The Snowman*.  *Baxter v. MCA, Inc.*, 812 F.2d 421, 423–424 & n.2 (9th Cir. 1987), cert. denied, 484 U.S. 954 (1987).

The Ninth Circuit uses the "extrinsic/intrinsic" infringement test to distinguish between permissible copying of ideas and impermissible copying of expression. *Mattel, Inc. v. MGA Enter., Inc.*, 616 F.3d 904, 913 (9th Cir. 2010).  "[T]he 'extrinsic' test considers whether two works share a similarity of ideas and expression based on external, objective criteria" and the 'intrinsic test' asks whether an 'ordinary, reasonable observer' would find a substantial similarity of expression of the shared idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

At the initial "extrinsic" stage, the similarities between the copyrighted and challenged work are examined to determine whether the similar elements are protectable or unprotectable.  *Mattel, supra*, 616 F.3d at 913.  "For example, ideas, scenes a faire (standard features) and unoriginal components aren't protectable." *Id*.  "When the

unprotectable elements are 'filtered' out, what's left is an author's particular expression of an idea, which most definitely is protectable." *Id*. Because ideas are not protectable, the inquiry starts by "determining the breadth of the possible expression of those ideas." *Id*. "If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work. If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id.* at 913-914.

A relaxed standard of similarity applies to works for children. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1166 (9th Cir. 1977). The standard is also relaxed for fictional or fanciful rather than factual works. *Landsberg v. Scrabble Crossword Game Players, Inc.,* 736 F.2d 485, 488 (9th Cir. 1984) ("One consequence of the policy in favor of free use of ideas is that the degree of substantial similarity required to show infringement varies according to the type of work and the ideas expressed in it. Some ideas can be expressed in myriad ways, while others allow only a narrow range of expression. Fictional works generally fall into the first category."). Because of Defendants' high degree of access to *The Snowman*, a third "lower standard of proof on substantial similarity" applies in this case. *Smith*, *supra,* 84 F.3d at 1218. Given this *triple lowering* of Plaintiff's burden of proof, the substantial similarity between the *Frozen* teaser trailer and *The Snowman* is indisputable.

Defendants admit that they did not receive permission from Plaintiff to copy *The Snowman*. Doc. 41. Thus, Defendants infringed Plaintiff's copyright when they reproduced original elements (*i.e.* "copied") from *The Snowman* without Plaintiff's permission.

## A. Plaintiff Owns The Copyright In *The Snowman*

The registration certificate for *The Snowman* states that Plaintiff Kelly Wilson is the copyright claimant with Wrischnik. Doc. 1. Under 17 U.S.C. § 410(c), the certificate

**ARIAS OZZELLO & GIGNAC LLP**

constitutes *prima facie* evidence of the validity of the copyright and the facts stated in the certificate, including Plaintiff's ownership and the originality of *The Snowman*.  See *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir. 1984); 4-13 NIMMER ON COPYRIGHT § 13.01 ("the copyright registration certificate constitutes prima facie evidence in favor of the plaintiff […] [t]his is clearly true on the issue of originality, as well as in establishing the copyrightability of the subject matter") (citations omitted).

### B.  Defendants Copied Original Elements Of *The Snowman*

#### 1.  The *Frozen* Teaser Trailer Is Strikingly Similar to *The Snowman*

In this case, although there is indisputable proof of Defendants' access to *The Snowman*, Plaintiff does not even need to show access because it is also an indisputable and material fact that Defendants admitted that there are "striking similarities" between *The Snowman* and the *Frozen* teaser trailer.[21]  Barteau Decl., Ex. 14.

A striking similarity is one sufficiently unique or complex as to make it unlikely that the work alleged to infringe was independently created.  *Selle v. Gibb*, 741 F.2d 896, 904 (7th Cir. 1984).  "[E]vidence of a work's availability, together with evidence of striking similarity, supports a finding that defendant impermissibly copied plaintiff's works." *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1100 (C.D. Cal. 2005); *see also Baxter*, *supra*, 812 F.2d at 423-424 ("Absent evidence of access, a 'striking similarity' between the works may give rise to a permissible inference of copying.") (citations omitted).  This admission alone warrants granting summary judgment in favor of Plaintiff in this case.

