J. Paul Gignac, State Bar No. 125676
Mischa N. Barteau, State Bar No. 274474
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone:  (805) 683-7400
Facsimile:   (805) 683-7401
j.paul@aogllp.com
mbarteau@aogllp.com

J.A. Ted Baer, State Bar No. 135092
**LAW OFFICE OF J.A. TED BAER**
21 E. Canon Perdido Street, Suite 223
Santa Barbara, California 93101
Telephone:  (805) 963-7177
Facsimile:   (801) 730-2874
ted@tedbaerlaw.com

Attorneys for Plaintiff
Kelly Wilson

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KELLY WILSON, an individual, | Case No.  3:14-cv-01441-VC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| THE WALT DISNEY COMPANY, a Delaware corporation; DISNEY ENTERPRISES, INC., a Delaware corporation; WALT DISNEY PICTURES, a California corporation; WALT DISNEY MOTION PICTURES GROUP, INC., a California corporation; and DOES 1 through 25, inclusive, | Judge:   Hon. Vince G. Chhabria<br>Date:     April 9, 2015<br>Time:    10:00 a.m.<br>Ctrm:    4 |
| Defendants. | |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARIAS OZZELLO & GIGNAC LLP**

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................1

II.   ARGUMENT ............................................................................................................3

    A.   Defendants' Argument, If Accepted, Would Overturn Decades of Precedent and Diminish Copyright Protection for All Creative Works.......................................3

    B.   The Similarities Between the *Frozen* Teaser Trailer and *The Snowman* Are So Substantial and Striking That Copying May Be Found as a Matter of Law .........5

    C.   Because The Evidence Indisputably Demonstrates that Defendants Had Access to *The Snowman,* Access May Be Found as a Matter of Law .............................7

        1.   *The Snowman* Has Been Widely Disseminated Since 2010 ........................8

        2.   *The Snowman* Screened with Defendants' Film *Play by Play* at the 2011 San Francisco International Film Festival, ................................................11

        3.   Plaintiff Shows More Than "Corporate Receipt" Because Defendants Acknowledged Receipt and Review of *The Snowman* with Plaintiff's and Wrischnik's Job Applications ................................................................12

        4.   Pixar Indisputably Viewed *The Snowman* and Defendants Admitted That Pixar Participated in the Process of Creating, Developing and Producing the *Frozen* Teaser Trailer.......................................................................14

    D.   Defendants Rely on Improper Legal Standards and Inapposite Cases in Attempting to Disprove Access.........................................................................16

    E.   Plaintiff's Expert Dr. Maureen Furniss Engaged In the Proper Analysis and Concluded The Similarities Between The Frozen Teaser Trailer and The Snowman Are Substantial and Striking ................................................................18

    F.   Defendants Have Failed To Raise Any Triable Issue of Fact to Support Their Theory of "Independent Creation" ...................................................................19

III.  CONCLUSION ......................................................................................................20

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

ARIAS OZZELLO & GIGNAC LLP

ARIAS OZZELLO & GIGNAC LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Destiny's Child,*
 2009 U.S. Dist. LEXIS 63001 (N.D. Ill. July 21, 2009) ...........................................15

*Baxter v. MCA, Inc.,*
 812 F.2d 421 (9th Cir. 1987) .............................................................................5, 6

*Francescatti v. Germanotta,*
 2014 U.S. Dist. LEXIS 81794 (N.D. Ill. June 17, 2014) ...................................15, 16

*Gable v. NBC,*
 727 F. Supp. 2d 815 (C.D. Cal. 2010)...........................................................17

*Kamar International, Inc. v. Russ Berrie & Co.,*
 657 F.2d 1059, 1062 (9th Cir. Cal. 1981) ...............................................15

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.,*
 676 F.3d 841 (9th Cir. 2012) ................................................................8, 9

*Mattel, Inc. v. MGA Entm't, Inc.,*
 616 F.3d 904 (9th Cir. 2010) ...............................................................1, 6

*Meta-Film Associates, Inc. v. MCA, Inc.,*
 586 F. Supp. 1346 (C.D. Cal. 1984).......................................................15

*Miller v. Miramax Film Corp.,*
 2001 U.S. Dist. LEXIS 25967 (C.D. Cal. Sept. 26, 2001)........................................20

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*
 562 F.2d 1157 (9th Cir. 1977) .......................................................1, 4, 5

*Stewart v. Wachowski,*
 574 F. Supp. 2d 1074 (C.D. Cal. 2005)....................................................6

*Three Boys Music Corp. v. Bolton,*
 212 F.3d 477 (9th Cir. 2000) ................................................................18

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,*
 465 F.3d 1102 (9th Cir. 2006) ...............................................................15

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Walt Disney Productions v. Air Pirates*,

    345 F. Supp. 108 (N.D. Cal. 1972) ........................................................ 3, 4

*Walt Disney Productions v. Air Pirates*,

    581 F.2d 751 (9th Cir. 1978) ................................................................ 4, 5

*Williams v. Bridgeport Music, Inc.*,

    2014 U.S. Dist. LEXIS 182240 (C.D. Cal. Oct. 30, 2014) ...................................... 18

TREATISES

4-13 NIMMER ON COPYRIGHT § 13.02.......................................................... 6, 11, 13, 14, 17

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

Copyright law protects only original and unique works of creative expression. Copyright law does not protect ideas, and it does not protect works that are merely reproductions of things already in existence.  For example, there is limited expression in a painting of a red bouncy ball that looks just like a red bouncy ball would look in the real world, and therefore it has very limited protection under copyright law.  *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010).  By contrast, Michelangelo's *David* is a statue of a nude man, "[b]ut no one would question the proposition that if a copyrighted work it would deserve protection even against the poorest of imitations. This is because so much more was added in the expression over the idea."  *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1168 (9th Cir. 1977).  Works of fantasy, and especially works of animation, are afforded very broad protection under copyright law because the expression available is limited only by the human imagination.

