**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# EXHIBIT 11

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
 3
 4   KELLY WILSON, an individual,
 5        Plaintiff,
 6      vs.                              No. 3:14-CV-01441-VC
 7   THE WALT DISNEY COMPANY, a Delaware
     corporation; DISNEY ENTERPRISES, INC.,
 8   a Delaware corporation; WALT DISNEY
     PICTURES, a California corporation;
 9   WALT DISNEY MOTION PICTURES GROUP,
     INC., a California corporation; and
10   DOES 1 through 25, inclusive,
11        Defendants.
12
13   _____
14
15                       CONFIDENTIAL
16
17             DEPOSITION of MATT ROBERTS
18                  BURBANK, CALIFORNIA
19              MONDAY, NOVEMBER 17, 2014
20                        VOLUME 1
21
22
23   Reported by
     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356
24   Job No. 1964975
25   PAGES 1 - 187
```

Page 1

CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
 3
 4      KELLY WILSON, an individual,
 5             Plaintiff,
 6         vs.                                  No. 3:14-CV-01441-VC
 7      THE WALT DISNEY COMPANY, a Delaware
        corporation; DISNEY ENTERPRISES, INC.,
 8      a Delaware corporation; WALT DISNEY
        PICTURES, a California corporation;
 9      WALT DISNEY MOTION PICTURES GROUP,
        INC., a California corporation; and
10      DOES 1 through 25, inclusive,
11             Defendants.
12      _____
13
14
15
16          DEPOSITION of MATT ROBERTS, at 500 South Buena
17          Vista Street, Burbank, California, beginning at
18          1:03 p.m., and ending at 5:48 p.m., on Monday,
19          November 17, 2014, before Daryl Baucum, RPR,
20          CRR, RMR, CSR No. 10356.
21
22
23
24
25
```

Page 2

CONFIDENTIAL

1        MS. COX:  Objection; calls for speculation,
2   vague and ambiguous.
3        THE WITNESS:  You would have to get more
4   specific in your question.
5   BY MS. BARTEAU:
6        Q.   So when you're -- let's say you are hiring --
7   do you ever hire animators just for general Animation
8   Department, not for a specific film or project?
9        MS. COX:  Objection; vague and ambiguous as to
10  time.
11       THE WITNESS:  If we're talking animation
12  specifically, occasionally, but not that often.
13  BY MS. BARTEAU:
14       Q.   So you are usually hiring animators for a
15  specific project; is that correct?
16       A.   Correct.
17       Q.   And so on -- let's take a project such as
18  "Frozen."
19            Did you hire any animators who worked on the
20  movie "Frozen"?
21       A.   Yes.
22       Q.   And who were the hiring managers who oversaw
23  the hiring of those animators?
24       MS. COX:  Objection; foundation, calls for
25  speculation.

1           THE WITNESS: I am not sure I understand the
2  question.
3  BY MS. BARTEAU:
4      Q.  How many animators did you hire who worked on
5  "Frozen"?
6      A.  I don't know offhand. I think it was somewhere
7  in the vicinity of maybe 15, 15 to 20 animators, hired
8  specifically on to that show.
9      Q.  And what was the time period when those
10 animators were hired?
11     A.  We hired the animators October of 2012 through,
12 I believe, April of 2013.
13     Q.  And did you hire animators who worked on the
14 "Frozen" teaser trailer?
15     A.  I don't know.
16     Q.  To your knowledge, is there any animator who
17 would have worked on the "Frozen" teaser trailer that
18 didn't work on the movie "Frozen"?
19          MS. COX: Objection; foundation, calls for
20 speculation.
21          THE WITNESS: I am not sure exactly what you
22 are asking. Sorry.
23 BY MS. BARTEAU:
24     Q.  So as far as you know, there were no animators
25 hired specifically for the trailer; is that right?

