UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY WILSON,<br>        Plaintiff,<br>    v.<br>THE WALT DISNEY COMPANY, et al.,<br>        Defendants. | Case No. 14-cv-01441-VC<br><br>**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 84, 105 |

The cross-motions for summary judgment are denied.

<u>Wilson's Motion</u>

Wilson contends she should win on summary judgment because the *Frozen* trailer and *The Snowman* are so "strikingly similar" that they could not have been created independently. In support of this argument, Wilson primarily cites emails from Disney employees to one another about the similarities between the two works, including one email in which a Disney employee described the works as "strikingly similar." But the Disney employee appears to have been speaking as a layperson; the employee does not appear to have been using the phrase "strikingly similar" as it is used in copyright law. Nor does the testimony of Wilson's expert, assuming for purposes of this discussion that it would be admissible at trial, establish as a matter of law that the works are "strikingly similar." Indeed, a reasonable jury could go either way on whether the *Frozen* trailer and *The Snowman* are "substantially similar," *see* Doc. No. 39, which by definition prevents a finding that they are "strikingly similar" as a matter of law.

<u>Disney's Motion</u>

Because a reasonable jury could go either way on whether the works are substantially similar, and because Disney has not established as a matter of law that the *Frozen* trailer was

created independently, Disney cannot win its summary judgment motion unless it can show that the creators of the *Frozen* trailer lacked access to *The Snowman* as a matter of law. But as discussed below, there is a genuine factual dispute on this issue as well.

To get the "access" question to a jury, Wilson need not present evidence that the creators of the trailer actually viewed or copied the *The Snowman*. Nor is the Court permitted to credit the Disney witnesses' denials that they'd ever seen *The Snowman*. Wilson need only present evidence that people involved in the creation of the trailer had enough of a connection to *The Snowman* that there was a "reasonable possibility" that they had an "opportunity" to view or copy it. *L.A. Printex Ind., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482, 484-85 (9th Cir. 2000); 4 *Nimmer on Copyright* § 13.02.

The most direct connection between *The Snowman* and the creators of the trailer – a connection that's sufficient on its own to create a genuine issue of material fact on the issue of access – comes from the 2011 San Francisco International Film Festival. There, *The Snowman* was screened four times back-to-back with the short film *Play by Play*, which was created by employees of Pixar, a Disney subsidiary. Many Pixar employees attended the festival, including Elyse Klaidman, an executive producer of *Play by Play*. Klaidman works with John Lasseter, who is Chief Creative Officer for both Disney and Pixar. Lasseter was heavily involved in the creation of the *Frozen* trailer. Klaidman also had at least some work-related interaction with two other Disney people who participated in the creation of the *Frozen* trailer – Greg Coleman and Jessica Julius. Therefore, the connection between *The Snowman* and people involved in creating the *Frozen* trailer is fairly close. And in contrast to many copyright cases, Klaidman is not merely some random employee who is alleged to have received a routine submission of a copyrighted work from a random aspiring artist and then passed it on to the creator of the allegedly infringing work. Klaidman's exposure to *The Snowman* was much more noteworthy – she saw it at a film festival where it was shown back-to-back with her own work. And Klaidman's connection with Lasseter was more direct – she has known him for 15 or 16 years, interacts with him every few months, and has access to him whenever she needs to speak with him. This connection is therefore less attenuated than in other cases where courts have let the question of access go to a

1 jury. *See, e.g., Three Boys Music Corp. v. Bolton*, 212 F.3d at 482-85; *Straughter v. Raymond*,
2 2011 WL 3651350, at *11 (C.D. Cal. Aug. 19, 2011); *Allen v. Destiny's Child*, 2009 WL 2178676,
3 at *5-7 (N.D. Ill. July 21, 2009); *Francescatti v. Germanotta*, 2014 U.S. Dist. LEXIS 81794, at
4 *11-21 (N.D. Ill. June 17, 2014).  For that matter, the connection is less attenuated than in the
5 cases Disney relies on for the proposition that there is no access as a matter of law.  *See, e.g.,*
6 *Gable v. Nat'l Broad. Co.*, 727 F.Supp.2d 815, 824-29 (C.D. Cal. 2010); *Stewart v. Wachowski*,
7 574 F.Supp.2d 1074, 1088-89 (C.D. Cal. 2005); *Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F.Supp.
8 1346, 1355-56 (C.D. Cal. 1984).

9       Although the above-described connection is enough on its own to send the case to a jury,
10 additional circumstances make the "possibility" even more "reasonable" that the creators of the
11 *Frozen* trailer had an opportunity to view or copy Wilson's work.  For example, there is evidence
12 that roughly sixteen Pixar employees saw *The Snowman* at the San Francisco International Film
13 Festival, and Wilson spoke on-stage with Pixar employees twice during the festival.  *The*
14 *Snowman* was also shown at seven other film festivals, which is not an insignificant thing in the
15 film world.  A screening at a total of eight film festivals (including at least one attended by many
16 Pixar employees) might not rise to the level of "widespread dissemination" within the meaning of
17 copyright law.  *Cf. Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1144-45 (9th Cir.
18 2009).  But that shouldn't make it irrelevant to the ultimate question whether there is a reasonable
19 possibility the defendants had an opportunity to view or copy the work.  Film festivals are news-
20 generating events, and their inclusion of *The Snowman* certainly increases the chances that people
21 in the industry, including people involved in the creation of the *Frozen* trailer, learned of *The*
22 *Snowman* through word of mouth and viewed it.

23       And there are other circumstances, albeit less significant ones.  Wilson and her co-creator
24 sent numerous job applications to Disney and Pixar, some of which included images from or
25 references to *The Snowman*.  *The Snowman* was available on YouTube and Vimeo, and one
26 unknown person did a YouTube search for "snowman and rabbit" at the same time Disney's
27 people were meeting to create the trailer.  Disney rightly points out that *The Snowman* was not
28 popular online, but the lack of online popularity actually makes this YouTube search, and its

timing, more noteworthy. And Wilson's co-creator for *The Snowman* was Facebook friends with one of the animators on *Frozen*, meaning that whenever Wilson's co-creator posted *The Snowman*, the animator could have been notified of the posting. None of these additional circumstances would, on their own, create a reasonable possibility that the people involved in the creation of the *Frozen* trailer had an opportunity to copy or view *The Snowman*. But they further increase the possibility, making Disney's case for summary judgment on the question of access even weaker.

**IT IS SO ORDERED.**

Dated: April 16, 2015

_____
VINCE CHHABRIA
United States District Judge