Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Vince G. Chhabria

KELLY WILSON,                          )  No. 3:14-cv-1441-VC
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )  San Francisco,
                                       )  California
THE WALT DISNEY COMPANY, DISNEY        )
ENTERPRISES, INC., WALT DISNEY         )
PICTURES, and WALT DISNEY GROUP,       )  Thursday, April 9, 2015
INC.,                                  )
                                       )
        Defendants.                    )
_____)


TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING - FTR 11:26-12:45


APPEARANCES:

For Plaintiff:
                    LAW OFFICE OF J.A. TED BAER
                    21 E. Canon Perdido Street, Suite 223
                    Santa Barbara, Ca 93101
        BY:         **J.A. TED BAER, ESQ.**


                    ARIAS OZZELLO GIGNAC LLP
                    115 S. La Cumbre Lane
                    Suite 300
                    Santa Barbara, CA 93105
        BY:         **MISCHA NICOLE BARTEAU, ESQ.**
                    **J. PAUL GIGNAC, ESQ.**


Transcribed by:  Kelly Polvi, CSR No. 6389, RMR, FCRR
                 Contract Transcriber


(Appearances continued on following page.)

1    <u>APPEARANCES (Continued):</u>

2

3    For Defendants:
                         MUNGER TOLLES & OLSON LLP
                         560 Mission Street
4                        27th Floor
                         San Francisco, CA 94105
5        BY:             **KELLY MAX KLAUS, ESQ.**
                         **ERIN J. COX, ESQ.**
6                        **JORDAN D. SEGALL, ESQ.**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APRIL 9, 2015                          11:26 A.M.

2                        P R O C E E D I N G S

3        THE CLERK:  Calling case No. 14-cv-1441, Wilson vs.

4    Walt Disney Company.

5        Counsel, please step forward and state your appearances

6    for the record.

7        MR. GIGNAC:  Good morning, Your Honor, I'm J. Paul Gignac

8    with Arias Ozzello & Gignac representing the plaintiff,

9    Kelly Wilson.  Also present in court with me is Mischa Barteau

10   from my firm, and also my co-counsel, J.A. Ted Baer.

11       Good morning.

12       THE COURT:  Good morning, everyone.

13       MR. KLAUS:  Good morning, Your Honor.  Kelly Klaus from

14   Munger Tolles & Olson, and with me are my colleagues, Erin Cox

15   and Jordan Segall.

16       THE COURT:  Good morning, everyone.

17       All right.  Onto somewhat happier topic, perhaps.

18   Although I suppose that's in the eye of the beholder.

19       I guess my reaction to the papers is that, you know, the

20   plaintiff can't get summary judgment.

21       I don't think it's possible to rule as a matter of law

22   that they are strikingly similar.  I don't think that it's

23   possible to rule as a matter of law that they are not

24   substantially similar.

25       And I guess, really, I mean -- I guess -- and I'm pretty

1    strongly inclined -- and I guess I'm pretty firm on those two

2    first points, that the plaintiff is not entitled to summary

3    judgment.  It's not -- you know, they can't be held, as a

4    matter of law, to be strikingly similar, that I'm not -- you

5    know, I don't think that it can be held, as a matter of law,

6    that they're not substantially similar.

7        And so I think the only issue, really, that we need to

8    discuss today is access.  And my fairly strong inclination is

9    that I can't say as a matter of law that the plaintiff didn't

10   have access.

11       So Mr. Klaus, I think it's on you.

12       And, I mean, I have a -- I guess I have a number of

13   questions I won't spit out all at once, but, you know, the main

14   thing is just that people at Pixar, you know, saw *The Snowman*,

15   stood on the stage with the plaintiff, apparently, gave talks

16   about their works together at a film festival and, in

17   particular, the San Francisco Film Festival, but then there's

18   also the Santa Barbara Film Festival.  And the fact that, you

19   know, it was shown at six other film festivals.

20       And, you know, certainly at the San Francisco Film

21   Festival and at least possibly at the other film festivals

22   people who worked with Lasseter saw them.

23       And so the chain of events that gave Lasseter the

24   opportunity to view or copy I think is a lot more direct, my

25   sense is a lot more direct than some of the -- than some cases

1    that have actually held access, like those couple cases from --

2    from -- those District Court decisions from Illinois, for

3    example.  There were a couple of them.

4         And it doesn't seem like you have a case where the

5    connection was nearly as close as this one where a Court said

6    that there was no access as a matter of law.

7         So I guess -- and I do focus primarily on the film

8    festivals in reaching that tentative conclusion.  Although I

9    think -- you know, I think it may be that the applications do

10   some work as well, arguably.  But primarily the film festivals,

11   I would say.

12        So anyway, if you could address that.

13        MR. KLAUS:  Sure, Your Honor.  And on the film festival

14   are we just talking about San Francisco?  Because the

15   Santa Barbara Film Festival, which the plaintiff made a huge

16   deal out of in her opening brief, seems like the evidence for

17   that collapsed when it was clear that everyone from Pixar

18   had --

19        THE COURT:  Either left or not arrived.

20        MR. KLAUS:  -- either left or not arrived.

21        THE COURT:  Right.

22        MR. KLAUS:  So I think we're talking about one film

23   festival, which is San Francisco.

24        THE COURT:  So, I mean, that actually raises kind of a

25   burning question for me that I have about access and the way

1     the Courts treat access, but -- and we'll get to that.

2          But for the purposes of the initial part of our

3     discussion, why don't we limit our focus to the San Francisco

4     Film Festival.

5          There were people at the San Francisco Film Festival who

6     saw *The Snowman* who worked with Lasseter.  Why isn't that

7     connection just right there.  What I just said.

8          And I realize one of the people was -- went on leave and

9     didn't come back, but --

10          But what I just said.  Why isn't that enough to establish

11     enough of a connection to avoid a conclusion that there was no

12     access as a matter of law.

13          **MR. KLAUS:**  Because the case law -- and let's start with

14     Judge Pfaelzer's opinion in the *Meta-Film* case.  That was the

15     *Animal House* case from the Central District of California.

16          What Judge Pfaelzer says there, very clearly, is that the

17     intermediary -- and in this case we have -- John Lasseter was

18     not at the film festival.

19          **THE COURT:**  Right.

20          **MR. KLAUS:**  No one, insofar as we know, continued to work

21     with Mr. Lasseter in any sort of creative capacity at Pixar was

22     at the film festival.

23          The plaintiff deposed Ms. Klaidman, who's the archivist

24     and the director of Pixar University, and -- who said she

25     didn't remember the film, she didn't discuss it with

1    Lasseter --

2         THE COURT:  But could I just --

3         MR. KLAUS:  Yes.  Go ahead.

4         THE COURT:  -- interrupt?

5    I'm looking at the *Meta-Film* case --

6         MR. KLAUS:  Yeah.

7         THE COURT:  -- and the judge in that case goes on to

8    distinguish -- distinguishes a bunch of other cases where

9    Courts held that there was access, or that there was a fact

10   issue on whether there was access.

11        And what the judge says is, "In each of these cases, an

12   individual in a position to provide suggestions or comments

13   with respect to the defendant's work had the opportunity to

14   view the plaintiff's work."

15        Why doesn't this case fit that description?

16        MR. KLAUS:  Because no one at Pixar was in a position to

17   provide comment on suggestions on the *Frozen* teaser trailer.

18        THE COURT:  But that -- so that -- I mean, and that gets

19   to the -- I mean, in these cases, you know, I think we judges

20   are instructed, at the summary judgment stage, to not credit

21   the defendant's evidence on stuff like that.  Right?

22        And so it may be that everybody at Disney and Pixar

23   testifies that -- let me -- scratch that.

24        It may be that everybody involved in the creation of the

25   *Frozen* teaser trailer says, "Nobody at Pixar had any

1  opportunity to provide me with any input about this."

2      But we judges at the summary judgment stage, I think, are

3  instructed not to credit that kind of testimony because that's

4  for the jury.  And what we are supposed to do is look at the

5  connection and look at how closely connected the people are,

6  without regard to what -- their testimony about what they

7  actually -- what their own opportunities were to communicate

8  with one other.

9      **MR. KLAUS:**  With respect, I don't think that's true with

10  respect to the issue we're talking about here, which is, as a

11  factual matter, is there any evidence that people from Pixar --

12  or, again, in Judge Pfaelzer's -- the words of Judge Pfaelzer's

13  order, which this is *Meta-Film* 586 F.Supp. at 1355 through -56.

14      Was the intermediary, was that person, in a position to

15  transmit it to the copier, either was a supervisor with

16  responsibility for the defendant's project.

17      **THE COURT:**  Mm-hm.