Independent of Defendants' admission, however, a comparison of the two works reveals a multitude of obvious and striking similarities.  The basic idea—a snowman losing and competing for his carrot nose on an ice pond with an animal antagonist—is the same.  In *The Snowman*, the snowman competes with a group of bunnies (and one fat bunny in particular), and they both devise ways to cross the ice to reach the carrot nose in the center

---

[21] This admission of "striking similarity" is admissible evidence as an admission of a party opponent because Sam Klock worked as an effects artist on *Frozen,* he was an agent of Defendants, and the statement was within the scope of his agency. Fed. R. Evid. 801(d)(2).

1  of the pond.

2       Although the concept of a snowman competing with an animal antagonist over a

3  carrot nose of itself may not be protectable under copyright law, the sequence of events

4  expressed in this storyline/plot, together with the choice of setting, colors, editing

5  technique, framing and interactions between the characters, constitutes protectable

6  expression. *See Williams v. Bridgeport Music, Inc.*, 2014 U.S. Dist. LEXIS 182240, 52-54

7  (C.D. Cal. Oct. 30, 2014) ("to the extent that any of these elements is itself not protectable,

8  the combination and selection of these elements may be considered under the extrinsic test

9  because 'the over-all impact and effect indicate substantial appropriation.'") (quoting *Three*

10  *Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *see also Brown Bag*

11  *Software v. Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992) ("Although copyright

12  protection is not afforded to certain elements of a work, such limitations 'must not obscure

13  the general proposition that copyright may inhere, under appropriate circumstances, in the

14  selection and arrangement of unprotected components.'")

15       The differences—the snowman losing his carrot nose because of a flower instead of

16  a bird, a reindeer instead of rabbits, the snowman's head blowing off, and the fact that there

17  are additional plot points in *The Snowman* (due to the longer running time), are relatively

18  minor and are not significant enough to find that the *Frozen* teaser trailer did not copy *The*

19  *Snowman*'s protectable expression.  "[N]o plagiarist can excuse the wrong by showing how

20  much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d

21  49, 56 (2d Cir. 1936); *see also Olem Shoe Corp. v. Wash. Shoe Corp.*, 2015 U.S. App. LEXIS

22  434, 29 (11th Cir. Jan. 12, 2015) ("works need not be exactly identical to be strikingly

23  similar."); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (9th Cir. 2002) ("The whole

24  picture need not be copied to constitute infringement. The mere copying of a major

25  sequence is sufficient.")

26       A side-by-side frame comparison demonstrates the striking similarities.   Wilson

27  Decl., Ex. B.  Due to space constraints, Plaintiff will not identify each and every similarity

28  in the fifty frames compared.  However, a comparison of just the first four frames alone

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

ARIAS OZZELLO & GIGNAC LLP

demonstrates the striking similarities between the *Frozen* teaser trailer and *The Snowman*.

As demonstrated in <u>frame set 1</u>, both the *Frozen* teaser trailer and *The Snowman* begin with a shot introducing the catalyst of their respective films (the flower that causes the snowman to sneeze and lose his carrot nose in the *Frozen* teaser trailer, and the bird that causes the snowman in to lose his carrot nose in *The Snowman*). *Id.*

As demonstrated in <u>frame set 2</u>, both the *Frozen* teaser trailer and *The Snowman* introduce the snowman in the frame immediately following the introduction of the story catalyst. The camera angle is the same, the framing is the same (the snowmen are in the same position on the screen relative to the background elements and screen edges, and the horizon line of the rolling hills covered in snow is the same), the environment is the same (same smooth rolling snow covered hills, same type of snow covered trees, same use of blue and white hues, same application of shadows, same sun direction and clear skies, same time of day, same use of lighter atmosphere values in the foreground set against darker background of snow covered mountains and trees), and the snowmen look strikingly similar (same orange carrot nose, same three black coal buttons on body, same stick arms, same colors, same height, same body proportions and overall shape). *Id.*

As demonstrated in <u>frame set 3</u>, in both the *Frozen* teaser trailer and *The Snowman* the snowman's gaze tracks and follows the bird/flower story catalyst as they cross paths. Both snowmen react to the catalyst and the plot moves forward. As in other frames, the camera angle, framing, and environments are the same. *Id.*