Defendants attempt to exonerate themselves from liability in this case by arguing that *The Snowman* is like a painting of a red bouncy ball—the ways to express a snowman and an animal competing for a carrot are so limited that *there is only one way to do it.  See, e.g.,* Defendants' Opening Summary Judgment Brief ("Defendants' MSJ") (Doc. 84-3) at 21:22-20 ("The Court's order denying Disney's motion listed eight elements of the sequence of events.  (Dkt. 39 at 1.)  Many of those elements flow necessarily from the concept of a snowman competing with an animal over a carrot nose.") (citation omitted). In order for Defendants to prevail on this point, many decades of legal precedent would have to be overturned, and Defendants' copyright protection in their own original works would be severely diminished.

Defendants do not deny that similarities exist between the *Frozen* teaser trailer and *The Snowman*.  Instead, they argue that the similarities should be "filtered out" because they "necessarily flow from the concept of a snowman competing with an animal over a carrot nose."  Defendants' MSJ at 21:22-22:3.  Defendants do not explicitly argue that *The*

*Snowman* is not original, but instead repeatedly use the term "generic." *See*, *e.g.*, *id.* at 22:3. "Generic," of course, means not original. However, *The Snowman* as a whole is original because the ideas expressed in *The Snowman* have not been expressed in the same way and in the same combination before. Defendants' own proffered "expert" James McDonald conceded in his deposition that *The Snowman* is original:

> Q: **Let me ask you this. Do you think that The Snowman**
> **created by Kelly Wilson is an original work?**
>
> ███████████████████████.

Declaration of J.A. Ted Baer ("Baer Decl."), Ex. 1 (Deposition of James McDonald ("McDonald Depo.") at 52:19-22). Mr. McDonald argues in his report that the following sequence of events is "generic" and "must be filtered out": ██████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

(Declaration of Erin Cox (Doc 93-4), Ex. 50 at 11.). Yet, when questioned during his deposition as to whether there are any other works in which these "generic" aspects appear, McDonald said: ██████████████████████." Baer Decl., Ex. 1 (McDonald Depo. at 88:5-90:22).

The following facts are indisputable: (1) Defendants had access to *The Snowman*; and (2) the *Frozen* teaser trailer is substantially (and strikingly) similar to the original elements expressed in *The Snowman*. In fact, Defendants have admitted the striking similarities. *See* Declaration of Mischa N. Barteau in Support of Plaintiff's Motion for Summary Judgment ("Barteau Decl."), Ex. 14 (Doc. 60/106). Ordinary observers have also recognized and commented on the striking similarities. *See* Plaintiff's Motion for Partial Summary Judgment at 4-6 (Doc. 58-3/105-3). Finally, Dr. Maureen Furniss, who has been studying and teaching animation history for over twenty years, describes the similarities as "extraordinary" and concludes that Defendants could not have created the teaser trailer without first having had exposure to *The Snowman*. Expert Witness Report of Maureen Furniss, Ph.D. at 27, 30 (Doc. 59/105-6).

1    Plaintiff is entitled to summary judgment on Defendants' liability for copyright

2  infringement as a matter of law because, even considering the evidence in the light most

3  favorable to Defendants, no reasonable person could deny that the *Frozen* teaser trailer

4  infringes Plaintiff's copyright in *The Snowman*.

5  **II.  ARGUMENT**

6    **A.  Defendants' Argument, If Accepted, Would Overturn Decades of Precedent
       and Diminish Copyright Protection for All Creative Works**

7

8    Defendants make the incredible argument that almost everything in *The Snowman* is

9  "generic" and unprotectable by copyright law.   *See* Defendants' MSJ at 21:13-23:8.

10  Defendants even go so far as to argue that *everything* must be filtered when analyzing the

11  similarity between the films *except* for "the resolution of the plots after the characters reach

12  the carrot nose," which Defendants allege to be "highly *dissimilar*."  *Id*. at 22:3-7.  In other

13  words, Defendants argue that the only part of *The Snowman* that is protectable under

14  copyright law is the part that is *different* than the *Frozen* teaser trailer.   Defendants'

15  argument flies in the face of decades of copyright law and, if accepted, would diminish

16  Defendants' rights in their own intellectual property, including the feature film *Frozen.*[1]

17    In 1972, The Walt Disney Company, then Walt Disney Productions, sued a group of

18  cartoonists known as the Air Pirates for copyright infringement of several cartoon

19  characters, including Mickey Mouse.  *See Walt Disney Productions v. Air Pirates*, 345 F.

20  Supp. 108, 109 (N.D. Cal. 1972).  Although the defendants in *Air Pirates* claimed various

21  defenses to copyright infringement including fair use (which Defendants in this case do

22  not), the arguments made by the defendants in *Air Pirates* are very similar to the arguments

23  made by Defendants in this case.  *See id.*  The defendants in *Air Pirates* claimed, *inter alia*,

24

25  [1] Plaintiff requested documents in discovery related to the registration of copyrights for the
*Frozen* teaser trailer.  Defendants refused to provide these documents, and Plaintiff sought
26  an order from the Court requiring Defendants to produce these documents.  Plaintiff did not
learn until a joint letter was submitted to the Court on February 13, 2015, that "Defendants
27  did not file a copyright application with the U.S. Copyright Office for the *Frozen* teaser
trailer".  (Doc. 53 at 6).  This fact in itself is an admission of liability and demonstrates that
28  Defendants knew the *Frozen* teaser trailer was not original because copyright law only
protects "original works of authorship," and the teaser trailer clearly is not one. 17 USC § 102.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

ARIAS OZZELLO & GIGNAC LLP

that Disney's characters were not copyrightable by themselves because they were merely component parts of a larger work and, in any event, the copying did not exceed permissible levels. *Id*. at 114; *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 758 (9th Cir. 1978).  The defendants pointed out all the differences between their works and Disney's works, claiming that the "theme and 'plot' of the defendants' publications differ markedly from those of plaintiff." *Id*. at 110.  The district court rejected this argument, explaining:

> However defendants would have it, the hard fact remains that both parties are dealing in cartoon series, comic books or strips, and that the mode which the defendants have chosen for the expression of their concepts amounts to a substantial taking of plaintiff's expression of its concepts, even assuming vast difference in the content of those concepts. **It can scarcely be maintained that there is no other means available to defendants to convey the message they have, nor is it even clear that other means are not available within the chosen genre of comics and cartoons.**  To paraphrase, it is true that it would be easier to copy substantial portions of the expression as distinguished from the idea itself of the Disney works, but the value of such labor saving utility is far outweighed by the copyright interest in encouraging creation by protecting expression. *Id*. at 115 (emphasis added).