CONFIDENTIAL

| | |
|---|---|
| 1 | MS. COX: Objection; misstates testimony. |
| 2 | THE WITNESS: I only hired animators onto the |
| 3 | film "Frozen." |
| 4 | BY MS. BARTEAU: |
| 5 | Q. And who were the hiring managers for those |
| 6 | animators that you hired? |
| 7 | MS. COX: Objection; vague and ambiguous |
| 8 | foundation. |
| 9 | BY MS. BARTEAU: |
| 10 | Q. Do you know what I am asking? |
| 11 | A. I do. |
| 12 | It would have been the department leadership |
| 13 | for animation as well as the supervising animators |
| 14 | particular to the film of "Frozen." |
| 15 | Q. And do you remember who all of those people |
| 16 | were? |
| 17 | A. I do. |
| 18 | Q. Can you, please, tell me. |
| 19 | A. Lino Di Salvo, Wayne Unten, Becky Bresee, Hyram |
| 20 | Osmond. Renato Dos Anjos would have been part of that. |
| 21 | Again, I think Amy -- not Amy Smeed at that time -- |
| 22 | Patrick Osborne. For specifically the animators, that |
| 23 | is everyone I can think of off the top of my head. |
| 24 | Q. And do all of those individuals that you just |
| 25 | named, do they have the same job title? |

Page 54

```
 1              MS. COX:  Objection; foundation, calls for
 2     speculation, ambiguous as to time.
 3     BY MS. BARTEAU:
 4         Q.   Do you know the job titles of the people that
 5     you just mentioned?
 6              MS. COX:  Objection; foundation, calls for
 7     speculation as to time.
 8              THE WITNESS:  Yes.
 9     BY MS. BARTEAU:
10         Q.   Can you tell me their job titles, please.
11         A.   Lino Di Salvo was the Head of Animation for
12     "Frozen" and he is also a Studio Department Leader.
13     Patrick Osborne would have just been Studio Department
14     Leader.  And at the time, everyone else would have been
15     considered a supervising animator.
16         Q.   What does it mean to be a "Studio Department
17     Leader"?
18              MS. COX:  Objection.  This is far outside the
19     scope of the 30(b)(6) topics, also lacks foundation,
20     also calls for speculation.
21     BY MS. BARTEAU:
22         Q.   Do you know what it means to be a "Studio
23     Department Leader"?
24         A.   I do.
25         Q.   What does it mean?
```

```
 1        Q.   And under what circumstances would you destroy
 2   documents?
 3             MS. COX:  Objection; misstates testimony.  I
 4   believe that the phrase Mr. Roberts used was
 5   "recycling."
 6             THE WITNESS:  Can you be more specific.  Sorry.
 7   BY MS. BARTEAU:
 8        Q.   When would you destroy or recycle documents?
 9        A.   After a particular position has been filled or
10   if there just isn't any need for the application.
11        Q.   Is there a record kept of what documents are
12   destroyed?
13             MS. COX:  Objection; misstates prior testimony.
14             THE WITNESS:  Not to my recollection.
15   BY MS. BARTEAU:
16        Q.   To your knowledge, does Disney have a -- by
17   "Disney," I mean the company you are here
18   representing -- have a document retention policy?
19        A.   I don't know of a formal retention.
20        Q.   Do you know of an informal retention policy?
21        A.   For my own practices at the time, like I said,
22   we would hold onto the hard -- the hard files through
23   when a position was filled that the materials were
24   submitted for.
25        Q.   And does -- before documents are destroyed,
```

```
 1    does it need to be approved by somebody in the
 2    department?
 3           MS. COX:  Objection; vague and ambiguous,
 4    misstates prior testimony.  I believe Mr. Roberts used
 5    the phrase "recycling" as to what he does with
 6    documents.
 7           MS. BARTEAU:  Well, I believe that Mr. Roberts
 8    testified that when -- what he means by "recycled" is
 9    that they're sent to Iron Mountain and destroyed.
10    BY MS. BARTEAU:
11       Q.   Is that correct?
12       A.   When they are recycled, correct.
13       Q.   So I think we can use "recycled" and
14    "destroyed" interchangeably the way you are using
15    "recycled."
16           Would you agree with that?
17           MS. COX:  I would object to the extent that
18    Mr. Roberts is personally sending documents as Iron
19    Mountain and that action is refer to as "recycling," I
20    believe, within the animation studios.
21           You can correct me if I am wrong.
22           THE WITNESS:  Yeah, to my knowledge, I think
23    the materials get shredded, but I don't know
24    specifically what happens at Iron Mountain.  I just know
25    that is our secure recycling plant that we send
```