18      **MR. KLAUS:**  That's not true of any of the people who were

19  at the San Francisco Film Festival.

20      Was part of the same work unit as the alleged copier.

21      Not true of anyone at the San Francisco Film Festival

22  unless one is to -- unless one concludes that simply because

23  John Lasseter is at Pixar and is the chief creative officer

24  there every person in the company who works with him is deemed

25  to be part of the same unit.

1          THE COURT:  What about every creative person?  What about

2     every person in the company who works on -- who is creative?

3          MR. KLAUS:  I think that in the case -- if that were the

4     rule, Your Honor, then --

5          THE COURT:  And I didn't mean creative in, like,

6     describing their personalities.  I mean their job assignments.

7          MR. KLAUS:  Yes.  And I think that the problem with that,

8     Your Honor, is that the undispute- -- and it really is, it's

9     undisputed here, the plaintiffs don't dispute, that people --

10    that Pixar projects are separate from Walt Disney Animation

11    Studios projects.

12         And I think when we look at the other cases -- and

13    frankly, it's the *Meta-Film* case itself.  The person who -- the

14    gentleman, Badham, I think was his name --

15         THE COURT:  Yes.

16         MR. KLAUS:  -- who worked on the lot, he was a director.

17         THE COURT:  Worked on what?

18         MR. KLAUS:  He worked on the lot.  That was the --

19         THE COURT:  Oh.

20         MR. KLAUS:  The theory was, "Well, I've (indiscernible)

21    my thing off at the lot."  He has lunch with people.  He has --

22    they engage -- they engage in conversations in the elevator.

23         And what the Courts have said is no, that's not -- that

24    is speculation and conjecture and you don't create a fact issue

25    by saying, "Well, they're all in a creative business."

1    **THE COURT:**  Mm-hm.  But did Badham work with the people

2    who created *Animal House*?

3    **MR. KLAUS:**  He, I believe --

4    **THE COURT:**  Where, in the *Meta-Film* decision, does it say

5    that Badham worked with the people who created *Animal House*?"

6    **MR. KLAUS:**  Well, it says that -- on the top of page 35,

7    one of the plaintiff's theories --

8    **THE COURT:**  Sorry.  Wait.  Wait.  Hold on.  Let me get

9    there.  Top of page what?

10   **MR. KLAUS:**  1355.

11   **THE COURT:**  1355.

12   **MR. KLAUS:**  One of the theories was -- and this is

13   very -- frankly, very similar to the plaintiff's theory here,

14   was that Badham delivered or described the treatment that he'd

15   gotten to a Universal executive, most likely Ned Tanen, with

16   whom he worked during the post-production period of his movie.

17   **THE COURT:**  Wait.  Hold on.  Hold on.  I'm trying to find

18   the language.

19   I'm having a hard time finding -- you said the top of

20   1355?

21   **MR. KLAUS:**  I'm sorry, Your Honor.  Are you looking at

22   the two-column Westlaw or the one --

23   **THE COURT:**  I'm looking at the two-column Westlaw.

24   **MR. KLAUS:**  So this is -- I use the old PDF style

25   printout.  It's the upper right-hand side of the page 1355.

1      **THE COURT:**  All right.  Okay.  So it's probably a little

2  bit later in my -- okay.  Hold on.

3      So how does the paragraph start that you're looking at?

4      **MR. KLAUS:**  "In attempting to establish...".

5      **THE COURT:**  Oh, okay.  All right.  I'm there.

6      (Reading.)  Plaintiff constructs a tortuous -- I assume

7  what she means to say is torturous -- torturous chain of

8  hypothetical transmittals.  Plaintiff speculates that the chain

9  proceeded as follows:  Chase Mellon submitted the *Frat Rats*

10  screenplay to Badham, Badham delivered or transcribed it to a

11  Universal executive, most likely Ned Tanen, with whom he worked

12  during the post-production period of *Bingo Long*, or, one of

13  those executives, while in Badham's office to discuss *Bingo*

14  *Long*, saw *Frat Rats* on Badham's desk and read it, and then Ned

15  Tanen described *Frat Rats* to his assistant, Gerald Miller,

16  Miller then passed along this information to Matty Simmons

17  during one of their conversations, and finally Simmons provided

18  this information to the writers of the treatment, Chris Miller,

19  Doug Kenney, and Harold Ramis.

20      Plaintiff offers this hypothetical scenario in spite of

21  the fact that it's not supported by a shred of evidence, that

22  Badham had no connection with the treatment -- that Badham had

23  no connection with the treatment.  (End reading.)

24      So if your intermediary, by analog, in this case is

25  Badham, we have two things.  One, Badham had no connection with

1    the treatment.  Here, the people at the San Francisco Film

2    Festival obviously saw the work and were on stage with the

3    plaintiff talking about the work.

4        And then -- so that's one distinction between this case

5    and *Meta-Film*.

6        And then the second distinction, I think, is that there

7    is a very attenuated connection that the plaintiff hypothesized

8    between Badham and the creators of *Animal House,* whereas here

9    we're just talking about the people who went to the

10   San Francisco Film Festival working with Lasseter.

11       **MR. KLAUS:**  I think, Your Honor, with respect, when you

12   say "the treatment," the issue is Badham was the person who

13   received the plaintiff's treatment in the case.

14       **THE COURT:**  Right.

15       **MR. KLAUS:**  Badham, who is the analog to the people who

16   were in the audience at the film festival, they saw *The*

17   *Snowman*.  There has to be a -- there has to be a chain of

18   events by which they then described *The Snowman* to Lasseter.

19       **THE COURT:**  That's for a jury.  That's for a jury.  The

20   only question now is whether there is a sufficient connection

21   between Lasseter and the people who saw *The Snowman* to justify

22   sending it to the jury on the question of access.

23       And the standard is, is there a reasonable -- was there a

24   reasonable possibility that Lasseter, or someone else in the

25   creative process for the teaser trailer, had access.

1      And on summary judgment, it is, is there a genuine issue

2      of fact on whether there is a reasonable possibility.

3          So in other words, could any reasonable juror decide,

4      based on this connection, that there was a reasonable

5      possibility that Lasseter had the opportunity to view or copy

6      *The Snowman*.

7          And given the relative directness of the connection

8      compared to the *Meta-Film* case and compared to some of the

9      cases which held that there was access, or there could -- or

10     the question of access should go to a jury, I just don't see

11     how I can say, as a matter of law, that there was no access

12     here.

13         **MR. KLAUS:**  Your Honor, I think that there's still a --

14     there's still a chain of events that has -- that there is an

15     implicit chain of events that, as the *Meta-Film* case and others

16     make clear, is not necessarily for the jury.

17         And Courts -- the *Gable* case, the *My Name is Bro* case

18     from Judge Wilson, also in the Central District, that make it

19     clear, Your Honor, that one still has to look at what is the --

20     what is the hypothesized chain of events.

21         The hypothesized chain of events here is that people who

22     it is undisputed had zero involvement with the *Frozen* teaser

23     trailer, which came -- which started to be developed two years

24     after this film festival, went back to Pixar, somehow got the

25     information -- either directly or indirectly -- to Lasseter

1    about this movie, that Lasseter at that point viewed the movie

2    and then, two years later, in the face of copious notes

3    documenting the independent development of this -- of this

4    work, somehow reached back -- I think where -- I think the

5    YouTube conspiracy theory is gone now as a result of the

6    analysis of the analytics, but that somehow what happened was

7    that Lasseter, through either extraordinary recall or, say,

8    "Somebody at Pixar told me about this two years ago and I'm

9    going to come up with this," it is -- it is, with respect, Your

10   Honor, pretty fantastical and pretty attenuated.

11        And the fact that there is a -- and let's compare this to

12   something like --

13        THE COURT:  I mean, it's not nearly as fantastical or

14   attenuated as the connection that I just read to you from the

15   *Meta-Film* case.  Wouldn't you agree with that?

16        MR. KLAUS:  No, I wouldn't agree with that.  Because

17   there was a much closer time of contemporaneousness in the

18   case.

19        And in both cases I think the treatment was done within

20   the matter of a year.

21        But the point is, Your Honor, in both cases what is the

22   missing element here is some -- some link that says there is

23   some reason to believe that someone who attended this film

24   festival somehow got that information about *The Snowman* to

25   Lasseter and that it was recalled in the face of the evidence

1   of the development of the work --

2          THE COURT:  But one of the things --

3          MR. KLAUS:  -- when there's --

4          THE COURT:  I'm sorry.  I was just going to say, one of

5   the things, I guess, that's a little bit different about this

6   case is, you know, oftentimes in these cases you have somebody,

7   you know, submitting a screenplay; right?