As demonstrated in <u>frame set 4</u>, in both the *Frozen* teaser trailer and *The Snowman* the camera closes in on a tighter framing of the snowman while interacting with the flower/bird. Both snowmen begin to anticipate losing their carrot noses in the same way in the same sequence: both squint and scrunch their face in reaction to the bird/flower. Both snowmen use their stick arms for balance. As in other frames, the environments and use of color are the same. *Id.*

"In copyright infringement cases, liability experts may opine as to similarities that are probative of copying if their testimony will aid the trier of fact in understanding the

evidence." *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 284 (S.D.N.Y. 2010) (citing *Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir. 1998)). Generally, a court considers expert testimony in order to perform the "analytical dissection" of a work under the extrinsic test. *Williams, supra,* 2014 U.S. Dist. LEXIS 182240 at 15. "'Analytical dissection' requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity.' Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Id*. (quoting *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. Cal. 2004)). "However, although copyright protection is not afforded to certain elements of a work, such limitations must not obscure the general proposition that copyright may inhere, under appropriate circumstances, in the selection and arrangement of unprotected components." *Id*. at 16.

Plaintiff retained Maureen Furniss, Ph.D. to conduct an independent analysis and comparison of *The Snowman* and the *Frozen* teaser trailer, to identify the original elements of *The Snowman* and compare those to the *Frozen* teaser trailer, and to determine whether there is objective evidence of copying in this case. *See* Expert Witness Report of Maureen Furniss, Ph.D. Dr. Furniss identified the following elements as original expressions in *The Snowman*: (1) plot/sequence of events; (2) characters; (3) scenes; (4) situations; (5) setting; (6) editing; (7) pace; (8) framing; and (9) overall concept and feel. *Id*. at pp. 6-15.

After a thorough analysis and examination of both *The Snowman* and the *Frozen* teaser trailer, Dr. Furniss concluded the following: (1) "Wilson's *The Snowman* contains many elements that are original. Wilson's *The Snowman* as a whole presents a unique expression of ideas"; (2) "Disney's Teaser Trailer for its feature film *Frozen* has striking similarities to the original elements expressed in Wilson's *The Snowman*"; (3) "The striking similarities between Disney's *Frozen* Teaser Trailer and the original elements of Wilson's *The Snowman* indicate that Disney's *Frozen* Teaser Trailer copied the original elements of Wilson's *The Snowman*"; and (4) "The striking similarities between Disney's *Frozen* Teaser Trailer and Wilson's *The*

*Snowman* indicate that Disney's Frozen Teaser Trailer could not have been created independently." *Id*. at 30.

### 2.  Access Need Not Be Shown

When the defendant's work is "strikingly similar" to the plaintiff's work, access need not be shown. *Baxter, supra*, 812 F.2d at 423–424 & n.2.

In this case, Defendants admitted that the *Frozen* teaser trailer is "strikingly similar" to *The Snowman*.  Barteau Decl., Ex. 14.  Given the striking similarities between the *Frozen* teaser trailer and *The Snowman*, access need not be shown in this case.  Thus, "[a] grant of summary judgment for plaintiff is proper where works are so overwhelmingly identical that the possibility of independent creation is precluded." *Twentieth-Century Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983); *see also* 4-13 NIMMER ON COPYRIGHT § 13.02 ("A more common circumstance requiring no independent proof of access occurs when the similarity between plaintiff's and defendant's works is sufficiently striking such that the trier of fact may be permitted to infer copying on that basis alone. For this purpose, similarity may be regarded as 'striking' even if somewhat less than verbatim.  What is required is that the similarities in question be so striking as to preclude the possibility that the defendant independently arrived at the same result.").

### 3.  Defendants Had Access to *The Snowman*

Even if proof of access is required, Plaintiff can show that Defendants had access to *The Snowman* in multiple ways.  The fact that Defendants had an opportunity to view or copy *The Snowman* is indisputable.  In order to prevail, Plaintiff does not have to show that anyone who created the *Frozen* teaser trailer actually saw *The Snowman*.  Instead, "[p]roof of access requires an *opportunity* to view or to copy plaintiff's work." *Three Boys Music Corp.*, *supra*,  212 F.3d at 482 (citation and quotation marks omitted) (emphasis added). "This is often described as providing a reasonable opportunity or reasonable possibility of viewing the plaintiff's work." *Id*.