The Ninth Circuit affirmed, ruling that "[b]ecause the amount of defendant's copying exceeded permissible levels, summary judgment was proper."  *Air Pirates*, 581 F.2d at 758.  The Ninth Circuit also examined the district court's opinion in *Air Pirates* in *Sid & Marty Krofft Television Productions, Inc.*, *supra*, 562 F.2d 1157 another case involving the copying of a fantasy work for children.  The defendants in that case copied H. R. Pufnstuf and used elements from H. R. Pufnstuf for the McDonaldland advertising campaign. *Id*.  Following a jury verdict favorable to plaintiff, defendants appealed to the Ninth Circuit and made essentially the same arguments made by Defendants in this case: "that the expressions of this idea are too dissimilar for there to be an infringement. [Defendants] come to this conclusion by dissecting the constituent parts of the Pufnstuf series -- characters, setting, and plot -- and pointing out the dissimilarities between these parts and those of the McDonaldland commercials." *Id*. at 1165.  The Ninth Circuit rejected this argument, explaining that "[An] infringement is not confined to literal and exact repetition or reproduction; it includes also

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Id*. at 1167. The Ninth Circuit concluded that "[i]t is clear to us that defendants' works are substantially similar to plaintiffs'.  They have captured the 'total concept and feel' of the Pufnstuf show. We would so conclude even if we were sitting as the triers of fact." *Id*. at 1167 (citation omitted).

In explaining the "idea-expression" dichotomy, the Ninth Circuit cited the district court's opinion in *Air Pirates* and added:

> The district court in [*Air Pirates*] recognized that the expression inherent in plaintiff's works differs from the mere idea of those works. **The "idea" of Mickey Mouse is, after all, no more than a mouse. Yet the particular expression of that mouse has phenomenal commercial value and is recognized worldwide. Defendants there could have chosen any number of ways to express their idea of a mouse, but chose to copy Disney's. So too the defendants in this case had many ways to express the idea of a fantasyland with characters, but chose to copy the expression of plaintiffs'.**

*Id*. at 1171 (emphasis added).  This case is no different.  The "idea" of a snowman and an animal competing over a carrot nose is just that—an idea.  But the "particular expression" of that idea as depicted in *The Snowman* is what is protected under copyright law.  "Defendants [here] could have chosen any number of ways to express their idea of a [snowman and animal competing over a carrot nose], but chose to copy [Plaintiff's]." *Id*.  "Because the amount of defendant's copying exceed[s] permissible levels, summary judgment [is] proper." *Air Pirates*, 581 F.2d at 758.

**B.  The Similarities Between the *Frozen* Teaser Trailer and *The Snowman* Are So Substantial and Striking That Copying May Be Found as a Matter of Law**

Where, as here, the similarities between the two works are such that it is *not* reasonably possible that Defendants *did not* copy *The Snowman*, unlawful copying may be found as a matter of law.  *See Baxter v. MCA, Inc*., 812 F.2d 421, 423 (9th Cir. 1987).  "What is required is

ARIAS OZZELLO & GIGNAC LLP

1  that the similarities in question be so striking as to preclude the possibility that the defendant

2  independently arrived at the same result."  4-13 NIMMER ON COPYRIGHT § 13.02.  That is

3  exactly the case here.

4      Defendants attempt to downplay the fact that their own effects artist Sam Klock admitted

5  that there are "striking similarities" between the *Frozen* teaser trailer and *The Snowman*,

6  arguing that this party admission should not be held against them because "Klock obviously was

7  making a lay observation, not offering a legal opinion."  Defendants' MSJ at 16:4-7.  But that is

8  exactly what the test for similarity is: "the gauge of substantial similarity is the response of the

9  ordinary lay [observer]."  *Baxter*, *supra,* 812 F.2d at 424.  Not only is Klock's statement

10 regarding the "striking similarities" admissible as a statement by a party opponent, but, as

11 Defendants point out, his statement also reflects the response of the ordinary "lay observ[er]"

12 and is therefore admissible under the extrinsic and intrinsic tests to be applied in this case.

13 Defendants' admission concerning the striking similarities between the *Frozen* teaser trailer

14 and *The Snowman* establishes the absence of a triable issue of fact regarding striking

15 similarity such that summary judgment should be granted in favor of Plaintiff.  *See Stewart*

16 *v. Wachowski*, 574 F. Supp. 2d 1074, 1104 (C.D. Cal. 2005) ("[Plaintiff's] admissions

17 concerning the lack of similarity between her works and the [Defendants'] films establish the

18 absence of a triable issue of fact regarding striking similarity.").

19     The *Frozen* teaser trailer is a work of fantasy set in a fantasy land where a snowman and

20 a reindeer engage in a contest over a carrot.  Because it is a work of fantasy, there are

21 "gazillions" of ways that Defendants could have expressed the idea a snowman and an animal

22 competing over a carrot.  *See Mattel, supra*, 616 F.3d at 913.  As Walt Disney himself once

23 said, "animation can explain whatever the mind of man can conceive."[2]  This truism is

24 exemplified by the ideas explored by Defendants for the *Frozen* teaser trailer *before* they

25 settled on copying the ideas expressed in *The Snowman*.  For example, Defendants assert in

26 their brief that before settling on the ideas that are expressed in the *Frozen* teaser trailer,

27

28

---

[2] Source:  http://www.brainyquote.com/quotes/quotes/w/waltdisney131677.html

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

ARIAS OZZELLO & GIGNAC LLP

Defendants proposed ideas relating to Sven and Olaf playing with Olaf's carrot nose.  *See* Defendants' MSJ at 12.  These ideas that pre-dated the ideas expressed in the published *Frozen* teaser trailer demonstrate that there are "gazillions" of ways that Defendants could have expressed the idea of Olaf and Sven competing over Olaf's carrot nose.  Instead, Defendants "had to move quickly" to create the *Frozen* teaser trailer and chose to copy Plaintiff's expression of the idea of a snowman and animal competing over a carrot nose because it achieved their goal of creating a teaser trailer featuring Olaf and Sven with physical comedy and little dialogue.  *See* Plaintiff's Opening Brief at 2:13-3:3.