CONFIDENTIAL

1   department.
2   Q.  Based on your recollection, what is the lowest
3   number of hiring managers that have reviewed an
4   applicant?
5   A.  I would say maybe between five and ten.
6   Q.  And so is ten the highest number of hiring
7   managers that you recall ever being assigned to a
8   candidate?
9   A.  I would say in that range.
10      Could we also take a bathroom break in the next
11  couple of questions.
12  Q.  Absolutely.  Why don't we break right now.
13      (Off the record.)
14  BY MS. BARTEAU:
15  Q.  Let's go back to who you're here appearing on
16  behalf of, which Disney entity.
17      In the 30(b)(6) notice of deposition, do you
18  know which of the four Disney entities you are here
19  representing today?
20  A.  It would be Walt Disney Pictures and Walt
21  Disney Animation Studios within that.
22  Q.  You testified that in reviewing an application
23  that includes something like original artwork or
24  original animation, you would bring in -- I believe the
25  term is an SDL, Studio --

Page 82

1       A.      Studio Department Leader.

2       Q.      To review that creative material; is that

3    correct?

4       A.      Correct.

5       Q.      And has John Lassiter ever served as an SDL

6    since you have been a recruiter?

7       A.      No.

8       Q.      How about Mike Giamo?

9       A.      Not as an SDL but he has reviewed submissions

10   in the past.

11      Q.      If not as an SDL, in what capacity has he

12   reviewed submissions?

13      A.      Hiring manager.

14      Q.      Has John Lassiter ever reviewed remissions in

15   any capacity since you have been a recruiter?

16              MS. COX:  Objection; foundation, calls for

17   speculation.

18   BY MS. BARTEAU:

19      Q.      To your knowledge.

20      A.      Not for our studio.

21      Q.      For what studio?  Do you know?

22              MS. COX:  Objection; foundation, calls for

23   speculation.

24              THE WITNESS:  No.  Again, I only speak for Walt

25   Disney Animation.  He has never reviewed anything for

Page 83

```
 1   work is only being reviewed for the merit of their
 2   skills, nothing more.
 3        Q.   If you received original artwork from an
 4   applicant, what is your procedure for protecting it from
 5   being used for purposes other than evaluating an
 6   application?
 7             MS. COX:  Objection; vague and ambiguous as to
 8   the method of receipt and as to the specific instance.
 9             THE WITNESS:  Could you rephrase.
10   BY MS. BARTEAU:
11        Q.   Sure.
12             If you receive an artistic submission with an
13   application, what is your procedure for protecting the
14   artistic submission from being used for any purpose
15   other than evaluating that application?
16        A.   Really, there is no formal process just because
17   to my knowledge, I have never seen a reviewer evaluate
18   someone's work other than for the merit of their skills
19   for a role.
20        Q.   In your review of an application, do you ever
21   recommend that applicants get further experience or
22   training and then offer them suggestions as to how to
23   get that further experience or training?
24        A.   Yes.
25        Q.   And what sort of suggestions do you or have you
```

Page 89

CONFIDENTIAL

1    A.    It's possible.

2    Q.    Is there any reason you took a screen shot

3    instead of just printing out the document?

4         MS. COX:  Objection to the extent that it calls

5    for attorney-client communications, relevance.