8          And we've all seen the TV shows and the movies about, you

9   know, people who review screenplays and they get sent thousands

10  of screenplays and, you know, it's impossible to review every

11  screenplay that you get sent.

12         And so, you know, there are certain, like, logical, you

13  know, inferences that you can draw about the import of somebody

14  merely, you know, sending someone a screenplay in Hollywood.

15         But this is very different; right?  I mean, this is --

16  this person's -- Ms. Wilson's short was shown at a film

17  festi- -- the San Francisco Film Festival, and it was, as I

18  understand it, competing with the short that was produced by

19  the Pixar folks.

20         And that's a really big deal.  That's a much more

21  notable, memorable event, I would think, than -- than just

22  merely being one of 20,000 people who's trying to get some

23  producer to read your screenplay.

24         And it's the kind of thing that you -- I think most

25  people would assume, generates discussion back at the ranch;

1    right?  I mean, you know, you're a Pixar employee, you have a

2    short that's competing with other shorts -- presumably only a

3    handful of them -- at the San Francisco Film Festival, and you

4    go there and you watch all the shorts and somebody wins and you

5    talk about -- you know, and you go up on stage and you talk

6    about the -- you talk about the shorts and then you come back

7    to the office and you talk about it.

8         I mean, everybody wants to know how it went, who won,

9    why'd -- you know, what did you think of the winner?  What did

10   you think of the other?

11        I mean, those kinds of conversations, I think, are

12   naturally expected to happen in a way that they don't when some

13   random person just sends a screenplay to a producer.

14        **MR. KLAUS:**  I don't believe that that's -- there's any

15   evidence in the record, Your Honor, about that being the way

16   that things went down with this film festival.

17        **THE COURT:**  But that's not the question for me at summary

18   judgment.

19        **MR. KLAUS:**  No, it is -- I believe -- the theory that you

20   are hypothesizing, which is that would be what is necessary to

21   fill in this chain, is that there was something so

22   extraordinary about the plaintiff's work, or so remarkable

23   about the plaintiff's work --

24        **THE COURT:**  Well, I wasn't saying that, just to be --

25   just to slightly tweak what you're saying to me.  I mean, I'm

1    not saying that there was something so remarkable about her

2    work, necessarily.  I'm also not saying that it was

3    unremarkable.

4        But the point is that the Pixar employee having a short

5    in a film festival and going up and competing against other

6    shorts, that event is much more remarkable than somebody just

7    randomly sending a screenplay to a producer.

8        MR. KLAUS:  But the evidence on -- the testimony on the

9    screening, Your Honor, is not that this was in the form of a

10   competition, or that there was -- there was nothing awarded to

11   the plaintiff.  She wasn't on stage, accepting --

12       THE COURT:  Wasn't there a winner, though?

13       MR. KLAUS:  There was an award for a short category

14   that -- along with a number of others, that I think she either

15   ultimately received or had received before the festival

16   started.

17       But the event itself, this particular screening at the

18   Kabuki theater, there was no award handed out.  The picture the

19   plaintiff has put into the record, that's not her receiving an

20   award.

21       THE COURT:  Oh, no, I didn't think --

22       MR. KLAUS:  That's her with a number of other people who

23   are -- and the other thing is --

24       THE COURT:  I actually didn't even think she won, and

25   that wasn't -- I may be misremembering, but I didn't think she

1    actually won anything at that film festival either.

2         But that's not really my point.  I mean, my point is just

3    that the Pixar employees going up to compete in a -- or even

4    just chosen to participate in a film festival is something that

5    is much more likely to generate quite a bit of widespread

6    conversation around the office, I would think.

7         MR. KLAUS:  But the person who was -- the person who was

8    on stage, who was Mr. Baena, when you say he went back to the

9    office, his testimony was he was actually on leave from Pixar

10   and he never went back.

11        And there's no evidence that anyone else who was there

12   had creative involvement with -- directly with Lasseter, number

13   one, no evidence of that, and, number two, there's no evidence

14   that they had anything to do with him with respect to the

15   teaser trailer, which took place two years later.

16        And the cases -- the cases that have found access in

17   these sorts of theories, Your Honor, like, for example, the

18   *Lady Gaga* case from the Northern District of Illinois, what you

19   had there is you had a direct connection.  The person who had

20   worked with the plaintiff on her song had worked with Lady Gaga

21   at least on the album and he had changed his story.

22        And so there was a -- in that case, you had -- I would

23   submit -- extremely direct, extremely close connection between

24   the two.

25        THE COURT:  Yeah, I didn't read the case that way but I

1      need to pull it back up.  This is the one -- it's *Francescatti*

2      or something like that?  Is that right?

3              **MR. KLAUS:**  It's the *Francescatti* case, Your Honor.

4              **THE COURT:**  Yeah.  Hold on one second.

5              **MR. KLAUS:**  Sure.

6              **THE COURT:**  Yeah, give me just one second here.

7              So Gaynor was the -- Gaynor was the person to whom the

8      plaintiff submitted -- submitted her -- her work, as she

9      claimed ultimately Lady Gaga copied; right?

10             And so this kind of illustrates the point that I'm

11     making.  So the Court says, on page -- Lexis page 6 -- so this

12     is just towards the end of the discussion on access.

13             (Reading.)  To reach the conclusion that Francescatti --

14             that the Francescatti song was available to defendants, a

15             trier of fact would have to discredit the testimony of

16             Gaynor, Blair and Gaga, that neither Blair nor Gaga

17             received a copy of the Francescatti song, and further,

18             that Gaynor either gave the Francescatti song to Gaga

19             directly, or that he gave it to Blair and Blair then gave

20             it to Gaga, and discredit Gaga and RedOne's testimony

21             that they independently created the song.  (End reading.)

22             And the Court says a jury could do that; right?  Because

23     all this testimony about, you know, to apply the concept to our

24     case, you know, all this testimony about, you know, the people

25     who attended the film festival who saw *The Snowman* never having

1   had an opportunity to, you know, converse with Lasseter about

2   it or -- and therefore Lasseter never had an opportunity to

3   view it -- and that's all stuff that, under the case law, seems

4   like you're supposed to argue to a jury and get a jury to

5   believe.  But it's not my job to credit that testimony, as

6   credible as it may seem on the surface.

7        MR. KLAUS:  There has to be some reason -- with respect,

8   Your Honor, I think there has to be some reason to doubt it.

9   It is -- plaintiff has the burden of showing access.  She has

10  to show some direct chain.

11       And with respect to the -- with respect to Gaynor and the

12  Francescatti case, the reason the Court said that a jury could

13  discredit his testimony that he never saw it was because he

14  changed his story.

15       He lied to the plaintiff --

16       THE COURT:  Right.

17       MR. KLAUS:  -- about whether he was with Lady Gaga in

18  Paris, helping her with her album.

19       And when it appeared that it became inconvenient for that

20  to be the fact, he changed his story.

21       Here you have nothing of the kind.  You have Baena who

22  says he never went back to Pixar.  His communications with

23  Lasseter in a creative capacity were with respect to the movie

24  *Cars*, which was six years before the San Francisco Film

25  Festival.

1    **THE COURT:**  Could I just interrupt you?  Just to be

2    clear.  The Lady Gaga -- Gaynor did not work with Lady Gaga --

3    there was no evidence that Gaynor worked with Lady Gaga on her

4    work.  Gaynor worked with somebody else who worked with Lady

5    Gaga.  There's no direct collaboration between Gaynor and Lady

6    Gaga.

7    Which, again, is, like, quite different from the

8    situation here.  Because -- because the people who went to the

9    film festival worked with Lasseter.

10   **MR. KLAUS:**  I mean, I'm looking on page -- I've got the

11   Westlaw printout of that case, Your Honor, and I start on --

12   Sorry.  I'm looking for the asterisks.

13   **THE COURT:**  So the --

14   **MR. KLAUS:**  Under "Facts," it says, "In January 2010, Lee

15   introduced Gaynor to Blair for the purpose of creating original

16   material for Gaga to use --

17   **THE COURT:**  Yeah, but he didn't work --

18   **MR. KLAUS:**  "-- (indiscernible - simultaneous speaking)

19   album."

20   **THE COURT:**  But what it says later is that here it is

21   Blair who is the third party.  Gaynor worked on the

22   Francescatti song before collaborating with Blair for the

23   purpose of providing music to Gaga for the *Born This Way* album.

24   So it doesn't appear that Gaynor worked directly with

25   Gaga.  At least as far as -- I mean, I'm not sure that the

1  distinction is neither here nor there.  I may have taken us on

2  an unnecessary detour.