Circumstantial evidence of reasonable access may be proven in the following ways: "(1) a particular chain of events is established between the plaintiff's work and the

1   defendant's access to that work (such as through dealings with a publisher or record

2   company), or (2) the plaintiff's work has been widely disseminated." *Id.*; *Hayes v. Keys*,

3   2015 U.S. Dist. LEXIS 2860, 6-7 (C.D. Cal. Jan. 7, 2015) (citing *Three Boys Music Corp.*,

4   *supra*, 212 F.3d 477).

5        The evidence indisputably demonstrates that Plaintiff can establish both of these.

6   Plaintiff and Wrischnik had direct dealings with Defendants by submitting fourteen job

7   applications containing *The Snowman*, in part or in full, to Defendants.  Moreover, "[i]f the

8   defendant is a corporation, some courts infer from the fact that one employee of the

9   corporation had possession of plaintiff's work the conclusion that another employee (who

10  composed defendant's work) had access to plaintiff's work, where by reason of the physical

11  propinquity between the employees, the latter has the opportunity to view the work in the

12  possession of the former."  4-13 NIMMER ON COPYRIGHT § 13.02.  Here, it is indisputable

13  that Pixar viewed *The Snowman*.   The evidence demonstrates that Pixar viewed

14  Wrischnik's reel containing *The Snowman* when he submitted it with a job application in

15  2010, and the evidence demonstrates that Pixar also viewed *The Snowman* at the 2011 San

16  Francisco International Film Festival.  Whether Pixar is regarded as one in the same as

17  Defendants (as it should be) or as a third party in this case, the many interactions between

18  Disney Animation Studios and Pixar Animation Studios, most notably through John

19  Lasseter—who was directly involved in the creation of the *Frozen* teaser trailer—

20  indisputably establish that Defendants had access to *The Snowman*.

21       The evidence that *The Snowman* has been widely disseminated is similarly

22  indisputable.  In addition to being screened at eight film festivals across the country over a

23  two-year period, *The Snowman* was publicly available on YouTube and Vimeo through a

24  simple Internet search.  There is strong circumstantial evidence that Defendants viewed *The*

25  *Snowman* as demonstrated by the fact that eleven people in California viewed *The*

26  *Snowman* during the critical time period between brainstorm meetings for the *Frozen* teaser

27  trailer (January 9-January 15, 2013).  It is reasonably likely that someone involved with the

28  creation of the *Frozen* teaser trailer was researching ideas on the Internet and viewed *The*

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

*Snowman* as a result of a search for "snowman cartoons for children" on YouTube.

"Unusual speed in the creation of defendant's work may furnish some evidence that defendant had access to and used plaintiff's work rather than resorting to independent creation." 4-13 NIMMER ON COPYRIGHT § 13.02. In this case, Defendants admitted that they had a short time to work on the *Frozen* teaser trailer. It is also indisputable that the storyline/sequence of events for the *Frozen* teaser trailer was decided upon in the first brainstorming meeting attended by John Lasseter. These facts likewise provide strong circumstantial evidence that Defendants had access to *The Snowman* prior to and during the creation of the *Frozen* teaser trailer.

"In a number of cases, courts have found access when the alleged infringer and the intermediary occupy positions such that it is natural that information possessed by one would be imparted to the other." *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1356 (C.D. Cal. 1984). "The 'intermediary,' the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work." *Id*. at 1355-1356. In this case, Pixar Animation Studios—and John Lasseter as the creative head of Pixar Animation Studios and Disney Animation Studios—is the "intermediary." John Lasseter has connections to all of the Pixar employees who were present at the screening of *The Snowman* at the 2011 San Francisco Film Festival, and he also has connections with the individuals who viewed Wrischnik's reel submitted with a job application to Pixar and which contained *The Snowman*. Mr. Lasseter was "very involved" in the creation of the *Frozen* teaser trailer and was in charge of making the final creative decisions on the *Frozen* teaser trailer. Barteau Decl., Ex. 3 (Briggs Depo. at 55:13-22; 62:24-63:4). These facts also demonstrate strong circumstantial evidence of Defendants' access to *The Snowman*.