An examination of other films that involve snowmen and animals further demonstrates the "gazillions" of ways that the idea can be expressed.  *See* Furniss Report at 6-15 (Doc. 59/105-6).  Two well-known films featuring animated snowmen, *Frosty the Snowman* (USA, 1969) and *The Snowman* (UK, 1982), feature an ensemble cast, humans and some animals, and no direct antagonist in competition with the snowman, and no carrot noses.  *Id*. at 8.  A lesser-known film centering around an animated snowman is the Nazi-era German short film *Der Schneemann*.  The snowman in *Der Schneemann* has a carrot nose, but the role of the carrot nose is "entirely different" from the role it plays in Plaintiff's *The Snowman*.  *Id*. at 13.  There are also animals that appear in *Der Schneemann*; but only briefly, and they are incidental characters, not antagonists.  *Id*.  Finally, *Der Schneemann* contains some scenes on a frozen lake, but unlike in Plaintiff's *The Snowman*, the snowman skates "quite well, not slipping at all."  *Id*. at 14.

The best evidence is, of course, a comparison of the two works themselves.  The indisputable fact that there are *fifty-five* points of similarity from the 90 second *Frozen* teaser trailer when compared to the four and a half minute *The Snowman* is in itself demonstrative of copying.  *See* Wilson Decl., Ex. B (Doc. 59-1/105-5).  Such extensive similarity does not happen by coincidence.  *See* Furniss Report (Doc. 59/105-6).

### C. Because The Evidence Indisputably Demonstrates that Defendants Had Access to *The Snowman,* Access May Be Found as a Matter of Law

Proof of access requires only a reasonable opportunity or reasonable possibility to

ARIAS OZZELLO & GIGNAC LLP

view or to copy plaintiff's work.  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012).  "Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of either (1) a chain of events linking the plaintiff's work and the defendant's access, or (2) widespread dissemination of the plaintiff's work."  *Id*. at 846-47.  The evidence in this case indisputably demonstrates that Defendants had access to *The Snowman*: (1) through "a chain of events" and people linking *The Snowman* to many of Defendants' employees; and (2) by virtue of the fact that *The Snowman* has been widely disseminated since 2010, especially within the animation world.

Plaintiff has provided more proof of access in this case than just about any published copyright infringement case where access has been contested.  The evidence indisputably demonstrates that: (1) Defendants received and reviewed *The Snowman* with job applications multiple times; (2) Defendants attended screenings of *The Snowman* at the San Francisco International Film Festival; (3) Defendants attended at least one of the other eight film festivals where *The Snowman* was screened; (4) many individuals who actually saw *The Snowman* communicate with John Lasseter on a regular basis; and (5) Defendants look to the internet for research, and a search for "snowman" videos would likely lead to *The Snowman* on YouTube or Vimeo (and a search on YouTube or Vimeo would surely result in the opportunity to view *The Snowman*).  The evidence of Defendants' access to *The Snowman* is so strong in this case that access may be found as a matter of law.

### 1. *The Snowman* Has Been Widely Disseminated Since 2010

"The evidence required to show widespread dissemination will vary from case to case."  *L.A. Printex Indus., Inc*, *supra*, 676 F.3d at 847.  In *L.A. Printex Indus., Inc.*, the parties both operated businesses in the fabric industry in Los Angeles.  Plaintiff created and copyrighted a fabric design and disseminated the fabric design over a four-year period immediately preceding the defendants' alleged infringement of the design. The Ninth Circuit held that "[a] reasonable jury could find that [the fabric design] was widely disseminated in the Los Angeles-area fabric industry, and hence that there was a 'reasonable possibility' that Defendants had an opportunity to view and copy L.A. Printex's

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

design." *Id.* at 848.

Here, "[*The Snowman*] was widely disseminated in the [animation] industry, and hence [] there was a 'reasonable possibility' that Defendants had an opportunity to view and copy [*The Snowman*]." *Id.* at 848. *The Snowman* screened at eight film festivals across the country over two years, and people involved with the creation of the *Frozen* teaser trailer attended film festivals regularly. *See* Plaintiff's Opening MSJ Brief at 9-12 (Doc. 58-3/105-3). In addition, *The Snowman* has been posted on Plaintiff's website since 2010, Vimeo since 2012, and YouTube since January 10, 2013. *The Snowman* has also been posted to Facebook and shared by Plaintiff's friends, thereby exposing all of Plaintiff's friends' connections on Facebook to *The Snowman*. *See* Wilson Decl., ¶¶ 16-17. Between Plaintiff and Neil Wrischnik, 303 people who work for Disney potentially have been exposed to *The Snowman* on Facebook. *Id.*; Wrischnik Decl., ¶¶ 16-18.

Defendants argue that the audience for *The Snowman* on Vimeo was comprised of Plaintiff's Facebook friends. Defendants' MSJ Brief at 11. In truth, there is no proof one way or the other as to who looked at *The Snowman* on Vimeo, and Defendants' argument is pure conjecture. However, even assuming that every one of the 267 views of *The Snowman* on Vimeo in January 2013 could be attributed to Plaintiff's and Wrischnik's Facebook friends, 303 people who worked for Disney potentially would have been exposed to *The Snowman* during the same time when ideas for the *Frozen* teaser trailer were being discussed. Wilson Decl., ¶ 16; Wrischnik Decl., ¶¶ 16-17. Finally, and most importantly, Wrischnik has been Facebook friends (i.e. directly connected) with Jorge Ernesto Ruiz Cano, an animator on *Frozen*, since December 2008. This means that every time *The Snowman* was posted, liked, or commented on by Wrischnik or one of their mutual friends on Facebook, Jorge Ernesto Ruiz Cano had the opportunity to view *The Snowman*.

In addition, *The Snowman* was posted to YouTube on January 10, 2013, around the same time that Defendants were looking for ideas for the *Frozen* teaser trailer. Plaintiff's Opening MSJ Brief at 6:19-27. Plaintiff provided analytics regarding *The Snowman* on YouTube, including evidence that someone in the United States searched for "snowman

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**ARIAS OZZELLO & GIGNAC LLP**

cartoons for children" and, as a result, watched *The Snowman* on January 15, 2013. Defendants go to great lengths to try to show that this person could not have been anyone related to Defendants.  *See* Defendants' Opening MSJ Brief at 9-10.  However, there are multiple assumptions that must be accepted as true in order for Defendants' theory to fly.

For example, Defendants attempt to show that the only people who watched *The Snowman* on YouTube in the time between January 10, 2013 and January 15, 2013 were Plaintiff and Wrischnik.  *See* Defendants' MSJ Brief at 9:17-10:26; Cox Decl. (Doc. 88) at ¶ 53-59.  In truth, there is no evidence to support this contention.  Defendants state that the person who viewed *The Snowman* on YouTube on January 11, 2013, reached the video as a result of "NO_LINK_OTHER."   Defendants disclose part, but not all, of the actual definition of "NO_LINK_OTHER" provided by Google/YouTube, stating that it "encompasses direct traffic to a video as well as traffic on mobile apps." Cox Decl. at ¶ 54(f). The *actual* definition provided by Google/YouTube at the link provided by Defendants states "NO_LINK_OTHER" means "YouTube did not identify a referrer for the traffic. This category encompasses direct traffic to a video as well as traffic on mobile apps."  Defendants argue that "*If* Plaintiff clicked on the link forwarded by Mr. Wrischnik, then she would have viewed the video as a result of 'NO_LINK_OTHER.'"  *Id.*  at ¶ 54(g) (emphasis added).  By this logic, *if* John Lasseter had viewed *The Snowman* that day on his iPad, then he would have viewed the video as a result of "NO_LINK_OTHER."   The bottom line is that "YouTube did not identify a referrer for the traffic" and therefore any speculation as to who watched *The Snowman* on January 15, 2013 is just that—speculation.

In addition, Defendants attempt to show that the viewer who watched *The Snowman* on YouTube as a result of a search for "snowman cartoons for children" could not have been Defendants because the viewer could not have come from California.  However, it is a pointless exercise to argue over calculations of the average time someone watched *The Snowman* on YouTube because any video can be easily downloaded, stored on a personal computer and watched an infinite number of times without any tracking of the views.  In fact, a user would not have to watch *any* amount of *The Snowman* on YouTube in order to

download and watch it later.  Although videos are supposed to be "locked" by Vimeo and YouTube, websites such as http://savevideo.me/ allow users to download a video by simply entering the URL of the video page and pressing "download."  Moreover, given that an unknown number of people worked on creating the *Frozen* teaser trailer, any one of those people could have watched *The Snowman* from anywhere in the world.  And it is more likely that *The Snowman* would have been found by someone looking at snowman videos as research for the *Frozen* teaser trailer on YouTube because YouTube suggests "related videos" that will automatically appear and be available for viewing.  *See* https://support.google.com/youtube/answer/92651?hl=en.

### 2.  *The Snowman* Screened with Defendants' Film *Play by Play* at the 2011 San Francisco International Film Festival,

*The Snowman* screened four times with Defendants' film *Play by Play* at the 2011 San Francisco International Film Festival ("SFIFF"), and Plaintiff spoke on stage **twice** with Defendants at the SFIFF.  Wilson Decl., ¶¶ 14-16, Ex. A (Doc. 59-1/105-5). Defendants describe *Play by Play* as "an independent project" produced by "several Pixar employees."  Defendants' MSJ at 7:15-16.  But this is misleading and not true.  *Play by Play* was not an "independent" project.  *Play by Play* was produced by Afterwork Films, which is a subsidiary of Defendants.  Baer Decl., Ex. 2.  Afterwork Films is an "after work" program offered at Pixar, where Pixar employees get together and create live action short films.  As explained in Plaintiff's Opening MSJ Brief, there were many people from Pixar in attendance at the screenings of *The Snowman* at the 2011 SFIFF.

Because Defendants are corporations, it would be an impossible burden (and in fact is not legally required) for Plaintiff to provide direct evidence of access showing that *The Snowman* was seen by, shared with or discussed with anyone who worked on the *Frozen* teaser trailer.  *See* 4-13 NIMMER ON COPYRIGHT § 13.02 ("In view of the fact that it would usually not be possible for the plaintiff to offer direct evidence of such knowledge by the various persons in such a [corporate] channel of communication, it would seem that proof of the fact of communication (on any subject) as between the various persons in the channel

should suffice to permit the trier of fact to find access, without any need to directly counter such persons' respective denials of knowledge."). Plaintiff has met her burden.

In this case, Defendants refused to identify everyone who worked on the *Frozen* teaser trailer, so there is no way for Plaintiff to evaluate all the possible connections. *See* Baer Decl., Ex. 18 at 13. The connections that are known, however, are extraordinary. There is indisputable evidence that people at Pixar who work closely with John Lasseter actually saw *The Snowman*. Elyse Klaidman, who is head of Pixar University and has known Lasseter for "████████" years, attended the film festival and has regular communications with Lasseter. Baer Decl., Ex. 3 (Deposition of Elyse Klaidman ("Klaidman Depo.") at 13:5-16). ██████████████████████████████████████
████████████████████████████████████████. *Id*. at Ex. 4-6.
████████████████████████████████████████
████████████████████████████ (Baer Decl., Ex. 7) and ██████████
(*Id*. at Ex. 8). ████████████████████████████████████████
████████████████████████████████████████
███████████████ Baer Decl., Ex. 9 (Deposition of Carlos Baena ("Baena Depo.") at 49:12-13; 60:8). ████████████████████████████████
████████████████████ *Id*. (Baena Depo. at 50:1-22). In addition, there were countless other Pixar employees in attendance at the screenings of *The Snowman* at the 2011 SFIFF. Any one of them could have communicated about *The Snowman* with any one of the many individuals who worked on the *Frozen* teaser trailer. Finally, Lasseter is connected to *Play by Play* because the production notes specifically give "special thanks" to him. Baer Decl., Ex. 10.

### 3. Plaintiff Shows More Than "Corporate Receipt" Because Defendants Acknowledged Receipt and Review of *The Snowman* with Plaintiff's and Wrischnik's Job Applications

The evidence shows that Defendants reviewed *The Snowman* both on Plaintiff's website as part of her job application and as it was contained on a demo reel submitted to

ARIAS OZZELLO & GIGNAC LLP

Pixar by Wrischnik.  Plaintiff is not claiming that Defendants had access through "bare corporate receipt" of job applications.  To the contrary, the evidence demonstrates that in addition to the fact that Defendants did in fact receive the job applications, which included *The Snowman*, Defendants actually reviewed the applications.  In fact, Wrischnik was contacted by Pixar and told that his demo reel (containing *The Snowman*) was reviewed.  Wrischnik Decl., ¶¶ 11-12; Wilson Decl., ¶¶ 6-13; Baer Decl., Ex. 11 (Deposition of Matt Roberts ("Roberts Depo.") at 52:19-25; 53:1-7; 69:16-25; 70:6-25).

Plaintiff submitted eight job applications to Defendants between 2008 and 2012 which contained references to *The Snowman*.  Plaintiff submitted still images from *The Snowman* in a portfolio to The Walt Disney Company in September 2008 and twice to Pixar in October 2009.  Wilson Decl., ¶¶ 6-8. Plaintiff submitted links to her website which featured the full version of *The Snowman* to Pixar and Playdom in September 2011, to Playdom in November 2011, and to Cinderbiter in February 2012.  Plaintiff received responses confirming that her resume had been reviewed from Playdom in September 2011 and from Cinderbiter in February 2012.

Wrischnik submitted six job applications to Defendants between 2009 and 2010 which contained references to *The Snowman*, and he submitted five demo reels which contained footage of *The Snowman*, in part or in full.  Wrischnik Decl., ¶ 7.  Wrischnik received an email from Pixar stating: "We had your animation reel & resume reviewed and while everyone was impressed with your work, we are unable to utilize your skill set at this time."  *Id*. at ¶ 12.

Defendants claim that "there is no evidence that any of the applications made their way past the recruiting departments, which act as gatekeepers between submitters such as Plaintiff and the people who create Disney's animated films." Defendants' MSJ at 1:12-14.  Courts have found that evidence of access is insufficient where the only evidence proffered is unsolicited submission of work to the defendant and "the defendant company can demonstrate that its established procedures insulate decision-making and creative personnel from unsolicited submissions…".  4-13 NIMMER ON COPYRIGHT § 13.02 (citations omitted).

ARIAS OZZELLO & GIGNAC LLP

ARIAS OZZELLO & GIGNAC LLP

1    Here, Defendant fails to offer any competent evidence that there are "established

2    procedures" to "insulate decision-making and creative personnel from unsolicited

3    submissions." *Id*.  Plaintiff requested all such policies in discovery, and Defendants

4    produced none.  In truth, although Defendants allege such "insulation," Defendants have no

5    policies or procedures in place which regulate who reviews or is allowed to view creative

6    material submitted with applications and the evidence shows that ████████████████

7    ████████████████████████████████████████████████.

8    Baer Decl., Ex. 11 (Roberts Depo. at 82:22-83:13; 94:23-95:1).  Defendants likewise have

9    no policy in place to protect the artistic work submitted with portfolios from illegal use or

10   copying.  *Id*. at 89:12-19.

11   On the contrary, Disney Animation Recruiter Matt Roberts testified that ████████

12   ████████████████████████████████████████████████

13   ████████████████████████.  *Id*. at 54:5-

14   55:15. ████████████████████████████

15   ████████████████████████████████████████████

16   ████  *Id*. at 111:23-112:23.

17   Pixar's 30(b)(6) witness Edwin Fabian, who testified about Pixar's recruiting

18   practices but was ████████████████████████████████████

19   ████████ (Baer Decl., Ex. 12 (Deposition of Edwin Fabian ("Fabian Depo.") at 110:15-

20   111:11), said that it ████████████████████████████

21   ████████████████████. *Id*. at 52:19-53:7.



### 4. Pixar Indisputably Viewed *The Snowman* and Defendants Admitted That Pixar Participated in the Process of Creating, Developing and Producing the *Frozen* Teaser Trailer

24   In response to Plaintiff's Rule 36 Requests for Admissions, Defendants admitted

25   that "one or more persons employed by Pixar participated in the process of creating,

26   developing and producing the *Frozen* teaser trailer."  Baer Decl., Ex. 13 at 4.  Based on the

27   indisputable proof that numerous individuals at Pixar actually saw *The Snowman*, this

28

admission conclusively establishes Defendants' access to *The Snowman* and cannot be rebutted by contrary testimony. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1112 (9th Cir. 2006) (court cannot ignore admissions even when presented with more credible evidence by party against whom admission operates).

Access may be shown where "an individual in a position to provide suggestions or comments with respect to the defendant's work -- a supervisory employee or an employee within the unit from which the defendant's work was developed -- had the opportunity to view the plaintiff's work." *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1357 (C.D. Cal. 1984). The Ninth Circuit has found that access is sufficiently shown where the parties did business with the same third party who had possession of the plaintiff's work alleged to have been infringed. *Kamar International, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir. Cal. 1981). "If a channel of communication between the person to whom the work is submitted (here, [numerous people at Pixar and Disney]) and the person who ultimately created the allegedly infringing work (here, [Lasseter]) and 'such channel involves a number of different people, each of whom (other than the original person to whom plaintiff submitted the work) denies knowledge of the work,' access is a reasonable, not a bare possibility." *Francescatti v. Germanotta*, 2014 U.S. Dist. LEXIS 81794, 13-14 (N.D. Ill. June 17, 2014).

Access has also been found in cases where the connections were even more attenuated. In *Allen v. Destiny's Child*, 2009 U.S. Dist. LEXIS 63001, (N.D. Ill. July 21, 2009), "although (1) the creators of the Destiny Child's Song ('DC Song') denied under oath that they did not receive a copy of the plaintiff's song from any source, and (2) a third party—whom the plaintiff had allegedly given his song and who later created a remix of the DC Song—denied giving the creators a copy of the plaintiff's song, it was undisputed that 'sometime in 2000, 2001, or 2002,' the creators came into contact with the third party. It was therefore possible for [the third party] to have provided a copy of [the plaintiff's song], or a key part thereof to the creators of the DC Song before the songwriter defendants wrote and recorded the DC song in 2004." *Francescatti*, 2014 U.S. Dist. LEXIS 81794 at 14-15.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  Plaintiff's case is similar to *Kamar International, Inc.* and *Francescatti*.  Here, John
2  Lasseter was the supervisory employee of the unit from which the *Frozen* teaser trailer was
3  created.  There is indisputable evidence that dozens of people from Pixar actually saw *The*
4  *Snowman*, and many of these people have worked with Lasseter.  Here, as in *Francescatti*,
5  Plaintiff has offered evidence "concerning a channel of communication between [numerous
6  individuals at Pixar], [numerous individuals at Disney], and [Lasseter] that surpasses the
7  threshold of 'mere conjecture or speculation,' thus giving rise to a reasonable possibility of
8  access." *Id*. at 14.

### D.  Defendants Rely on Improper Legal Standards and Inapposite Cases in Attempting to Disprove Access

Defendants' argument against access consists of assertions that have no bearing on
proof of access.  Defendants contend that there is no evidence that anyone involved in the
creation of the *Frozen* teaser trailer viewed *The Snowman*.  Defendants' MSJ at 17:10-13.
This contention misses the mark for two reasons.  First, the proof is in the pudding—a
comparison of the two works reveals the striking similarities and demonstrates that
*someone* involved in the creation of the *Frozen* teaser trailer saw *The Snowman*.  Second, it
is not Plaintiff's burden to prove that someone involved in the creation of the *Frozen* teaser
trailer actually saw *The Snowman*.  The law recognizes that this is an impossible standard
to meet and therefore allows copyright infringement to be proven through an *opportunity* to
view the work and substantial similarity.  If no person who worked on the *Frozen* teaser
trailer could have even had an opportunity to view *The Snowman* prior to the creation of the
*Frozen* teaser trailer because *The Snowman* was so obscure that there would be no way
Defendants would have known about it, then access might not be shown.  But where, as
here, any person who worked on the *Frozen* teaser trailer *could* have learned of *The*
*Snowman* and therefore had the opportunity to view it, access is shown.

Defendants would like the Court to believe that "[t]o credit Plaintiff's theory of
copying, the Court would have to conclude that the entire production process was an
elaborate charade undertaken to conceal the true source of inspiration for the teaser trailer."

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants' MSJ at 24:20-22.  Under the law, however, the Court need only conclude that Defendants had access to *The Snowman* and that the similarities between the *Frozen* teaser trailer and *The Snowman* are substantial.  Plaintiff does not have to prove, and Plaintiff does not allege, that Defendants "conspired" to copy *The Snowman*.  In order to have "copied" *The Snowman*, Defendants need not have screened *The Snowman* in their studio theater, or fabricated documents such as storyboards and meeting notes, or have emailed *The Snowman* around to each other.  Professor Nimmer addresses this issue squarely:

> Just as it is virtually impossible to offer direct proof of copying, so it is often impossible for a plaintiff to offer direct evidence that defendant (or the person who composed defendant's work) actually viewed or had knowledge of plaintiff's work. Such viewing will ordinarily have occurred, if at all, in a private office or home outside of the presence of any witnesses available to the plaintiff. For this reason, it is clear that, even if evidence is unavailable to demonstrate actual viewing, proof that the defendant had the opportunity to view (when combined with probative similarity) is sufficient to permit the trier to conclude that copying as a factual matter has occurred—in other words, the factfinder has the discretion to reject even the uncontradicted testimony of the writer of defendant's work that he had never in fact viewed plaintiff's work.

4-13 NIMMER ON COPYRIGHT § 13.02 (citations omitted).

Defendants rely on cases completely inapposite, such as *Gable v. NBC*, 727 F. Supp. 2d 815 (C.D. Cal. 2010), to support their argument that Plaintiff has not shown that Defendants had access to *The Snowman*.  In *Gable*, plaintiff claimed that the television show *My Name is Earl* was copied from his screenplay.  *Id*.  The only "evidence" of access consisted of a declaration from the plaintiff and his girlfriend stating that they had mailed the screenplay to a talent agency in 1995.  *Id*. at 825   Plaintiff did not offer any evidence that the screenplay was mailed or that the talent agency ever received the screenplay.

In contrast, here, in addition to the fact that *The Snowman* has been widely disseminated, Plaintiff has proof that Defendants had access to *The Snowman* because it was submitted to them with job applications, in part or in full, and because employees at Pixar who work with John Lasseter actually saw *The Snowman*.

ARIAS OZZELLO & GIGNAC LLP

**E. Plaintiff's Expert Dr. Maureen Furniss Engaged In the Proper Analysis and Concluded The Similarities Between The Frozen Teaser Trailer and The Snowman Are Substantial and Striking**

Plaintiff's expert witness Maureen Furniss, Ph.D., who has been studying and teaching animation history for over twenty years, calls the similarities between the films "extraordinary" (Doc. 105-6 at 30) and concludes that the "striking similarities between the *Frozen* teaser trailer and *The Snowman* indicate that Disney's Frozen Teaser Trailer could not have been created independently." *Id*. at 33.

Defendants argue that Dr. Furniss engaged in improper analysis when evaluating the similarities between *The Snowman* and the *Frozen* teaser trailer. Defendants' counsel asked Dr. Furniss *eleven times* in her deposition whether she filtered out the unprotectable elements of *The Snowman* before evaluating the similarities between the works. *See, e.g.* Baer Decl., Ex. 14 (Deposition of Maureen Furniss, Ph.D. ("Furniss Depo.") at 85:3-4-87:8; 88:14-89:1; 90:1-2; 91:3-4; 223:4-8. Each time Dr. Furniss answered affirmatively and explained, "The elements in my report are what I considered to be protectable." Baer Decl., Ex. 14 (Deposition of Maureen Furniss, Ph.D. ("Furniss Depo.") at 85:3-4. Defendants also criticize Dr. Furniss for not conducting an in-depth investigation of the possibility that the *Frozen* teaser trailer could have been created independently. First, this criticism is misplaced because it is Defendants' burden, not Plaintiff's, to prove independent creation. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000). Second, Defendants did not even ask their own "expert" to review the notes and storyboards allegedly used to create the teaser trailer.

Dr. Furniss's analysis was based on protectable elements. (Furniss Depo at 223:4-8). Dr. Furniss first identified the original elements in *The Snowman*, and then compared those to the *Frozen* teaser trailer. This is exactly the role of the expert in copyright infringement cases. *See Williams v. Bridgeport Music, Inc*., 2014 U.S. Dist. LEXIS 182240, 1, 15 (C.D. Cal. Oct. 30, 2014) (a court considers expert testimony in order to perform the "analytical dissection" of a work under the extrinsic test).

Defendants hired their own "expert" James McDonald—who is not even an expert in

animation or animation history, but who ███████████████████

███ Baer Decl., Ex. 1 (Deposition of James McDonald ("McDonald Depo." at 52:1-3; 58:6-8); Ex. 15.  McDonald clearly lacks expertise in identifying substantial similarity in animated works, as this is not where his experience lies.  His reports, and especially his rebuttal report (Doc. 93-5), read more like Defendants' legal briefs than an expert report identifying the original elements of *The Snowman* and comparing those to the *Frozen* teaser trailer.  McDonald's Reports do nothing more than argue that everything in *The Snowman* is *not* protectable.  Dr. Furniss, in response to McDonald's Report, stated: "Mr. McDonald has described Wilson's Short Film abstractly—as he says 'on a macro level'—not examining the actual plot action on the 'micro level' that a study of similarity requires. To say that all narratives are confined by limited choices suggests that nothing new, nothing original or copyrightable, could ever be created."  Baer Decl., Ex 16 (Expert Rebuttal Report of Maureen Furniss. Ph.D).

### F. Defendants Have Failed To Raise Any Triable Issue of Fact to Support Their Theory of "Independent Creation"

Defendants liken their creation of the *Frozen* teaser trailer to a case where the defendants presented evidence that an animated character "'evolved organically' over time out of cooperative endeavors of many employees."  Defendants' MSJ at 24:13-15. However, Defendants have presented no such evidence here.  Defendants would have this Court believe that the meeting notes and storyboards show incremental creation of the *Frozen* teaser trailer.  They do not.  In fact, they show the opposite.  They show that the story being told in the *Frozen* teaser trailer came out of the first meeting with John Lasseter and did not change except for minor details.  *See* Plaintiff's Opening MSJ at 3.

Even if the meeting notes did reflect any incremental evolution of the idea behind the *Frozen* teaser trailer, the meeting notes are triple hearsay and therefore inadmissible evidence.  The meeting notes were allegedly taken down by an unidentified person and do not represent verbatim notes of what was said and occurred at the meetings.  Baer Decl., Ex. 17 (Deposition of Paul Briggs at 73:13-75:20; 84:10-85:2).  Peter Del Vecho, who

ARIAS OZZELLO & GIGNAC LLP

attempted to authenticate the notes as "business records" in his declaration, did not record the notes and therefore cannot attest to their authenticity or establish their admissibility.

Mr. Del Vecho asserts that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Baer Decl., Ex. 19 (Deposition of Peter Del Vecho ("Del Vecho Depo." at 38:5-8; 38:17-21) ("████████████████████████████████ ████████████████████████████████████") (Del Vecho Depo. at 50:7-11).   As the producer, Mr. Del Vecho is a top-level executive who oversees production of the film. However, he testified that "██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████." (*Id*. at 55:9-14).

Despite asserting "independent creation," all of Defendants' witnesses claimed at their depositions that they could not remember who came up with the ideas or parroted the canned response that it was a "collaboration." ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████.  Baer Decl., Ex. 17 (Briggs Depo. at 84:1-14).  In short, when it comes to proving independent creation, Defendants' witnesses have serious credibility issues.

Because Defendants have failed to offer any competent and admissible evidence of independent creation, either in documents or testimony, summary judgment on the issue of independent creation is inappropriate.  *See Miller v. Miramax Film Corp*., 2001 U.S. Dist. LEXIS 25967, 31-32 (C.D. Cal. Sept. 26, 2001).

## III.  CONCLUSION

Plaintiff has demonstrated striking similarity and access, and has satisfied the extrinsic and intrinsic tests for substantial similarity.  Therefore, summary judgment on liability should be granted in favor of Plaintiff on her claim for copyright infringement.

ARIAS OZZELLO & GIGNAC LLP

Dated:  March 19, 2015

ARIAS OZZELLO & GIGNAC LLP

By: *Mischa Barteau*

J. Paul Gignac
Mischa N. Barteau

LAW OFFICE OF J.A. TED BAER
J.A. Ted Baer

Attorneys for Plaintiff Kelly Wilson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARIAS OZZELLO & GIGNAC LLP

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**