6    BY MS. BARTEAU:

7    Q.    Outside of advice from your attorney, is there

8    any reason that you just took a screen shot instead of

9    printing the document?

10   A.    Just because it was just this is the direct

11   process for other reviews for when a candidate applies.

12   So we felt this was the most relevant.

13   Q.    Do you know who wrote this document?

14   A.    I believe it was Camile Eden.  I could be

15   mistaken, though.

16   Q.    Do you know when these procedures were -- went

17   into place?

18   A.    They have been in place since I have been a

19   recruiter.  This is just the formal writeup of it.

20   Q.    Was there -- do you know when this formal

21   writeup was written?

22   A.    Within the last couple of years.

23   Q.    So before the last couple of years, was there

24   anything in writing regarding policies or steps in the

25   recruitment process?

Page 94

CONFIDENTIAL

1    A.    No.

2    Q.    So what else is contained in this document that
3    wasn't -- is not shown in the screen right here?
4         MS. COX:  Object to the extent that not the
5    full production is being shown on Exhibit 95 in any
6    event.
7         THE WITNESS:  Basically, we didn't show
8    anything else because it's so far outside of the
9    relevancy of this deposition, that we didn't feel it was
10   necessary to be submitted.
11   BY MS. BARTEAU:
12   Q.    So what is not relevant?  I mean what else is
13   contained in the document?
14        MS. COX:  Objection to the extent that, first
15   of all, this is not the full production of the document
16   that was produced to the plaintiff.  And object to the
17   extent that it calls for attorney-client communications.
18        MS. BARTEAU:  So are you claiming privilege
19   over the rest of this document?
20        MS. COX:  I am referring to the fact that this
21   single screen shot is not the full production of the
22   document.  So to the extent that it's been represented
23   on the record this is the entirety of the production of
24   this particular document, it's not.  I don't want it to
25   be unclear from the record.

Page 95

CONFIDENTIAL

```
 1   documented whether or not that has been done?
 2       A.   Correct.
 3       Q.   And would that be in that same candidate
 4   profile?
 5       A.   Correct.
 6       Q.   And would it show exactly who the SDL was who
 7   reviewed the submission?
 8       A.   Correct.
 9       Q.   Would it also document whether an artistic
10   manager, for instance, was present at the review of the
11   artistic submission?
12       A.   No.
13       Q.   So it documents -- so it doesn't actually
14   document exactly everybody who has been exposed to that
15   artistic submission; is that correct?
16       A.   Correct.
17       Q.   And then I think you mentioned that the SDL's
18   document, meaning make a record, of their review right
19   into that candidate's profile; is that right?  So that
20   would indicate that they have reviewed the artistic
21   submission?
22       A.   Correct.
23       Q.   And when you receive a resume with a link or
24   reference to a website, is it your policy in reviewing
25   somebody's application to visit their website?
```

Page 111

CONFIDENTIAL

1   A.   Correct.
2   Q.   And is that a written policy or is that just
3   your policy?
4   A.   Really, if you are going to assess a candidate,
5   you have to look at their work to do so.  So if all of
6   they have given is a website, then you really have to go
7   to the website to look at the work.
8   Q.   Would that be documented in the candidate's
9   profile, whether or not their website was visited?
10  A.   Not formally.
11  Q.   Is there any way to tell based on records
12  whether or not a candidate's website was visited?
13  A.   If all they have given is a website and there
14  is an assessment, it's safe to say that the recruiter or
15  the hiring manager looked at that website.
16  Q.   And would it be safe to say that for the
17  recruiter who was working in 2008, do you think the
18  policy would have been the same?
19  A.   Yes.
20  Q.   And 2009, same policy?
21  A.   Correct.
22  Q.   2010, same policy?
23  A.   Yes.
24  Q.   This has previously been marked as Exhibit 36.
25       (Plaintiff's Exhibit 36, having been

Page 112