3      **MR. KLAUS:**  No.  It's an interesting detour, if nothing

4  else, Your Honor.  But it does -- I think what there was a

5  fact issue.  Because Gaynor had told the plaintiff that he was

6  in Paris to work with her.

7      And what the Court -- the Court doesn't say, "I find as a

8  matter of fact he didn't work on the album."  What the Court

9  says is, "According to Blair, Gaynor, and Gaga, neither Blair

10  nor Gaynor worked specifically on the Gaga song."

11     So there's a -- and it's that paragraph about the

12  recanting.

13     **THE COURT:**  Right.  Right.  Right.

14     **MR. KLAUS:**  Here, Your Honor -- here, Your Honor, we

15  really have nothing -- we have nothing analogous to that.  The

16  plaintiff had numerous opportunities to depose Pixar witnesses

17  who were at the film festival.  She chose to depose Carlos

18  Baena, who said he never went back to Pixar.

19     That's not a fact issue for the jury to decide there.  He

20  didn't go back.  The last movie he had worked directly with

21  Lasseter on was six years earlier.

22     She deposed Ms. Klaidman, who was the executive producer

23  and the archivist.  And there's nothing to suggest that Ms. --

24  there's no evidence in the record from which one could suggest

25  that there's something that was false about Ms. Klaidman's

1    testimony that she went back and she didn't discuss it.

2         The plaintiff had the opportunity to depose her.  The

3    plaintiff culled through numerous documents.  What they showed

4    you were communications that Ms. Klaidman had with Mr. Lasseter

5    about exhibitions of the history of Pixar art in various

6    places.  Or in Pixar open house.  Nothing about a collaborative

7    creative process.

8         She has the burden on access and she hasn't established

9    anyone, anyone who was at that screening having some direct

10   link with Lasseter on anything.

11        But then we go to the next step, which is at an

12   entirely -- there's no one, no one who's alleged to have been

13   in the audience had anything to do with the creation of the

14   teaser trailer.  Nothing.

15        And so you do have to have some sort of a link in between

16   the people who went to the film festival and John Lasseter.

17        So is it your -- wait a minute.  Sorry.  There needs to

18   be a link between the people who went to the film festival and

19   John Lasseter?

20        **MR. KLAUS**:  And John Lasseter with respect to the

21   creation of the teaser trailer.

22        **THE COURT**:  Oh, no.  See, I think there needs to be a

23   link between the people who went to the film festival and John

24   Lasseter.  And more than just -- you know, I mean, it's -- you

25   know, it's to be distinguished from a situation where, you

1   know, like the whole idea of Bayer corporate receipt is not

2   enough; right?  But this is more than Bayer corporate receipt.

3   This is, you know, a situation where people went to a film

4   festival and viewed the short and those people worked with

5   Lasseter.

6        That, you know -- the question of whether there needs to

7   be a connection between the people who viewed the short and

8   Lasseter's work on the teaser trailer, I think that's a

9   question for the jury.

10       The fact that there's a connection between those people

11  and Lasseter, I think, causes it to go to the jury.  Because

12  I'm not supposed to be, you know, questioning whether they had

13  any conversations with Lasseter either about *Snowman* or about

14  the *Frozen* teaser trailer.

15       **MR. KLAUS**:  It says, Your Honor, in the *Meta-Film* case --

16  again, between 1355 and 56, either the intermediary's the

17  supervisor -- not the case here, was part of the same work unit

18  as the copier.

19       **THE COURT**:  That begs the question.

20       **MR. KLAUS**:  Well, that begs the question, Your Honor,

21  only in the sense that the same work unit that you're

22  describing, under that theory the work unit is the entire

23  studio, or the entire creative division of the studio, which is

24  -- there's no case, as far as I know, that goes so far as to

25  say that simply because somebody is within the same studio they

1       are part of the same work unit.

2            THE COURT:  Well, but they're creative people who work

3       with Lasseter.  Right?  I mean, why -- I mean, do you agree

4       that they're creative people who worked with Lasseter?

5            MR. KLAUS:  I agree that they are creative people who

6       work with Lasseter, Your Honor, but the rule that you would be

7       announcing -- I know of no case that has gone this far -- but

8       the rule that you would be announcing is that anyone who works

9       in a studio with somebody else is part of the same work unit.

10           And then the realities of the situation -- I think this

11      is one of the things that really was driving the decision --

12           THE COURT:  Well, I mean, couldn't the rule that I -- I

13      mean, why does that have to be the rule that I announce?  I

14      mean, in this case it's undisputed that they actually worked

15      together; right?

16           MR. KLAUS:  It's undisputed that -- it's undisputed that

17      the they -- and I don't know who the -- if the "they" is Elise

18      Klaidman --

19           THE COURT:  Yes.

20           MR. KLAUS:  -- that they worked at the same studio.

21           THE COURT:  Together.  I mean, they worked together;

22      right?

23           MR. KLAUS:  They work in the same building.  What they

24      work on is not -- there's no evidence that Ms. Klaidman worked

25      on anything having to do with any movie.  Ms. Klaidman is the

1    archivist.  She's the head of the after works program by which

2    they do -- not animated films -- live action films.

3        These are for Pixar people who are not doing what they do

4    during their day job.  It is an after work proposition.

5        **THE COURT:**  Speaking of announcing rules.  The language

6    that you just quoted to me from *Meta-Film* where it has to be

7    either a supervisor or somebody in the same unit, is there a

8    Ninth Circuit case that adopts that formulation?  Or is that

9    just the District Court in *Meta-Film?*

10       **MR. KLAUS:**  I believe it's not just the *Meta Film's* case.

11   The same language is repeated again in the *Gable* case, which is

12   from Judge Wilson.

13       **THE COURT:**  Right.  Okay.

14       **MR. KLAUS:**  And the law on -- the law on -- and this is

15   also with respect to the nexus that's required, or the close

16   relationship that is required.

17       You also see that repeated in the *Jorgenson* case, which

18   is from the Second Circuit.

19       **THE COURT:**  Okay.

20       **MR. KLAUS:**  And I think that the general rule -- I mean,

21   the closest case that I think one might be -- because we've --

22   one of the things we have been discussing so far is how would

23   the initial information have gotten into the Pixar system.

24       There's still the -- there's still the question of how

25   did that information get to make it through John Lasseter, and

1    how was it recalled during this one -- you know, the one

2    session on January 15th that it was pulled up.

3         And that -- I think what you're talking about there --

4    because I don't think there's any contention that what happened

5    was Mr. Lasseter typed something into YouTube at that meeting,

6    or went through the plaintiff's website, or said, "Get me that

7    Kelly Wilson film that the people were talking about."

8         It is a question of -- I think what the theory would be,

9    it would be something of unconscious copy.  That I saw

10   something or something made such an impact on me.

11        And the cases, I think, are relevant for you to look at

12   on the unconscious copying point, which is another part of the

13   chain of hypo- -- the chain of events.

14        **THE COURT:**  That was the *Michael Bolton* case; right?

15   That was one of the cases, was the *Michael Bolton* case; right?

16        And the theory was that, you know, it could have been

17   unconscious copying because he had -- I can't remember, what

18   was the name of the band?

19        **MR. KLAUS:**  The Isley Brothers.

20        **THE COURT:**  The Isley Brothers.

21        So he listened to the Isley Brothers when he was a

22   teenager, and this song by the Isley Brothers never made it

23   into the Billboard Top 100, there was no evidence that it ever

24   played on the radio in the area where Michael Bolton ever grew

25   up, but there was evidence that Michael Bolton really liked the

1   Isley Brothers.

2        And the theory was that, you know, 20 years later -- or

3   maybe it was 15 years later or something like that, I don't

4   know -- Bolton might well have copied that song.

5        I mean, that connection -- and the Court, as I recall in

6   that case, said that that needs to go to a jury.

7        I mean, that connection seems a lot more attenuated than

8   this one.

9        **MR. KLAUS:**  Your Honor, it wasn't just that.  It was

10  that -- I believe -- there was actually testimony in the case

11  that Bolton had said that he wondered if he was copying a song

12  by another famous singer, that there was --

13       **THE COURT:**  That's true.

14       **MR. KLAUS:**  He said he was -- he confessed to the fact

15  that he was a fan.

16       **THE COURT:**  Right.

17       **MR. KLAUS:**  In fact, there was testimony that -- that the

18  song was playing and was popular on the radio when he was

19  taking a trip to Buffalo.

20       **THE COURT:**  I know, but that's --

21       **MR. KLAUS:**  They really went into some extensive detail.

22       **THE COURT:**  Yeah, I mean, that's really quite attenuated.

23  I mean --

24       **MR. KLAUS:**  Well, I don't know that that -- but, Your

25  Honor, that is -- you're talking about a major popular group,

1    and the defendant, the alleged copier, who freely admits, "I

2    was a huge fan of this group.  I thought I might actually be

3    copying."

4         That's not -- I don't --

5         THE COURT:  Well, no.  I mean, that's -- you're putting

6    those two things together, but they were separate things.  One

7    is he -- there were some prior statements where he admitted he

8    was a huge fan, and then there was a separate thing where,

9    during -- while he was composing or creating the song, he said,

10   "Hey, like, is this -- are we recording a song by so and so?",

11   and he was talking about a different artist; right?

12        MR. KLAUS:  No, but -- I'm not putting that together.

13   Judge Nelson was putting it together in her opinion.  I mean,

14   it says right on page 484, after she describes all the facts

15   that were in the record she says, "It's the cumulative weight

16   of all of these facts."

17        Frankly, what she said was, "This is a very weak case."

18        THE COURT:  Mm-hm.  Right.

19        MR. KLAUS:  But the cumulative weight --

20        THE COURT:  But it has to go to a jury.  It's a very weak

21   case, but looking at it all in its totality, it's got to go to

22   a jury.

23        And that actually leads to this burning question that I

24   referred to earlier, wouldn't -- one thing that I find a little

25   bit strange about how a lot of the cases treat access is they

1   say, you know, plaintiff can establish access in one of two

2   ways.  One is that there's a chain; right?  Chain of events or

3   a chain of people.  The other is widespread dissemination.

4        And then a lot of times the Courts seem to analyze those

5   two things in the disjunctive.

6        And a Court might say, "Well, the chain of events is

7   not -- you know, is not -- is too attenuated, so the plaintiff

8   can't establish access or go to a jury on access via the chain

9   of events' route.

10       And then we look at widespread dissemination and well,

11  you know, the work was out there, the T-shirts were out there,

12  there were 2,000 T-shirts circulating around the Los Angeles

13  County area -- or Southern California or whatever, but it

14  doesn't rise to the level of widespread dissemination and so

15  we're not going to allow the plaintiff to go forward on that

16  theory of access.

17       That type of analysis seems very strange to me.  And it

18  seems like it might be a little bit in tension with Judge

19  Nelson's analysis in the Michael Bolton case.

20       It seems to me that the question is, is there a

21  reasonable possibility that the defendant had an opportunity to

22  copy or view the work.  And I don't understand why we shouldn't

23  view all of the evidence holistically to figure out if all of

24  it rises to the level of reasonable possibility, or could rise

25  to the level of reasonable possibility.

1    And so as applied to this case -- you know, we've been

2    focusing thus far on the San Francisco Film Festival.  But I

3    don't understand why -- you know, it may be that the fact that

4    Ms. Wilson sent her application to Disney eight times, with

5    reference to her website some occasions before she had created

6    this snowman, other occasions after she had created

7    *The Snowman*, it may be that that, on its own, could not give

8    rise to a holding that the access question should go to the

9    jury.

10   And it may be that the fact that her film played at eight

11   film festivals, in itself, wouldn't lead to a conclusion that

12   there was widespread dissemination such that you would

13   automatically assume access.

14   But just because the applications -- the sending of the

15   applications don't, themselves, justify sending the case to the

16   jury, and the fact that the work was shown at eight film

17   festivals might not, in itself, justify sending the case to the

18   jury -- although I wonder about that, but the totality of it

19   all, you know, I mean, don't you add it up?

20   I mean, it's not a -- it's not a situation where the

21   sending of the applications has zero evidentiary value, it's --

22   you would assign a value to it in terms of increasing the

23   possibility that the defendants had the opportunity to view it

24   or copy it.  You would just say that it doesn't increase the

25   possibility enough to justify sending it to a jury.  And maybe

1    you would argue the same thing about, you know, the fact that

2    her work was shown at eight film festivals.

3         But what about when you add it all up?  What about when

4    you add up the fact that it was shown at eight film festivals,

5    she, coincidentally, sent eight applications to Disney, and

6    there was this interaction at the San Francisco Film Festival

7    and a potential interaction at the Santa Barbara Film Festival.

8         I mean, why -- why can -- I guess it's a question to you.

9    Can I -- you know, does the law allow me to examine all of that

10   holistically to, you know, determine whether it rises to the

11   level of reasonable possibility of access?

12        **MR. KLAUS:**  I would submit it can't be, Your Honor.

13   Because what --

14        **THE COURT:**  I can't look at it that way.

15        **MR. KLAUS:**  -- it has to be is there has to be a chain of

16   access.

17        **THE COURT:**  And if there is not a chain that is

18   sufficiently close, then I have to just disregard that

19   entirely.  And if there's not -- if there is dissemination that

20   is not -- it doesn't rise to the level of widespread

21   dissemination, then I have to disregard that entirely.

22        **MR. KLAUS:**  If -- you can only look at them together if

23   they go through the same chain, Your Honor.

24        With respect, what -- let me --

25        **THE COURT:**  Does that make sense?

1    MR. KLAUS:  Yes.  Absolutely --

2    THE COURT:  Why?

3    MR. KLAUS:  -- it makes sense.

4    Because what -- it is her burden to show -- it's her

5    burden to show that somebody who was in a position to actually

6    influence the development, the expression, that was used in the

7    teaser trailer, was in a direct chain of having received the

8    information.

9    THE COURT:  Well, not on the wide- -- not if you go the

10    widespread dissemination route; right?  I mean, if you go the

11    widespread dissemination route then that's the end of the

12    matter; right?

13    MR. KLAUS:  She can't pos- --

14    THE COURT:  Because we presume, we presume that everyone

15    had access, or everyone in the field, or whatever, had access.

16    MR. KLAUS:  And the case law is clear that what it takes

17    to reach the level of widespread dissemination is considerable

18    commercial success -- zero evidence of that here; none -- or,

19    ready availability on the market.

20    THE COURT:  Why --

21    MR. KLAUS:  No evidence of that.

22    THE COURT:  So -- so I guess I have a couple of

23    questions.

24    MR. KLAUS:  Sure.

25    THE COURT:  One is let's assume that it doesn't rise to

1    the level of widespread dissemination.  Let's say the fact that

2    it showed at eight film festivals doesn't rise to the level of

3    widespread dissemination under the test that you articulated.

4        I do still question that.  Because I wonder if having

5    your film shown at eight film festivals is -- could be defined

6    as commercial success.

7        But let's say it doesn't rise to the level of widespread

8    dissemination.  I still don't understand the idea that I would

9    then need to throw it out all together.

10       To say that the fact that it -- the fact that it was

11   shown at eight film festivals has no evidentiary value

12   whatsoever in determining whether it should go -- the question

13   of reasonable possibility of opportunity to copy or view goes

14   to the jury.

15       **MR. KLAUS**:  Because, Your Honor -- let me see if I can

16   try to describe it this way:  If, on -- she has to -- she has

17   to provide evidence of a reasonable possibility of some

18   connection, some pathway.

19       And in the -- in each of these cases, YouTube, Vimeo, it

20   was on my résumé, I submitted an application, my co-creator

21   submitted an application, on each of those, there are different

22   pathways that she's alleging.  There are different pathways to

23   the point of John Lasseter that she's alleging.

24       One is --

25       **THE COURT**:  Well, the ultimate question is whether there

1    was a reasonable possibility that they had the opportunity to

2    view.

3        And why is it that we -- and I concede to you that the

4    cases seem to describe it this way; right?  That once you --

5    once you go down this pathway, you can't consider anything else

6    that might fall in -- you know, that might -- you might meet

7    along this path.  The other path.

8        **MR. KLAUS:**  If there is overlap, you could consider them.

9    If there was overlap.  Of which there's none here.

10       But let me also say the following, which is if, to get to

11   the level of reasonable possibility, someone has to get to --

12   let's concede that is something less than what you might say is

13   a probability standard.

14       But if you have, out of a scale of 0 to 100, on one of

15   the chains you have a 5, which wherever you draw the line, 5

16   ain't enough.  Five is just a bare possibility.

17       And you have another chain where it goes up to 5, maybe

18   even 6 or 7.  Still no dispute.  That's just a bare

19   possibility.

20       And so on down the line.

21       **THE COURT:**  And so -- right.

22       **MR. KLAUS:**  At the end you can't combine --

23       **THE COURT:**  You can't combine them.

24       **MR. KLAUS:**  It's a total cheat to combine them and say,

25   "Well, I'm going to take 5 from this chain and 5 from this

chain and 5 from this chain and 5 from this chain and when I throw them all together, even though they're unrelated chains of supposed access, I now get the 35 or 40 and isn't that clever.

That's just -- that can't be the case, Your Honor.

**THE COURT:**  But I -- I mean, that -- that seems to -- I mean, you know, I'm not going to push you too hard on it because it does seem that the cases describe it in the way that you say, although it doesn't seem like any of the cases have discussed it in as much detail as you've just discussed it, or articulated it in the way you've articulated it.

But I -- that seems quite contrary to me to common sense.

I mean, let's say -- I'm going to make up a hypothetical on the fly, so it's probably going to be useless.

But -- well, without trying to make up a detailed hypothetical, let's just think about, like, a case -- probable cause -- a Fourth Amendment case, okay?  And the, you know, police officer say, "I had probable cause to arrest this person, and here are the, like, ten conclusions that I came to that support probable cause to arrest this person."  One, two, three, four, five, six, seven, eight, nine, ten.

And let's say we would agree that no one conclusion, no one factor that the officer took into account would, itself, give rise to probable cause to conclude that somebody committed a crime.

1    Let's say that no two of the ten factors, when added

2    together, would rise to the level of probable cause.

3    But if you believe the officer about the -- all ten

4    factors, those ten factors would combine to rise to the level

5    of probable cause so that he was justified in arresting the

6    person.

7    It would -- it would seem really weird to say, "Well,

8    that's cheating, to combine all of those things."

9    What's the difference between that and this situation?

10   **MR. KLAUS:**  The difference there is there's one officer

11   with one brain, there's one officer who's got one mind, but

12   there's a totality of things that are going into whether he

13   thinks the accumulation of those are enough.

14   In this situation --

15   **THE COURT:**  But why does that matter?  I mean, the point

16   I'm making is not about one officer versus many officers; the

17   point I'm making is more of an evidentiary one.  I mean, if

18   you've got five pieces of evidence, you know, it may be that --

19   it may be that one piece of evidence, or two of the five pieces

20   of evidence, don't, on their own, you know, support a

21   conclusion that "X" but if you take all five and put them

22   together, it does support a conclusion of "X."

23   And in this case, I mean, let's think about it this way:

24   Let's say -- let's wipe the slate completely clean in this

25   case, okay?  No -- Ms. Wilson created *The Snowman* in her home,

1    never shared it with anybody, never communicated with anybody,

2    never sent it to anybody.  She's the only person who ever saw

3    it in her life.

4         What percentage chance is there that the folks at Disney

5    had an opportunity to copy or view her work?

6         Zero.  Right?

7         **MR. KLAUS:**  On those facts, zero.

8         **THE COURT:**  Okay.  Now let's change the facts.  Let's say

9    that everything else is the same.  She didn't send it to

10   anybody, she didn't talk to anybody about it, but it was shown

11   at the Sequoia theater in Mill Valley, in one -- in one

12   showing, as a preview for -- a preview to a movie that was

13   being shown there one night.

14        What percentage chance?  Zero or something higher than

15   zero?  Maybe one of the Disney people was in Mill Valley

16   watching the movie; right?  So maybe .02 percent chance?

17        **MR. KLAUS:**  What you've thrown in it, in terms of -- I

18   don't believe that -- I believe that the cases say that you

19   can't simply assume that maybe there was a Disney person there

20   and that somehow moved the needle up.

21        **THE COURT:**  Well --

22        **MR. KLAUS:**  If it was -- if it was shown --

23        **THE COURT:**  Well, no.  I mean, the cases there would

24   say -- excuse me -- that's not a reasonable possibility of

25   access.  But I don't think the cases say that the chances of

1    the Disney people seeing that is still zero.  I mean, it's

2    something higher than zero.  It might be .01 percent chance;

3    right?

4         MR. KLAUS:  It is something higher than zero.  I would

5    agree.

6         THE COURT:  Okay.  So now let's say that her work is

7    shown only at one film festival, the Mill Valley Film Festival.

8         At that point, the person -- there's a higher chance that

9    somebody at Disney saw it; right?  Maybe .5 percent, maybe

10   1 percent.

11        MR. KLAUS:  I would agree that -- I would agree that the

12   fact that it's shown at the Mill Valley Film Festival is higher

13   than zero.  I wouldn't agree, unless there was evidence, that

14   there were some people who were present.

15        THE COURT:  Oh, we would never conclude, by a

16   preponderance of the evidence, that some people were present.

17   We would never conclude that that, in and of itself, created a

18   reasonable possibility that the Disney folks saw the short.

19        But the chance -- the chances of them having seen the

20   short are increasing; right?

21        Now let's say that she never sends her application to

22   Disney, she never attends, you know, a film festival with the

23   Pixar people, she never puts it on YouTube.  The only thing

24   that happens is her *The Snowman* is shown at five film

25   festivals -- one in Los Angeles, one in San Francisco, one in

1    Santa Barbara, one in New York, and one in Dubai.

2         Substantially more likely that somebody at Disney saw

3    it -- right? -- than if it just showed at the Mill Valley Film

4    Festival.

5         MR. KLAUS:  No.  Not unless there's some --

6         THE COURT:  No, I'm not saying -- I'm not saying as a

7    matter of law that it gets her to the point of reasonable

8    possibility of opportunity to view, necessarily.  What I'm

9    saying is that if it's shown at five film festivals in the

10   locations that I just rattled off, whatever they were, it --

11   there's a much higher chance that somebody from Disney saw it

12   than if it was only shown at the Mill Valley Film Festival.

13   Right?

14        You don't agree, as a factual matter, there's not a

15   higher chance that somebody at Disney saw *The Snowman* if it

16   played at five film festivals, including a couple in Southern

17   California?

18        MR. KLAUS:  I still go -- I still go back to --

19        THE COURT:  As a factual matter.  Not as a legal matter.

20        MR. KLAUS:  As a factual matter, I would want to know --

21   and I think the cases require you to know, was somebody from

22   Disney at one of those film festivals?  You're talking about

23   did somebody -- because it shows at more and more film

24   festivals, was there more opportunity for somebody to go to the

25   film festival?

1          Yes, I agree with you, there was more opportunity --

2          THE COURT:  And therefore, as a factual matter, there is

3     a higher chance that somebody at Disney saw *The Snowman* under

4     that scenario; right?

5          MR. KLAUS:  I will accept that under that scenario there

6     is a --

7          THE COURT:  As a factual matter.  I'm not asking you to

8     make any legal concessions.

9          MR. KLAUS:  I would say that that is a -- there's a

10    higher metaphysical, if you go somewhere beyond .001 --

11         THE COURT:  I mean, the higher metaphysical, I mean,

12    forget about metaphysical.  I mean, do you know anybody on this

13    planet who would say that there's not a higher chance that

14    somebody at Disney saw the work if it were shown at the five

15    film festivals as opposed to if it were shown at the

16    Mill Valley Film Festival only?

17         MR. KLAUS:  If these were -- if these were film festivals

18    that people from Disney didn't attend, then the likelihood --

19         THE COURT:  You're changing the hypothetical.  That's not

20    my -- that's not the hypothetical.  The hypothetical is -- I

21    mean, it's a fairly simple question.  I mean, why would it

22    cause you so much trouble to concede that as a factual matter?

23    Why would it be such a problem for you to concede that as a

24    factual matter?  It seems pretty obvious.

25         MR. KLAUS:  I'm not going to fight the hypothetical, Your

1    Honor.  I didn't think the hypothetical had built into it that

2    there was an increasing probability that somebody from Disney

3    actually attended those.

4         THE COURT:  It doesn't.  It doesn't.  The only thing we

5    know is that instead of it being shown at one film festival in

6    Mill Valley it's shown at five film festivals in San Francisco,

7    Los Angeles, Santa Barbara, New York, and Dubai.

8         On those two -- are you saying that there's no greater

9    chance that somebody who works for Disney saw *The Snowman* in

10   the second hypothetical?

11        MR. KLAUS:  I -- call me crazy; I am saying that, Your

12   Honor.  But I will except, for purposes of the hypothetical --

13   just to see where we're going with this, I will -- let me go

14   along with this and say that there is some incremental --

15   incremental or greater chance.

16        THE COURT:  Yeah, I'm not going to ask you to quantify

17   it.

18        MR. KLAUS:  Okay.  So we go there.  Then what?

19        THE COURT:  Okay.  Then -- so then let's say it's shown

20   at 20 film festivals.  You'd agree -- maybe you can't agree to

21   that.  But 20 film festivals instead of five.  And over the

22   course of three years, instead of in a six-month time frame,

23   shown at 20 film festivals increases the chances even more that

24   somebody at Disney might have seen *The Snowman*.

25        So then -- but then you might say, "Well, maybe that

1    doesn't rise to the level of the legal label of widespread

2    dissemination, and so whatever the chances are that the showing

3    at 50 film festivals, or 60 film festivals, or whatever,

4    whatever the chances are that somebody at Disney saw the film,

5    that has to be disregarded completely, that cannot be added to

6    the equation, that cannot be added to the calculus.

7         **MR. KLAUS:**  Which equation, though, Your Honor?

8         **THE COURT:**  Well, let's say -- just for example, let's

9    say I don't know what reasonable possibility is.  It's less

10   than 50 percent chance; right?  Reasonable possibility is less

11   than 50 percent chance.  So let's say that it's 20 percent.

12   Let's say that when you look at the evidence there's a

13   20-percent chance that somebody involved in the creation of the

14   *Frozen* teaser trailer had the opportunity to view or copy the

15   work.

16        And let's say that we were to examine -- we were to look

17   at the fact that it played in eight film festivals, *The Snowman*

18   played at eight film festivals.

19        And let's say, well, okay, you know, this is a film

20   festival and this is a section on animation and probably a

21   pretty good chance some folks from Disney were there, so let's

22   say that creates a, you know, 5 percent chance that somebody --

23   somebody involved in the creation of the *Frozen* teaser trailer

24   saw it, or that somebody who works with somebody involved in

25   the creation -- works closely with somebody involved in the

1          creation of the *Frozen* teaser trailer saw it.

2                  And then we'll say -- okay, so 5 percent.

3                  Then we'll say -- well, we add the fact that Ms. Wilson

4          and her partner sent applications a number of times to Disney.

5          And let's say that additional fact gets us up to 12 percent.

6          12 percent chance of access.

7                  And then we add the fact that people from Pixar who

8          worked with Lasseter were directly -- were -- had their short

9          shown at one of the same film festivals that Wilson had her

10         short shown and they were on stage together and they were

11         talking about their shorts together, and that that, maybe -- on

12         its own, that wouldn't rise to the level of reasonable

13         possibility, but when you consider the whole mix of evidence it

14         gets us above that magical 20 percent threshold.

15                 What law -- is there any law out there that prevents us

16         from analyzing it in that way?  That requires us to say, "Okay,

17         the fact that it was shown at eight film festivals in itself

18         doesn't constitute widespread dissemination so we have to

19         discount it entirely and we have to get rid of that 8 percent?

20         **MR. KLAUS:**  So two things, Your Honor.  Number one, to

21         answer the direct question, yes, the law is that it has to be a

22         particular chain.

23                 And I'm looking, just for example, at Judge Wilson's

24         opinion in the *Bernal* against *Paradigm Talent & Literary Agency*

25         case, page 788 F.Supp.2nd at 1054.  Has to be a particular

1     chain of events established between the plaintiff's work and

2     the defendant's access to that work.

3          **THE COURT:**  Okay.

4          **MR. KLAUS:**  To go back to -- you know, to go back to sort

5     of a broader point here, Your Honor, there's not just access in

6     the air.  Access has to be established either by proof that the

7     plaintiff's work was so out there in the world that it couldn't

8     have been avoided, which we don't have -- which we don't have

9     in this case, or it has to go through a particular chain.

10          And still, the problem with even accepting -- I want to

11     come back to these because I don't accept them as applied to

12     this case.

13          But even accepting that there is some greater than zero

14     possibility with respect to any of these, they all go off on

15     different chains.  In one chain, you've got somebody who was at

16     a film festival.  And what's the connection through them to

17     Lasseter?  In another chain, you've got an application that was

18     received by a recruiting department in some establishment of

19     which there is zero evidence that the application actually got

20     past the gatekeeper recruiter and then went to somebody who was

21     in some sort of creative position and that that person

22     ultimately was in a --

23          There is no evidence of any of that.

24          And the other thing that the law is very clear on -- and

25     again, this is -- gets restated in Judge Wilson's opinion in

1    *Bernal*, is that wherever you measure that line, what you have

2    to have is significant, affirmative, and probative evidence

3    that she bears the burden on.

4         And on all of these -- on all of these points --

5         **THE COURT:**  But it can be circumstantial evidence, and it

6    can be -- and the circumstantial evidence can be there was a

7    connection between the person who saw the work and the person

8    who created the accused work.

9         **MR. KLAUS:**  There can't -- they can be circumstantial but

10   it can't be speculative.

11        **THE COURT:**  Right.

12        **MR. KLAUS:**  And here, Your Honor, there is -- there's

13   nothing.  There is nothing connecting.  There's no --

14        **THE COURT:**  The connection cannot be speculative.  That's

15   the thing.  The connection cannot be speculative.  That is

16   true.

17        **MR. KLAUS:**  And there is nothing that the plaintiff has

18   introduced here that makes any connection -- let's start with

19   the film festivals.  Nothing that makes any connection between

20   any individual who was at that film festival and John Lasseter

21   or any other member of the *Frozen* creative team.  There's

22   nothing.  There is no evidence that she has put in to establish

23   what that is.

24        It's simply, well, they went to see it, they remembered

25   it, they work in the same motion picture studio as Lasseter,

1    therefore we're going to impute whatever they saw to him.

2        And that would be extraordinary, Your Honor.  There

3    simply would be that level of saying that once somebody from

4    the outside brings that in with their memory that that is

5    imputed throughout the studio to the creative head would be --

6    it would be extraordinary.  There is no evidence to fill that

7    point in that chain.

8        Going to the next particular chain.

9        With the applications and sending things in, there is no

10   evidence, none, that any of these -- that any of these many

11   applications got past a recruiter.

12       In fact, the inference -- I think the only reasonable

13   inference to draw from the evidence, Your Honor, is that

14   somebody who sends eight, nine, ten serial applications in a

15   month, and continues to go no- --

16       THE COURT:  It wasn't a month.  It was, like -- it was --

17       MR. KLAUS:  Couple of months.

18       THE COURT:  -- four years, I think.

19       MR. KLAUS:  No, I think there was -- there was one period

20   where Mr. Wrischnik sent, I think, five within a span of

21   about --

22       THE COURT:  Oh, let's focus in on Ms. Wilson's.

23       MR. KLAUS:  Okay.  Again, she did eight over the course

24   of a couple of years.  So I grant you that.  There was a little

25   bit broader.

1      But there's no evidence that these things ever went

2  anywhere, that they ever progressed beyond a gatekeeper.

3      **THE COURT:**  Yeah.  So in other words, you're -- yeah.  I

4  mean, I might be with you on that point, that the -- sending of

5  the applications could be zero, or close to zero.  If you

6  analyze it the way I think it should be analyzed.  It may be

7  that I -- the case law doesn't permit that.  It seems like, at

8  a minimum, the case law -- at least the way the Courts intone

9  the test, it seems -- it seems contrary to the way I

10  tentatively think it should be analyzed.

11      But I'm also -- I'm not sure it matters, for purposes of

12  this case.  Because -- primarily of the San Francisco Film

13  Festival.

14      But can I ask you -- I was curious on the YouTube issue.

15  I just -- I don't think we need to spend a lot of time on it,

16  but I was curious about the state of the record with respect to

17  the person who searched -- who did the search for "snowman and

18  carrot," I think was the search.

19      And I think they -- somebody from parts unknown did a

20  search on YouTube using the term -- the words "snowman and

21  carrot."  And I think that happened on January 13th, if I

22  remember correctly.

23      **MR. KLAUS:**  Let me just double check the Declaration.

24      **THE COURT:**  And I think the -- maybe the person viewed

25  only the first minute of the video before -- (pause.)

1         **MR. KLAUS:**  January 12th.  It wasn't snowman --

2         **THE COURT:**  January 12th.

3         **MR. KLAUS:**  -- and carrot.  It was snowman and rabbit.

4         **THE COURT:**  Snowman and rabbit.  Right.  Sorry.

5         **MR. KLAUS:**  And the duration of the viewing was

6 zero seconds.

7         **THE COURT:**  Zero seconds?  Oh, I thought it was, like,

8 60 seconds or 54 seconds or something.

9         **MR. KLAUS:**  Your Honor, on January 12th, I believe, if we

10 look at Exhibit 30 to Ms. Cox's Declaration, the analytics for

11 that day show --

12         **THE COURT:**  Exhibit 30?

13         **MR. KLAUS:**  Oh, I'm sorry.  I stand corrected.  There was

14 one viewing from California.  The duration of that viewing was

15 zero seconds.

16         **THE COURT:**  Right.

17         **MR. KLAUS:**  There was another viewing -- there were two

18 viewings that day -- from an unknown region in the US.

19         **THE COURT:**  Parts unknown.

20         **MR. KLAUS:**  Parts unknown.  And the view on that day was

21 56 seconds, which --

22         **THE COURT:**  And that was the person who searched for

23 snowman and rabbit?

24         **MR. KLAUS:**  Yes.

25         **THE COURT:**  Is there anything in the record that explains

1   why it's parts unknown, why it's unknown where that search was

2   initiated?

3       MR. KLAUS:  I don't believe there's anything that's in

4   the record.

5       I also think, Your Honor, just to be very clear,

6   56 seconds into *The Snowman* he hasn't even stepped out onto the

7   ice.

8       And the type of copying that is being alleged here -- we

9   haven't talked about that so far, Your Honor, but the type of

10  copying that's being alleged here is not, "I'm going to watch

11  the first 10 seconds or 15 seconds of the YouTube video and I

12  know what the plot is."

13      The type of copying --

14      THE COURT:  But maybe I'm reminded what the plot is.

15      MR. KLAUS:  The type of copying --

16      THE COURT:  If I've seen it -- if I've seen it at a film

17  festival.

18      MR. KLAUS:  Right.  But who -- who has seen it at a film

19  festival?  John Lasseter wasn't at the film festival.  Nobody

20  else, who was in the room when the team brainstormed that idea

21  between January 7th and January 15th, there's no evidence that

22  any of them were at the film festival.

23      There's no evidence, whatsoever, of any connection

24  between anyone who was at that film festival and anyone who was

25  in the room for those meetings in between the time of that.

1    And again, Your Honor, this is one of the reasons that I

2    brought up the *3 Boyz* case.  Another case that's of a

3    similar -- of a similar type is the George Harrison case

4    involving The Chiffons' "He's So Fine," and his "My Sweet

5    Lord."

6        And of course nobody was going to disbelieve George

7    Harrison.

8        But one of the things that -- one of the things that the

9    Court said was this was an extremely popular song.

10       It's the same thing with respect to the Isley Brothers'

11   case.  It's one of the --

12   **THE COURT:**  Well, except for that wasn't an extremely

13   popular song.

14       Which was the *3 Boyz*' case again?  Was that the Destiny's

15   Child one?

16   **MR. KLAUS:**  No, 3 Boyz Corp. is the Isley Brothers.

17   That's the name of their -- that's the name of their --

18   **THE COURT:**  Oh, that's the -- the Michael Bolton case.

19   **MR. KLAUS:**  Well, what some other people call the Michael

20   Bolton case I'm calling the --

21   **THE COURT:**  How could you call it anything other than the

22   Michael Bolton case?  Sorry.

23   **MR. KLAUS:**  That's okay, Your Honor.

24   **THE COURT:**  I'm a big fan, big fan of Michael Bolton.

25   **MR. KLAUS:**  Please don't hold it against me.

1        Your Honor, there is -- again --

2        **THE COURT:**  Particularly his *Saturday Night Live* video.

3        I don't know if you've ever seen Michael Bolton's

4    *Saturday Night* with Andy -- Andy Sandberg?

5        **MR. KLAUS:**  I will grant you that's an extremely funny

6    video.  I will grant you that.

7        **THE COURT:**  We actually had another case -- we had a case

8    involving another one of those S & L shorts and stumbled upon

9    the Michael Bolton one and we've watched it, like, a hundred

10   times in our chambers, but --

11       **MR. KLAUS:**  I agree with you, that is very funny.

12       But again, Your Honor, here, with respect --

13       **THE COURT:**  Back to this case?

14       **MR. KLAUS:**  Back to this case, this is not the -- there's

15   no evidence that *The Snowman* was "Love is a Wonderful Thing."

16   There's no evidence that *The Snowman* was "He's So Fine."

17       Again, it's -- the evidence that it was shown at a film

18   festival, that there were people from an entirely different

19   motion picture studio who attended the event with the people

20   who were up on stage, with the executive -- again, there's

21   no -- there's nothing that fills in the particular chain going

22   back to John Lasseter.  There's no evidence.

23       There is speculation.  There is a guess.  There's

24   conjecture that somebody might have -- somewhere in a cafeteria

25   somewhere might have had a discussion.

1          And then you pile on top of that, Your Honor, the idea

2     that at the point at which the brainstorming was going on for

3     the teaser trailer that this video had so stuck in

4     Mr. Lasseter's mind there was some reason to think that it

5     was -- it was so impact-full and so important that it sort of

6     necessarily popped up when the notes of the development and the

7     story boards demonstrate the logical progression and the

8     organic progression of that idea.

9          **THE COURT:**  I mean, the story boards tell a really, you

10    know, interesting story.  I mean, I think it's -- I think it's

11    probably a story to be told to the jury, but --

12         Can I ask you one other, just, quick kind of nit-picky

13    question, which is, you know, they talk about opportunity to

14    view or copy.  That's the language that the courts use,

15    "opportunity to view or copy."  And I'm wondering, like, what

16    about the scenario where it's described to somebody?  Like,

17    they didn't view it.  I guess if, like, just hypothetically

18    somebody describes it to Lasseter.  I'm not saying that the

19    evidence suggests that this happened or that it shows that it

20    happened, but let's say somebody comes back from the film

21    festival and describes this in detail, this thing to Lasseter.

22         He hasn't viewed it, but would that -- would that fit

23    within "opportunity to copy" because it was described to him in

24    so much detail that he -- that that description created for him

25    the opportunity to copy it?

1        MR. KLAUS:  I don't know -- the short answer, I don't

2    know of any case that says one way or the other whether it

3    would.  The description by this unknown, unknown person, this

4    totally hypothetically world of conveying something to him and

5    him having -- Your Honor, with respect, I just think that

6    leaves -- that goes beyond the area of something that is proper

7    to submit to a jury.  It's totally fanciful conjecture to say

8    well, maybe somebody went back and described the plot of this

9    work in excruciating detail and it made such an impact that two

10   years later, when he was in a room where people were talking

11   about Olaf going out on the ice, where people were talking

12   about Olaf sneezing his nose, where people were talking about

13   the idea of there being a conflict, that suddenly what you had

14   was this, you know, this miraculous Madeline-eating type recall

15   of what had been -- of what had been said before.

16        And again, the cases are very clear, Your Honor, it is

17   the plaintiff's burden to establish the particular chain with

18   significant probative affirmative evidence.  And here the

19   chain -- it simply breaks off at the people who were at the

20   film festival.  There is no showing of any connection, there's

21   no showing of them contributing any ideas.

22        And the type of chain of events that you're talking about

23   here where maybe somebody went back and maybe somebody

24   described it to John Lasseter and then maybe two and a half

25   years later, I would submit that within the realm of the cases

1    that we've been looking at, the cases that are cited in the

2    brief, there's not a single case that would say that that's

3    evidence that is -- that is significant, affirmative, and

4    probative, and is sufficient to get to a jury.

5         THE COURT:  Okay.  I don't think I have any other

6    questions.

7         Assuming --

8         Thank you very much.

9         Assuming this goes to trial -- and I will go back and

10   think more carefully about the stuff that we've discussed

11   today.  But assuming it goes to trial, is there anything that I

12   can do for you all at this point on the case management front

13   or are you okay right now?

14        MR. KLAUS:  Well, I think the one thing on the case

15   management front, Your Honor, is -- and I don't know how long

16   Your Honor is thinking about cases to get a decision out.  We

17   are sort of on -- the written discovery request on damages have

18   been served.  If we're going to have to go down that path of

19   going through damage discovery and retaining experts and the

20   like, that's going to add even more expense to something that's

21   already been an expensive case.

22        If -- so one question would be, would Your Honor be

23   inclined to stay proceedings pending the disposition of your --

24   your decision --

25        THE COURT:  No.  But would it be helpful if I promised to

1    get you a decision by no later than next week?

2        **MR. KLAUS:**  I think that would help us.

3        **THE COURT:**  Okay.  I promise to get you a decision no

4    later than next week.  Possibly tomorrow.  But more likely I'm

5    going to want to spend some time over the weekend and early

6    next week thinking about what you've said and re-reading the

7    cases that you've cited.

8        **MR. KLAUS:**  Okay.

9        **THE COURT:**  Okay.  Very good.  Thanks.

10       **MR. BAER:**  Your Honor, do you wish to hear from me at all

11   on the plaintiff's side, or are you satisfied?

12       (No audible response.)

13       **MR. BAER:**  Thank you, Your Honor.

14       (Whereupon, the proceedings were adjourned at 12:45 P.M.)

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF CONTRACT TRANSCRIBER

I, Kelly Polvi, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated this 20th day of April, 2015.

_____
Kelly Polvi, CSR #6389, RMR, FCRR
Contract Transcriber