#### 4. The *Frozen* Teaser Trailer Is Substantially Similar to *The Snowman* Under Both the Extrinsic and Intrinsic Tests

Plaintiff's bar for showing substantial similarity is low in this case. In the Ninth

ARIAS OZZELLO & GIGNAC LLP

ARIAS OZZELLO & GIGNAC LLP

1   Circuit, the access and substantial similarity elements of infringement are inextricably
2   linked by an inverse ratio rule. "Under the 'inverse ratio' rule, if a defendant had access to
3   a copyrighted work, the plaintiff may show infringement based on a lesser degree of
4   similarity between the copyrighted work and the allegedly infringing work." *Benay v.*
5   *Warner Bros. Entm't, Inc.,* 607 F.3d 620, 625 (9th Cir. 2010) (citations omitted).

6      The substantial similarity between how the sequence of events is expressed in both
7   the *Frozen* teaser trailer and *The Snowman* is alone enough to find substantial similarity.
8   *See* 4-13 NIMMER ON COPYRIGHT § 13.03 ("Where plot is more properly defined as "the
9   'sequence of events' by which the author expresses his 'theme' or 'idea,' " it constitutes a
10  pattern that is sufficiently concrete so as to warrant a finding of substantial similarity if it is
11  common to both plaintiff's and defendant's works.") (citations omitted).  "[I]t has been held
12  that similarity with respect to only one sequence of plaintiff's motion picture (representing 20
13  percent of the entire film) was sufficient to constitute substantial similarity." *Id.* (citing, *inter*
14  *alia*, *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947)).

15     Indeed, substantial similarity does not require that each and every element of the
16  overall works in question be substantially similar.  "It is entirely immaterial that in many
17  respects plaintiff's and defendant's works are dissimilar if in other respects similarity as to
18  a substantial element of plaintiffs work can be shown." 4-13 NIMMER ON COPYRIGHT §
19  13.03.  "If substantial similarity is found, the defendant will not be immunized from
20  liability by reason of the addition in his work of different characters or additional and
21  varied incidents, nor generally by reason of his work proving more attractive or saleable
22  than the plaintiff's." *Id.*; *see also Baxter, supra*, 812 F.2d at 425.

23     Here, Defendants copied more than a small portion of *The Snowman*.  *See* Wilson
24  Decl., Ex. B; Expert Witness Report of Maureen Furniss, Ph.D.  There is no question that
25  the similarities are substantial between the original elements of *The Snowman* and the
26  expression of the same elements in the *Frozen* teaser trailer.  Plaintiff has thus satisfied the
27  "extrinsic" test that is applied to determine substantial similarity.

28     Plaintiff has similarly satisfied the "intrinsic" test for substantial similarity by way

1    of the expert testimony of Dr. Furniss, as well as by establishing that the ordinary observer

2    would find the works substantially similar. "The standard for infringement – substantially

3    similar or virtually identical – determined at the 'extrinsic' stage is applied at the 'intrinsic'

4    stage." *Mattel, supra*, 616 F.3d at 914. The intrinsic stage asks "whether an ordinary

5    reasonable observer would consider the copyrighted and challenged works substantially

6    similar (or virtually identical)." *Id.*

7         "[If] the resemblance is so overwhelming as to mandate a finding of substantial

8    similarity, the court should grant summary judgment to plaintiff." *Morris v. Guetta*, 2013

9    U.S. Dist. LEXIS 15556, 11-17 (C.D. Cal. Feb. 4, 2013) (citing 3-12 NIMMER ON

10   COPYRIGHT § 12.10; *See also Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) ("Further,

11   even were such direct evidence of copying unavailable, the district court's decision could

12   be upheld in this case on the basis that defendant Koons' access to the copyrighted work is

13   conceded, and the accused work is so substantially similar to the copyrighted work that

14   reasonable jurors could not differ on this issue."). This case is governed by these principles.

15   **V. CONCLUSION**

16        Plaintiff has demonstrated striking similarity and access, and has satisfied the

17   extrinsic and intrinsic tests for substantial similarity. Therefore, summary judgment on

18   liability should be granted in favor of Plaintiff on her claim for copyright infringement.

19

20   Dated: March 5, 2015                    ARIAS OZZELLO & GIGNAC LLP

21

22                                           By: _____

23                                           J. Paul Gignac
                                             Micha N. Barteau
24
                                             LAW OFFICE OF J.A. TED BAER
25                                           J.A. Ted Baer

26                                           Attorneys for Plaintiff
                                             Kelly Wilson
27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF